Adam S. Sieff (Cal. Bar. # 302030)
**DAVIS WRIGHT TREMAINE LLP**
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: 213.633.8618
Email: adamsieff@dwt.com

Paul D. Clement (*PHV motion forthcoming*)
Erin. E. Murphy (*PHV motion forthcoming*)
James Y. Xi (*PHV motion forthcoming*)
Joseph J. DeMott (*PHV motion forthcoming*)
**CLEMENT & MURPHY PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: 202.742.8900
Email: paul.clement@clementmurphy.com
 erin.murphy@clementmurphy.com
 james.xi@clementmurphy.com
 joseph.demott@clementmurphy.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE,<br><br>                    Plaintiff,<br><br>        v.<br><br>ROB BONTA, Attorney General of California,<br><br>                    Defendant. | Case No.: 5:25-cv-3178<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1.      NetChoice brings this lawsuit on behalf of its members to challenge California Senate Bill 1144 of 2024 ("SB 1144"),[1] which has an effective date of July 1, 2025.  If allowed to take effect, SB 1144 will impose unprecedented and unconstitutional burdens on widely used online services that serve as the modern-day analog of the classifieds section in print newspapers, enabling millions of prospective buyers and sellers to communicate about potential in-person, offline sales.

2.      Existing California law already requires "online marketplaces" to (1) retain information about third-party sales *for which payment is processed by the marketplace*; (2) use that information to identify "high-volume" sellers; and (3) require those sellers to make various disclosures.  *See* Cal. Civil Code §§ 1749.8-1749.8.5 ("Title 1.4D").  These requirements mirror those of the federal INFORM Act, 15 U.S.C. §45f, and they apply *only* when an online marketplace processes payment for an on-platform sale, which incidentally generates the information necessary to comply.  They do not apply when the marketplace merely connects buyers and sellers who then meet up in person to consummate the transaction and exchange cash on their own terms.  That makes sense.  While online services like Craigslist, Facebook Marketplace, Nextdoor, and OfferUp can keep track of sales when they process electronic payments, they have no realistic way to track which items end up being sold (much less where they are sold, to whom, or for how much) when the buyer and seller complete the sale off platform— for example, when the buyer and seller meet up in person to exchange cash.

3.      But on July 1, 2025, SB 1144 will radically expand online marketplaces' obligations by forcing them to keep track of *not only* third-party sales of consumer products for which payment is processed through the online marketplace, but also additional sales "entered into … *utilizing* [an] online marketplace."  SB 1144 §3(b) (emphasis added).  Unless this Court intervenes, that change will transform Title 1.4D from a workable burden applicable to a limited set of e-commerce marketplaces into a virtually impossible mandate that all manner of online services—including classifieds platforms

---

[1] A copy of SB 1144 is attached for the Court's convenience as **Exhibit A**.  The operative provisions are §§3, 5, and 6.  For the sake of simplicity and brevity, this complaint uses "SB 1144" as a shorthand for these three sections.  (As for SB 1144's other provisions: Section 1 contains a statement of legislative intent, while §2 and §4 merely recodify the preexisting versions of Cal. Civil Code §1749.8 and §1749.8.4, adding a sunset date of July 1, 2025, and a repeal date of January 1, 2026.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

that merely facilitate third-party speech—investigate and retain information they would not otherwise collect on transactions that occur entirely off-platform, merely because the platform plays a role in facilitating third-party speech.

4.      In addition, SB 1144 expressly orders online marketplaces to maintain "policies, systems, and staff to monitor" millions of third-party classified ads "in order to affirmatively prevent and detect organized retail crime." SB 1144, §6(b)(1)(D). And the law imposes steep penalties for insufficient "monitor[ing]" of online classifieds: If an online marketplace "knows *or should know* that a third-party seller is selling or attempting to sell stolen goods to a California resident" but fails to "alert" law enforcement, the marketplace "shall be liable for a civil penalty" of up to $10,000, plus attorney's fees, costs, and other litigation expenses. *Id.* §§5, 6(a) (emphasis added).

5.      SB 1144 is invalid for multiple reasons. First, it is preempted by the federal INFORM Act, which forbids any "State" from "establish[ing] or continu[ing] in effect any law, regulation, rule, requirement, or standard that conflicts with [its] requirements." 15 U.S.C. §45f(g). As a federal court recently held with respect to a materially identical provision in Georgia law, SB 1144 §3(b) defies the INFORM Act's command that online marketplaces "shall *only be required* to count" on-platform transactions by requiring them to count off-platform transactions as well. *NetChoice, LLC v. Carr*, 2024 WL 3262633, at *3 (N.D. Ga. June 30, 2024) (quoting 15 U.S.C. §45f(f)(3)(B)), *appeal pending*, No. 24-12273 (11th Cir.). In so doing, SB 1144 §3(b) expands online marketplaces' obligations well beyond what Congress permitted—vitiating Congress' express intent to create a single, nationwide rule for online marketplaces. The conflict is so direct that even if one were to ignore the INFORM Act's express-preemption clause, SB 1144 §3(b) would be invalid under implied-preemption principles. *Id.* at *4-5.

6.      Second, SB 1144 runs afoul of §230 of the Communications Decency Act ("CDA"), which preempts state laws that impose "a duty [that] would necessarily require an internet company to monitor third-party content." *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177 n.3 (9th Cir. 2024). As explained, SB 1144 expressly requires online marketplaces "to monitor [third-party] listings," under threat of severe civil penalties. SB 1144, §6(b)(1)(D). Similarly, SB 1144's requirements to "establish and maintain a policy prohibiting the sale of stolen goods on the online marketplace"; punish violations with "consequences," including "suspension or termination of the

1    seller's account"; and alert law enforcement whenever an online marketplace "knows *or should know*

2    that a third-party seller is selling or attempting to sell stolen goods to a California resident," *id.* §6(a),

3    (b)(1)(A) (emphasis added), necessarily require monitoring and removal of third-party content. SB 1144

4    §6 is thus inconsistent with—and preempted by—§230. *See, e.g.*, *Fair Hous. Council of San Fernando*

5    *Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("[A]ny activity that

6    can be boiled down to deciding whether to exclude material that third parties seek to post online is

7    perforce immune under section 230.").

8        7.    Finally, SB 1144 violates the First Amendment. Its onerous regulations significantly

9    burden both non-commercial and commercial speech: The law imposes sizable costs and potential

10   liability on classifieds platforms, as the price of carrying third-party sellers' speech; it compels speech

11   by online marketplaces and third-party sellers alike; and it will inevitably suppress a significant number

12   of constitutionally protected online classifieds. SB 1144 thus triggers at least intermediate scrutiny,

13   which it plainly flunks. Forcing online marketplaces to investigate off-platform activity, obtain and

14   maintain sensitive information that they would not ordinarily collect, and ensure that third-party sellers

15   comply with disclosure obligations that the state does not directly impose or enforce on the sellers (who

16   actually have the requisite data), as SB 1144 §3(b) requires, is not remotely tailored to the state's asserted

17   interest in "stop[ping] theft from retail stores and community theft," *id.* §1. Indeed, commandeering

18   online platforms to gather private information beyond what they obtain as an incidental byproduct of

19   processing transactions not only furthers no legitimate government interest but raises Fourth

20   Amendment concerns by forcing private entities to gather information the state could otherwise only

21   gather in conformity with the Fourth Amendment. Similarly, forcing classifieds platforms such as

22   Craigslist, Facebook Marketplace, Nextdoor, and OfferUp to monitor millions of third-party listings for

23   indicia of potential sales of stolen goods, as SB 1144 §6 demands, "burden[s] substantially more speech

24   than is necessary to further the government's legitimate interests," *Comite de Jornaleros de Redondo*

25   *Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc).

26                                    **THE PARTIES**

27       8.    Plaintiff NetChoice is a nonprofit based in the District of Columbia. It is a trade

28   association for Internet companies. NetChoice's members include (among others) Amazon.com, eBay,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    CASE NO. 5:25-CV-3178

Etsy, Meta Platforms, Nextdoor, and OfferUp.[2]  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the free speech and free enterprise that SB 1144 undermines.

9.    NetChoice has associational standing to challenge SB 1144 because (1) some NetChoice members would have individual standing to sue in their own right; (2) challenging SB 1144 is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

10.    Several NetChoice members clearly have individual standing to sue in their own right. SB 1144 imposes obligations on "[o]nline marketplace[s]," defined as "consumer-directed, electronically accessed platform[s] that include[] features that allow for, facilitate, or enable a third-party seller to engage in the sale, purchase, payment, storage, shipment, or delivery of a consumer product in this state." SB 1144 §3(c).  SB 1144 thus directly regulates several NetChoice members that operate online marketplaces.  For example, Meta Platforms, LLC, operates an online service called Facebook Marketplace that gives its U.S. users the option of listing items for sale, arranging in-person meetings with prospective buyers, and completing the sale offline; Nextdoor Holdings, Inc., operates a neighborhood app (called Nextdoor) that allows users to market and sell products to other local users; and OfferUp, Inc., operates an online service (called OfferUp) that enables users to market items online and then sell them offline to buyers in their local community.

11.    NetChoice's mission is directly related to this lawsuit.  The association's purpose is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses to make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the free speech and free enterprise that SB 1144 undermines.  NetChoice brings this action on its members' behalf to vindicate their constitutional rights and to prevent the economic and other injuries that SB 1144 will cause them absent judicial relief.

---

[2] Meta Platforms owns and operates Facebook and Facebook Marketplace.  A full list of NetChoice's members is available at https://netchoice.org.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF            CASE NO. 5:25-CV-3178

12.     No individual participation of members is necessary in this purely legal challenge.

13.     Defendant Rob Bonta is the Attorney General of California.  Attorney General Bonta is responsible for enforcing SB 1144 (and the existing Title 1.4D regime that it expands).  *See* SB 1144, §4; Cal. Civil Code §1749.8.4; *see also* Cal. Const. art. V, §13.  Attorney General Bonta is a resident of California.  NetChoice sues Attorney General Bonta in his official capacity.

## JURISDICTION AND VENUE

14.     NetChoice's causes of action arise under 42 U.S.C. §§1983 and 1988 and the United States Constitution.  The Court therefore has jurisdiction under 28 U.S.C. §1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §2201(a).

15.     Venue is proper in the Northern District of California under 28 U.S.C. §1391(b)(1) and (2) because Attorney General Bonta performs his official duties in this District and is therefore considered to reside in this District as a matter of law, and because the injuries giving rise to this action are being inflicted on NetChoice and its members in this District.

16.     Assignment to the San Jose Division is proper under Local Civil Rule 3-2(c) and (e) because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

## BACKGROUND

**A.     The Rise of E-Commerce and Online Marketplaces.**

17.     Over the past quarter century, the United States has seen exponential growth in online shopping.  In 2000, the first full year for which the U.S. Census Bureau collected data, U.S. companies brought in about $25.8 billion in total retail e-commerce sales—reflecting less than 1% of the country's total retail sales for the year.[3]  By 2019, the United States' annual retail e-commerce sales had increased

---

[3] U.S. Dep't of Commerce News, *Retail E-Commerce Sales for the Fourth Quarter 2000 Were $8.7 Billion, Up 67.1 Percent From Fourth Quarter 1999, Census Bureau Reports* (Feb. 16, 2001), https://archive.ph/wip/dza49.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

more than twenty-three-fold, reaching an estimated $601.7 billion—approximately 11% of total retail sales for the year.[4]

18.    E-commerce takes a variety of forms.  Some retailers that sell their own products at brick-and-mortar stores also sell those same products through a company website.  Some large e-commerce marketplaces such as eBay and Etsy sell little, if any, of their own merchandise and instead serve as a forum for third-party sellers to reach a vast audience of potential consumers.  On other e-commerce marketplaces, such as Amazon.com and Wal-Mart Marketplace, the company that operates the marketplace sells its own products alongside those of third-party sellers.  And e-commerce is not limited to sites specifically designated as "marketplaces"; it also occurs through a host of "social media" services—e.g., Facebook, LinkedIn, and X (formerly known as Twitter)—that "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

19.    Some e-commerce marketplaces, including Amazon.com, eBay, Etsy, and Wal-Mart Marketplace, allow consumers to purchase items from third-party sellers practically anywhere in the United States.  These websites typically require the buyer to provide a shipping address and complete the sale online; the platform processes the payment and charges the seller a fee, which is often calculated as a percentage of the total sales price.[5]  Indeed, some such platforms expressly prohibit third-party sellers from encouraging prospective buyers to purchase items they see on the platform through a

---

[4] U.S. Census Bureau News, *Quarterly Retail E-Commerce Sales, 4th Quarter 2019* (Feb. 19, 2020), https://archive.ph/wip/60tWD.

[5] *See* Amazon, *Standard Selling Fees*, https://tinyurl.com/vupwtnaa (last visited April 6, 2025) ("Referral fees vary by product category.  For every item sold, you'll pay a percentage of the total price or a minimum amount, whichever is greater."); eBay, *Selling Fees*, https://tinyurl.com/5d7d2jvt (last visited April 6, 2025) ("We charge two main types of selling fees: an insertion fee when you create a listing, and a final value fee when your item sells."); Etsy Help Center, *Etsy Fee Basics*, https://help.etsy.com/hc/en-us/articles/360035902374-Etsy-Fee-Basics?segment=selling (last visited April 6, 2025) ("Etsy charges 6.5% of the total order amount in your designated listing currency."); Walmart Marketplace, *The Beginner's Guide to Selling on Walmart Marketplace* (Dec. 13, 2022), https://archive.ph/HWQcT ("We deduct a reasonable referral fee from each completed purchase.  Our commission rates vary by category and total sales price but range from 6% to 15%.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

different venue, or connecting with a prospective buyer on the platform but then completing the transaction offline.[6]

20.     Other online services operate in the space that was once dominated by classified advertisements in print newspapers:  They connect individuals who are looking to exchange goods or services in person.  One example is the website Craigslist, which disseminates tens of millions of classified advertisements (organized by category and location) each month from users around the world. Craigslist charges its users a small fee for listing jobs, property rentals, and some kinds of items, but it does not collect any other fees from buyers or sellers if and when a sale is consummated.[7]  Craigslist does not process payments between consumers and third-party sellers, either.  Instead, the buyer and seller typically meet in person and exchange cash or some other mutually agreeable form of payment.[8]

21.     OfferUp is another classifieds platform; it empowers users to buy and sell locally, enabling users to market items online and then sell them offline to buyers in their local community.[9] OfferUp's goal is to be the platform of choice for local commerce by connecting its users through an interface that makes selling an item as easy as snapping a picture from a mobile device.  While OfferUp does give third-party sellers the option of selling certain types of items nationwide—in which case the buyer provides shipping information and OfferUp facilitates an electronic payment through a third-party payment processor called Stripe—it estimates that this option is used for only about 2% of the items sold through its platform.

22.     Facebook Marketplace provides yet another example.  Like OfferUp, Facebook Marketplace gives its U.S. users the option of listing items for sale, arranging in-person meetings with prospective buyers, and completing the sale offline (without using any of Facebook's payment

---

[6] *See, e.g.*, Etsy, *Fees & Payments Policy* §2, https://www.etsy.com/legal/fees/ (last visited April 6, 2025) ("[A]ny action to move a transaction off the Etsy platform is strictly prohibited by Etsy.").

[7] *See* Craigslist, *Paid Posting Fees*, https://tinyurl.com/mpb64maa (last visited April 6, 2025), ("Publishing your posting is a one time charge. [C]raigslist does not have any subscription fees, or additional charges.") (emphasis omitted).

[8] Craigslist, *Avoiding Scams*, https://tinyurl.com/nhb67xz4 (last visited April 6, 2025).

[9] OfferUp, *About OfferUp*, https://tinyurl.com/3arwv99m (last visited April 6, 2025); *see* OfferUp Help Center, *Getting Paid*, https://tinyurl.com/n243c79b (last visited April 6, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

1  processing services).[10]  For a small percentage of items, Facebook Marketplace also gives users the

2  option to buy, sell, and ship items using its "checkout" feature, which processes secure payments

3  between a buyer and third-party seller via credit card, debit card, or PayPal.[11]

4        23.    Individuals may also post content about items for sale on Facebook (as distinguished

5  from Facebook Marketplace).  On Facebook, individuals who sign up for an account can establish

6  mutual connections and share content with family and friends.  Facebook users can post status updates,

7  photos, videos, and links; follow Pages managed by businesses, organizations, and public figures (such

8  as politicians or celebrities); join Groups or attend Events that relate to topics of interest; post ads; and

9  privately message one another via Meta's Messenger app.  While these features are not specifically

10  designed for promoting, buying, and selling products, they are often used for such purposes.

11        24.    Like Facebook, the neighborhood app Nextdoor offers a variety of social networking

12  services, including specific tools for listing classified advertisements.  On Nextdoor, users are placed in

13  a neighborhood based on their address and automatically receive updates from nearby neighbors,

14  businesses, and public services.[12]  Among other things, Nextdoor allows a merchant (1) to create a

15  "business page" through which it can market its products to local Nextdoor users; (2) to post content on

16  users' "newsfeed[s]"; and (3) to run paid advertisements.[13]  Countless sales are made using these tools.

17  In addition, Nextdoor allows users to post classified advertisements for personal items and homemade

18  goods through its "For Sale and Free" section.[14]

19

20

21

---

22  [10]  *See* Facebook Help Center, *How Marketplace Works*, https://www.facebook.com/help/1889067784738765/?helpref=hc_fnav (last visited April 6, 2025).

23  [11]  *See* Facebook Help Center, *Sell with Shipping on Marketplace*, https://www.facebook.com/help/773379109714742/?helpref=hc_fnav (last visited April 6, 2025);

24  Facebook Help Center, *Using Checkout on Facebook*, https://www.facebook.com/help/1411280809160810/?helpref=hc_fnav (last visited April 6, 2025).

25  [12]  *See* Nextdoor Help Center, *How to Join Nextdoor*, https://tinyurl.com/mr2hwyvy (last visited April 6, 2025).

26  [13]  *See* Nextdoor for Business, *Nextdoor for Local Businesses*, https://tinyurl.com/3rhkpkfy (last visited April 6, 2025).

27

28  [14]  *See* Nextdoor Help Center, *Sell or Giveaway an Item on Nextdoor*, https://tinyurl.com/4v3fsjx5 (last visited April 6, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                CASE NO. 5:25-CV-3178

**B.**     **Various States Enact Laws Regulating Online Marketplaces.**

25.     When the COVID-19 pandemic struck, online shopping became more prevalent than ever.  As Americans' online purchases of consumer goods soared to nearly $800 billion in 2020 and $870 billion in 2021, some elected officials raised concerns about the potential for third-party sellers to misuse online marketplaces.  In March 2021, for example, a group of U.S. Senators voiced concerns about potential "online sale of counterfeit goods by anonymous sellers" and "organized retail crime rings ... stealing items from stores to resell those items in bulk online."[15]  These Senators proposed federal legislation aimed at ensuring greater transparency among third-party sellers in online marketplaces.  But Congress did not enact that legislation.

26.     In the absence of federal legislation, several States took action—California among them.  On September 30, 2022, California enacted Title 1.4D, which requires online marketplaces (1) to collect contact information, a bank account number, and a tax identification number from any "high-volume third-party seller" and (2) verify that information and periodically prompt the high-volume seller to keep it up to date.  *See* 2022 Cal. Legis. Serv. Ch. 857 (S.B. 301) (codified at Cal. Civil Code §1749.8 through §1749.8.5).  For most individuals, this tax identification number is their Social Security Number.  In addition, Title 1.4D provides that "[a]n online marketplace shall require a high-volume third-party seller with at least twenty thousand dollars ($20,000) of gross annual revenues from transactions with buyers in California through the online marketplace in either of the two prior calendar years to provide" its full name, its physical address, contact information that will "allow users of the online marketplace to have direct and unhindered communication with the seller," and "[w]hether or not another party is responsible for supplying the product to the consumer upon purchase."  Cal. Civil Code §1749.8.2(a).  If a high-volume third-party seller fails to comply with these requirements, the online marketplace must "shall suspend [the seller's] future sales activity" until the seller comes into compliance.  *Id.* §1749.8.2(c).

27.     The linchpin of Title 1.4D is its definition of "high-volume third-party seller," which determines the extent of the regulatory burden on online marketplaces and their users.  The statute

---

[15] *See, e.g.*, U.S. Senate Comm. on the Judiciary, *Durbin, Cassidy, Grassley, Hirono, Coons, Tillis Introduce Bill to Ensure Greater Transparency for Third-Party Sellers of Consumer Products Online* (March 23, 2021), https://archive.ph/KfATl.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

defines "high-volume third-party seller" as a "person or entity, independent of an online marketplace," "who, in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete transactions through an online marketplace for the sale of new or unused consumer products to buyers located in California," generating "$5,000 or more in gross revenues." *Id.* §1749.8(b)(1), (d).

28.    Importantly, in its original (and, until July 1, present) form, Title 1.4D specifies that, when determining whether a third-party seller has met the "high-volume" thresholds, the online marketplace need "only" count "those transactions … for which payment is processed by the online marketplace or through a third party." *Id.* §1749.8(b)(1)(2). This limitation is critical to ensuring that the law's burdens are feasible, reasonable, and constitutional. After all, it is relatively easy for a company that handles payment processing (like Amazon or eBay) to identify high-volume sellers, as the company can readily track each user's total sales and gross revenue based on existing records of *online* transactions. But it would be extraordinarily burdensome—indeed, virtually impossible—for companies like Craigslist, Meta Platforms, Nextdoor, and OfferUp to gather accurate information about which third-party listings lead to *offline* transactions between two private parties, where payment is often made in cash. It is one thing to regulate private companies by reference to information they already collect in the ordinary course of processing payment. It is quite another to require private companies to discover and maintain information about third parties that the companies would not otherwise possess.

29.    The California Attorney General is tasked with enforcing the Inform Consumers Act. *See id.* §1749.8.4. In its current form, the statute authorizes the Attorney General to bring "a civil action" to enforce compliance, enjoin further violations, and obtain a civil penalty of up to $10,000 per violation. *Id.* §1749.8.4(a). In addition, the statute authorizes the Attorney General to recover "[r]easonable attorney's fees and costs, including expert witness fees and other litigation expenses." *Id.* 1749.8.4(b).

30.    Between April 2021 and September 2022, 12 other states enacted similar statutes obligating online marketplaces to collect and verify information from high-volume third-party sellers, and to require such sellers to disclose certain information to consumers.[16] Nearly all of them contain

---

[16] *See* 2021 Ark. Laws Act 555 (S.B. 470) (Apr. 5, 2021) (codified at Ark. Code §4-119-101 *et seq.*); 2022 Colo. Legis. Serv. Ch. 21 (H.B. 22-1099) (Mar. 17, 2022) (codified at Colo. Rev. Stat. §6-1-1401 *et seq.*); 2022 Ohio Laws 89 (Sub. H.B. 272) (Apr. 6, 2022) (codified at Ohio Rev. Code §1349.65 *et seq.*); 2022 Ala. Laws Act 2022-441 (H.B. 318) (Apr. 14, 2022) (codified at Ala. Code §8-

the same, sensible limitation on regulatory scope found in the original version of the California law. That is, in determining which sellers meet the "high volume" thresholds, online marketplaces need only consider sales for which payment was processed by the online marketplace itself, whether directly or through an affiliated payment processor; they need not attempt to investigate off-platform sales. *See, e.g.*, Ohio Rev. Code §1349.65(B); N.C. Gen. Stat. §66-491(2)(d).

31.   While all 13 of the state "Inform Consumers" statutes use the same "high-volume" thresholds—200 discrete sales, totaling $5,000, over 12 consecutive months during the previous 24-month period—there are a host of differences among those laws.  For example:

a.   Arkansas requires an online marketplace to ensure that every seller that reaches 200 sales and $5,000 in gross revenue makes certain disclosures not only to online marketplaces but also to consumers.  *See* Ark. Code §4-119-103(c).  In contrast, Georgia requires consumer-facing disclosures only for "high-volume third-party seller[s] with an aggregate total of $20,000.00 or more in annual gross revenues" on the relevant marketplace.  O.C.G.A. §10-1-942(a).  As noted above, California uses yet another standard:  It requires consumer-facing disclosures when the company had at least $20,000 in gross annual revenues "from transactions with buyers in California through the online marketplace in either of the two prior calendar years."  Cal. Civ. Code §1749.8.2(a).

b.   Arkansas requires an online marketplace to ensure that a covered third-party seller discloses to consumers its "full name," "full physical address," whether it "also engages in the manufacturing, importing, or reselling of consumer products," "a working telephone number," a "working email address," and "[a]ny other information determined to be necessary to address circumvention or evasion of the" statute.  Ark. Code §4-119-

---

41-1 *et seq.*); 2022 Ga. Laws Act 820 (S.B. 332) (May 4, 2022) (codified at O.C.G.A. §§10-1-940 through -945); 2022 Ill. Legis. Serv. P.A. 102-757 (H.B. 1091) (May 13, 2022) (codified at 815 Ill. Comp. Stat. 356/1-5 *et seq.*); 2022 Okla. Sess. Law Serv. Ch. 378 (S.B. 418) (May 26, 2022) (codified at 15 Okla. Stat. §799A.2 *et seq.*); 2022 La. Sess. Law Serv. Act 316 (S.B. 442) (June 10, 2022) (codified at La. Stat. §51:3261 *et seq.*); 2022 Iowa Legis. Serv. Ch. 1114 (H.F. 2401) (June 13, 2022) (codified at Iowa Code §554F.1); 2022 N.C. Session Law 2022-30 (S.B. 766) (June 30, 2022) (codified at N.C. Gen. Stat. §66-490 *et seq.*); 2022 Pa. Legis. Serv. Act 2022-64 (H.B. 1594) (July 11, 2022) (codified at 73 Pa. Stat. §201-9.4 *et seq.*); 2022 Mich. Legis. Serv. P.A. 153 (H.B. 5487) (July 19, 2022) (codified at Mich. Comp. Laws §445.903n *et seq.*).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

103(c).  In contrast, several other states (e.g., California, Colorado, and Michigan) require disclosure of just one type of contact information that will allow for "direct," "unhindered communication" between consumers and the seller (e.g., phone, email *or* electronic messaging), as well as disclosure of whether another party is responsible for supplying the product to the consumer upon purchase.  Cal. Civil Code §1749.8.2(a); *accord* Colo. Rev. Stat. §6-1-1402(4)(IV); Mich. Comp. Laws §445.903*o*(9)(b).

c.  Arkansas, Colorado, and Pennsylvania have adopted "Inform Consumers" laws that purport to regulate "third-party sellers" and "online marketplace[s]" that operate anywhere in the United States.  Ark. Code §4-119-102(3), (5)(A); Colo. Rev. Stat. §6-1-1401(3)(a), (5)(a); 73 Pa. Stat. §201-9.4(q).  The other 10 states' "Inform Consumers" laws are limited to in-state activity, though the exact contours of those limitations are far from clear, given the interstate nature of e-commerce.  *See, e.g.*, O.C.G.A. §10-1-940(a)(3), (5).

d.  The 13 states that have enacted "Inform Consumers" laws also impose a range of different penalties on online marketplaces that fail to comply with them.  *Compare, e.g.*, Iowa Code §554F.8 (state attorney general may "[a]ssess civil penalties in an amount not more than one hundred thousand dollars"), *with* Cal. Civ. Code §1749.8.4 (state attorney general may recover "civil penalty not to exceed ten thousand dollars ... for each violation," plus "[r]easonable attorney's fees" and other "litigation costs"), *and* Ark. Code Ann. §§4-119-104, 4-88-103 (state authorities may prosecute knowing and willful violations as a Class A misdemeanor).

e.  In sum, by October 2022, an uneven patchwork of state-level regulation had emerged, requiring online marketplaces to collect and verify a variety of personal information from their users, securely retain that sensitive information, impose disclosure requirements on certain users, disseminate those mandatory disclosures, and suspend users who failed to comply.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF            CASE NO. 5:25-CV-3178

1

**C.    The Federal Government Enacts the INFORM Act.**

2      32.    In December 2022, Congress stepped in, enacting the Integrity, Notification, and Fairness

3   in Online Retail Marketplaces for Consumers Act—a.k.a., the INFORM Act.  *See* Pub. L. No. 117-328,

4   §301, 136 Stat 4459, 5555-62 (Dec. 29, 2022) (codified at 15 U.S.C. §45f).  The law took effect on June

5   27, 2023.  *See id.* §301(h), 136 Stat. at 5562.

6      33.    The INFORM Act replaced the emerging patchwork of state-by-state regulation with a

7   single, nationwide framework for regulating online marketplaces that connect prospective buyers and

8   third-party sellers.

9      34.    The INFORM Act defines "high-volume, third party seller" as a person who "sells, offers

10  to sell, or contracts to sell a consumer product through an online marketplace's platform" and "in any

11  continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales

12  or transactions of new or unused consumer products and an aggregate total of $5,000 or more in gross

13  revenues."  15 U.S.C. §45f(f)(3)(A), (5).

14     35.    Following the lead of state laws, the Act sensibly limits its scope to transactions

15  processed by the relevant online marketplace, as opposed to off-platform transactions conducted directly

16  by private parties:  "For purposes of calculating the number of discrete sales or transactions or the

17  aggregate gross revenues ... an online marketplace shall *only* be required to count sales or transactions

18  *made through the online marketplace* and *for which payment was processed by the online marketplace*,

19  either directly or through its payment processor."  *Id.* §45f(f)(3)(B) (emphasis added).

20     36.    Online marketplaces must collect and verify the identity, contact information, bank

21  account number, and tax identification number of "high-volume third party seller[s]," *id.* §45f(a).  And

22  online marketplaces must require "any high-volume third party seller with an aggregate total of $20,000

23  or more in annual gross revenues on [an] online marketplace" to provide additional, consumer-facing

24  disclosures.  *Id.* §45f(b).  If a seller fails to comply with any applicable requirement, the online

25  marketplace must "suspend any future sales activity of such seller until the seller complies."  *Id.*

26  §45f(b)(4); *accord id.* §§45f(a)(1)(C).

27     37.    To replace the existing state-by-state regulation of online marketplaces, the INFORM

28  Act includes a broad preemption clause:  "No State or political subdivision of a State, or territory of the

- 13 -

1  United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that

2  conflicts with the requirements of this section." *Id.* §45f(g).

3      38.    Preempting state regulation of online marketplaces makes eminent sense, as such

4  marketplaces invariably operate across state lines. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d

5  96, 104 (2d Cir. 2003) (predicting that "the internet will soon be seen as falling within the class of

6  subjects that are protected from State regulation because they imperatively demand a single uniform

7  rule") (alterations omitted); *Am. Civ. Liberties Union v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999)

8  (similar).  Indeed, the need for a single, uniform, federal rule was a major motivation for congressional

9  action.

10      39.    The INFORM Act's express-preemption clause, in particular, played a vital role in

11  marshaling political support for its enactment.  NetChoice initially raised concerns about the law when

12  it was introduced in Congress, but ultimately concluded in light of the express-preemption provision

13  that the legislation reflected a sensible "compromise" that would "avoid a complex patchwork of state

14  laws related to seller vetting."[17]  Amazon and eBay likewise publicly stated that they supported the

15  INFORM Act because they recognized that it would "establish[] a federal standard, preventing an

16  unworkable patchwork of state-level regulations."[18]

17      40.    Congress' enactment of the INFORM Act came as no surprise to the states.  Indeed,

18  Oklahoma's law expressly anticipated the possibility that it would be overtaken by federal legislation.

19  *See* 15 Okla. Stat. §799A.7(C) ("If no federal law that requires online marketplaces to verify and disclose

20  information as described in this act goes into effect prior to January 1, 2023, the Attorney General may

21  promulgate rules necessary to implement and enforce this act.").  To the best of NetChoice's knowledge,

22  no state has enacted a new "Inform Consumers" analog since the INFORM Act was signed into law; nor

23

24  ───────────────

   [17] Amy Bos, *Georgia Legislature's Move to Redesign INFORM Hurts Small Businesses &
25  Increases Red Tape*, NetChoice (April 3, 2024), https://archive.ph/4mTaS; *cf.* Carl Szabo, *NetChoice
   Raises Concerns with the Introduction of the INFORM Consumers Act*, NetChoice (March 23, 2021),
26  https://archive.ph/v5xBC.

27      [18] Brian Huseman, *Amazon supports the U.S. House version of the INFORM Act*, Amazon (Oct.
   27, 2021), https://archive.ph/dKQg7; *see* eBay Main Street, *2021 INFORM Act Legislative Recap* (Dec.
28  16, 2021), https://archive.ph/hVujT (vowing to advocate for the INFORM Act because it would preempt
   similar state laws and "create a common sense federal framework and avoid a patchwork of state laws").

1    has any state attempted to enforce an existing state-level "Inform Consumers" statute.  Most states thus

2    appear to understand that the federal INFORM Act broadly preempts state-law analogs.

3        **D.        NetChoice Obtains Preliminary Relief From Georgia's Expanded "Inform Act"**

4        41.    Georgia did not get the message.  As originally enacted, the Georgia Inform Consumers

5    Act was, like the federal INFORM Act, limited to transactions "for which payment was processed by

6    the online marketplace"—in other words, information that companies generate in the ordinary course

7    and transactions about which an online marketplace can reasonably be expected to maintain records.

8    *See* 2022 Ga. Laws Act 820, §2; 15 U.S.C. §45f(f)(3)(B).  Last year, however, Georgia amended its

9    statute to remove that crucial guardrail, expanding the statute's scope to encompass all sales "*made by*

10   *utilizing* [an] online marketplace."  2024 Ga. Laws Act 564, §2 (S.B. 472) (May 6, 2024) (emphasis

11   added).  Under the guise of that ostensibly minor definitional change, Georgia sought to force classifieds

12   platforms such as Craigslist, Facebook Marketplace, Nextdoor, and OfferUp to investigate, maintain

13   information about, and impose and police disclosure obligations on third-party sellers based on sales

14   that occur entirely offline—in-person, cash transactions that these classifieds platforms have no realistic

15   way to monitor.

16       42.    NetChoice promptly challenged Georgia Act 564 on behalf of its members, and, on June

17   30, 2024, a federal district court preliminarily enjoined its enforcement.  *See Carr*, 2024 WL 3262633.

18   The court held that the federal INFORM Act expressly preempts Georgia's attempted expansion of

19   "Inform Act" liability.  The court explained that while federal law provides that "an online marketplace

20   *shall only* be required to count sales or transactions made through the online marketplace," the amended

21   Georgia law "conflicts with th[at] requirement[]" by ordering online marketplaces to also count

22   additional, off-platform transactions.  *Id.* at *3 (quoting 15 U.S.C. §45f(f)(3)(B), (g)).  The court further

23   held that the federal INFORM ACT preempts the Georgia law under implied-preemption principles too,

24   as it undermines the "calibrated middle path" of the INFORM Act—a single, nationwide standard that

25   balances the potential benefits of requiring disclosures from "high-volume" sellers against the burdens

26   of requiring online marketplaces to attempt to track transactions for which they do not process payment.

27   *See id.* at *4-5.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    CASE NO. 5:25-CV-3178

**E.    California Even More Radically Expands Its "Inform Act" Analog**

43.    Less than two months later, California enacted a materially identical amendment to its analogous statute (Title 1.4D).  Just like Georgia Act 564, California SB 1144 amends the statutory definition of "high-volume third-party seller" to cover *not* "only those transactions … for which payment is processed by the online marketplace," Cal. Civil Code §1749.8(b)(2), but also countless transactions where the buyer and seller "utiliz[e] the online marketplace" but ultimately meet in person to exchange cash or some other mutually agreeable form of payment.  SB 1144, §3(b).

44.    If SB 1144 takes effect, it would require platforms that disseminate third-party classifieds to begin collecting and retaining copious amounts of information to determine which of those users may be approaching the "high-volume" thresholds for sales and total revenue under the new, expanded statutory definition.  To even attempt to comply, such platforms would need to ask every individual who lists an item whether the listing led to a sale, where the sale occurred, and what the buyer paid.  But the platform would have no realistic way of requiring sellers to answer those questions.  Nor would it have any realistic way of knowing whether the seller is telling the truth.

45.    Further complicating matters, online services that primarily connect individuals seeking offline, in-person transactions but also process a small number of sales online (such as Facebook Marketplace and OfferUp, *see supra* ¶¶21-22) will need to create a system that tracks each third-party seller's combination of online and offline sales, as the combined number of sales and the total revenue from all those sales will determine which sellers meet the "high-volume" thresholds, and hence are covered by the Title 1.4D's expanded recordkeeping, disclosure, and disclosure-policing obligations.

46.    Moreover, SB 1144's disclosure requirements are so broadly worded that they appear to encompass not only individuals who post a "for sale" listing on services like Craigslist, Facebook Marketplace, Nextdoor, or OfferUp, but also companies that run advertisements on those platforms.  After all, such advertisers "utiliz[e] an online marketplace" to "sell" or "offer[] to sell... consumer product[s]," and are typically "independent of [the] online marketplace."  SB 1144 §3(d).  The law thus appears to require online services to collect and maintain information about how many "discrete transactions" each advertiser makes "utilizing the online marketplace," SB 1144 §3(b)—in other words, how many sales are traceable to their advertisements.  But online services ordinarily lack access to that

information.  In some cases, a seller may collect data about how many sales stem from a buyer "clicking" a particular online ad, but in many cases only the buyer knows whether a given purchase was traceable to a particular advertisement.

47.    Even worse, SB 1144 could well be construed not only to dramatically extend the Inform Consumers Act's coverage of Facebook Marketplace, but to extend the law's coverage to Facebook itself and to other social-networking services.  In addition to expanding Title 1.4D's information-collection requirements, SB 1144 broadens the definition of "online marketplace" by removing the requirement to "ha[ve] a contractual relationship with consumers governing their use of the platform to purchase consumer products."  *Compare* SB 1144 §2(c) (current definition), *with* SB 1144 §3(c) (new definition).  Many social-networking services may arguably meet the new definition.

48.    NetChoice members have no problem with a broad definition of "online marketplace" in Title 1.4D, so long as it covers only sales "for which payment is processed by the online marketplace." Cal. Civil Code §1749.8(b)(2).  Because SB 1144 eliminates that limitation, however, Meta Platforms, Nextdoor, and other online services now face the specter of being forced to track all activity on their sites that might lead to a sale, investigate whether such sales actually occur, and collect enough information about those sales to determine who is a "high-volume seller."  In other words, SB 1144 appears to require these online services to collect and maintain sensitive information about any Californian who "utiliz[es]" their general social networking tools (as distinct from Facebook Marketplace and Nextdoor's "For Sale and Free" feature) to promote items for sale—e.g., an artist, carpenter, florist, or other small business that uses these tools, or even a mom who uses the platform to notify friends that her daughter is selling Girl Scout Cookies outside the local grocery store.  This would be extraordinarily burdensome, if not impossible—and predictably discourages the dissemination of this particular type of speech.  Worse still, SB 1144 would put Facebook and Nextdoor in the position of policing the off-platform activities of their users, mandating disclosures by those third parties, and then carrying some of those disclosures as part of its own communications with users.

49.    SB 1144's additional requirements are similarly onerous; indeed, they effectively force online services to perform a number of investigatory functions as the price of facilitating third-party speech.  The law requires online marketplaces to create not only a "policy prohibiting the sale of stolen

- 17 -

goods," which may result in "suspension or termination of the seller's account," but also "written policies, systems, and staff to monitor listings in order to *affirmatively prevent and detect* organized retail crime." SB 1144 §6(b)(1)(D) (emphasis added). In addition, "[a]n online marketplace shall alert local, regional, or state law enforcement agencies in California if it knows or should know that a third-party seller is selling or attempting to sell stolen goods to a California." SB 1144 §6(a). Online marketplaces must also create a special "mechanism" (e.g., "a dedicated web page" or "online portal") to "ensure timely replies to law enforcement requests, including warrants, subpoenas, and other legal processes." SB 1144 §6(b)(1)(C).

50.    In sum, SB 1144 imposes a slew of new burdens on online marketplaces, involving everything from data collection and retention, policing third-party speech, and carrying mandatory disclosures themselves. And there are harsh penalties for companies whose efforts to track offline purchases and monitor millions of third-party listings are deemed insufficient—including a civil penalty of up to $10,000 *for each violation*; injunctive relief; and "reasonable attorney's fees and costs, including expert witness fees and other litigation expenses." SB 1144 §5(b). Notably, liability does not require any showing of consumer harm. For example, if the government establishes that an online marketplace "should [have] know[n]" that a third party was "attempting to sell stolen goods to a California[n]" and failed to "alert" the authorities, SB 1144 authorizes "the Attorney General, a district attorney in any county, a city attorney in any city or city and county, or a county counsel in any county" to obtain a large civil penalty, with attorneys' fees and litigation costs to boot. SB 1144 §§5(a), 6(a).

## CLAIMS FOR RELIEF

### COUNT ONE

### Supremacy Clause – INFORM Act Preemption

### (42 U.S.C. §1983)

51.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set forth herein.

52.    "Under the Supremacy Clause of the United States Constitution, state laws that 'interfere with, or are contrary to the laws of Congress' are preempted and are therefore invalid." *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 941 (9th Cir. 2002) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat)

1, 211 (1824)). "Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024). In this case, text, context, statutory structure, and common sense all point to the same conclusion: The federal INFORM Act preempts SB 1144.

53.     "When, as here, a federal statute includes an express preemption provision, 'the task of statutory construction must in the first instance focus on the plain wording of the clause.'" *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022) (quoting *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 654 (9th Cir. 2021)). Here, the INFORM Act's express-preemption clause provides: "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that *conflicts with* the requirements of this section." 15 U.S.C. §45f(g) (emphasis added).

54.     The INFORM Act does not supply any specialized definition of "conflict," so the term must be given "its 'ordinary, contemporary, common meaning.'" *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). In ordinary usage, the verb "conflict" connotes that two things "differ" or are "at variance"; that they are not "in agreement or accord"; or that they "clash." *See* Conflict, *Merriam-Webster Dictionary*; Conflict, *Am. Heritage Dictionary of the Eng. Language*, https://tinyurl.com/bdfh8mpc (last visited April 6, 2025); Conflict, *Oxford English Dictionary* (3d ed. 2010).

55.     As a federal court recently held with respect to a materially identical provision of Georgia law, SB 1144 "conflicts with" the federal INFORM Act under "[a]ny ordinary meaning of 'conflict.'" *Carr*, 2024 WL 3262633, at *3. As the court explained, one of the INFORM Act's key "requirements" is that, when determining who is a "high-volume third party seller," "an online marketplace shall *only be required* to count sales or transactions ... for which payment was processed by the online marketplace." *Id.* (quoting 15 U.S.C. §45f(f)(3)(B)). "[B]y using the word 'only,'" the federal INFORM Act "provides a ceiling on the recordkeeping requirements of online marketplaces." *Id.* (quoting 15 U.S.C. §45f(f)(3)(B)). SB 1144 "goes beyond that ceiling," as it requires online marketplaces to count

*not only* sales for which payment is processed through the online marketplace, but additional sales for which payment is exchanged through other means.  *Id.*  That is a clear conflict.  Indeed, there is "no scenario where [SB 1144]'s expansion upon the reach of the federal INFORM Act does not run afoul of its explicit limiting term: 'only.'"  *Id.*  Accordingly, the plain text of the INFORM Act expressly preempts SB 1144's "conflict[ing]" requirements.  15 U.S.C. §45f(g).

56.    The phrases surrounding "conflict[]" in §45f(g) reinforce that conclusion.  *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017) ("[A] word is given more precise content by the neighboring words with which it is associated."); *Nat'l R.R. Passenger Corp*, 41 F.4th at 1152 (express-preemption inquiry considers "the surrounding statutory framework").  The clause defines the political entities to which it applies in the broadest possible terms:  Its preemptive effect reaches every "State," "political subdivision of a State," and "territory of the United States."  15 U.S.C. §45f(g).  The clause also describes *what* is preempted in the broadest possible terms—"any law, regulation, rule, requirement, or standard."  *Id.* The clause's temporal reach is similarly expansive.  It forbids states not only from "establish[ing]" new measures but also from "continu[ing]" existing measures "in effect."  *Id.* The breadth of these neighboring phrases confirms that the INFORM Act's preemption clause has a wide scope that readily encompasses SB 1144.

57.    The INFORM Act's enforcement provisions likewise support reading its preemption clause to displace any inconsistent state requirement, as they expressly contemplate that the FTC and state attorneys general will work together to enforce a single federal standard.  *See* 15 U.S.C. §45f(c)(2)(A), (d)(1). Indeed, the Act takes pains to ensure that federal and state authorities will not initiate duplicative or overlapping actions.  When a state attorney general brings a suit to enforce the INFORM Act, he or she must notify the FTC, which is expressly authorized to intervene and "be heard on all matters arising therein."  *Id.* §45f(d)(2), (3).  Similarly, if the FTC initiates an enforcement action, a state may join that action but may not file a separate action.  *Id.* §45f(d)(4)-(5).  Those provisions presuppose that states cannot impose burdens on online marketplaces vis-à-vis off-platform transactions that the federal law leaves unregulated.

58.    The historical context confirms that the federal INFORM Act precludes states from adopting their own, divergent standards.  As explained, the federal law followed a wave of state laws

imposing similar—but not identical—requirements.  *See supra* ¶¶ 25-31.  That patchwork of state-level regulation prompted Congress to enact the INFORM Act and to include an express-preemption clause.  *See supra* ¶¶ 32-40.  And, to the best of NetChoice's knowledge, *no state* has sought to enforce its own, similar law since the enactment of the INFORM Act.  That is hardly surprising; as courts have emphasized time and again, when it comes to inherently interstate technology like the Internet, federal rules are generally preferable to state ones.  *See, e.g.*, *Am. Booksellers Found.*, 342 F.3d at 104; *Johnson*, 194 F.3d at 1162.  Indeed, given the impracticality of complying with 50 state laws and 50 different standards, allowing state-by-state legislation would likely make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Commerce Clause concerns.  *Am. Libr. Ass'n v. Pataki*, 969 F.Supp. 160, 183 (S.D.N.Y. 1997).

59.    In short, the tools of statutory interpretation overwhelmingly confirm that the federal INFORM Act "provides a ceiling" for online marketplaces' recordkeeping requirements with respect to high-volume third party sellers, expressly prohibiting states from extending those requirements beyond "transactions consummated through the marketplace or its payment processor."  *Carr*, 2024 WL 3262633, at *3, *5.  Because SB 1144 "goes beyond that ceiling," the federal INFORM Act preempts it.  *Id.* at *3.

60.    Indeed, the conflict is so stark that the INFORM Act would preempt SB 1144 even if the INFORM Act did not contain an express-preemption clause, because SB 1144 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* at *4 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)).  Congress enacted a nationwide standard reflecting a careful balance between the burdens of data collection and the potential benefits of disclosure requirements.  SB 1144 "punches a hole through the calibrated middle path that Congress intended."  *Id.* at *5.

61.    "At bottom, regardless of whether the Court gives 'conflict' its ordinary meaning or imports the narrower definition from implied conflict preemption doctrine, [SB 1144] cannot be reconciled with the text of the INFORM Act."  *Id.*  California may not defy Congress' command that "an online marketplace shall only be required to count" online transactions, 15 U.S.C. §45f(f)(3)(B), by demanding that online marketplaces count offline transactions as well.

**COUNT TWO**

**Supremacy Clause – CDA §230 Preemption**

**(42 U.S.C. §1983)**

62.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set forth herein.

63.    SB 1144 is also expressly preempted by §230 of the CDA, which Congress enacted "to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce," while "keep[ing] government interference in the medium to a minimum." *Batzel v. Smith,* 333 F.3d 1018, 1027 (9th Cir. 2003).

64.    Again, preemption is "a question of statutory construction" that begins with "the plain wording of the statute." *Am. Apparel,* 107 F.4th at 939.  Like the federal INFORM Act, §230 contains a broad express-preemption clause:  "[N]o liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. §230(e)(3).  As pertinent here, §230(c)(1) declares that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).

65.    The Ninth Circuit has construed these provisions to extend "robust immunity" to "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Estate of Bride*, 112 F.4th at 1176 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009)).

66.    The first requirement for §230 immunity is plainly met.  SB 1144 expressly regulates "provider[s] of … an interactive computer service," *id.*, which encompasses websites and other online services. *Fair Hous. Council*, 521 F.3d at 1162 n.6.  "Online marketplace[s]," such as Facebook Marketplace, Nextdoor, and OfferUp, unquestionably fit the bill.  SB 1144 §3(c).

67.    The third requirement is also unquestionably satisfied.  "[I]nformation provided by another information content provider" means "content created by third parties," *Fair Hous. Council*, 521 F.3d at 1162, and SB 1144 expressly imposes liability on online marketplaces based on the

"independent" speech of "third-party sellers."    SB 1144 §3(d); *see id.* §§5, 6; Cal. Civil Code §§1749.8.2, -.3.

68.    Accordingly, SB 1144 is "inconsistent with" §230(c)(1), and thus preempted, if it "seeks to treat" online marketplaces "as a publisher or speaker" with respect to third-party listings. *Barnes*, 570 F.3d at 1100-01.

69.    Because "the CDA does not define 'publisher,'" *id.*, the Ninth Circuit has given the term its plain and ordinary meaning.  "[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102.  The Ninth Circuit has accordingly held that §230(c)(1) "shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Id.* at 1105.  "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council*, 521 F.3d at 1170-71.  Section 230(c)(1) thus preempts any state law that creates a "duty [that] would necessarily require an internet company to monitor third-party content," *Estate of Bride*, 112 F.4th at 1177 n.3, or "impose[s] liability on the basis of … fail[ure] to remove" third-party content (which "is something publishers do"), *Barnes*, 570 F.3d at 1103.

70.    SB 1144 runs headlong into these binding precedents.  For one thing, it expressly requires online marketplaces "to monitor [third-party] listings," and specifically directs them to "[m]aintain … written policies, systems, and staff" to perform such monitoring.  SB 1144, §6(b)(1)(D).  And SB 1144 reinforces this monitoring requirement by imposing significant liability if an online marketplace "knows *or should know* that a third-party seller is selling or attempting to sell stolen goods to a California resident," but fails to "alert" law enforcement. *Id.* §6(a) (emphasis added).  SB 1144 also requires online marketplaces to remove third-party content, directing them to impose "consequences … including, but not limited to, suspension or termination of the seller's account," upon determining that a user has knowingly sold stolen goods on the platform. *Id.* §6(b)(1).  Each of those provisions impermissibly treats online marketplaces as "publisher[s]" of third-party speech within the meaning of §230(c)(1).

71.    "[T]he surrounding statutory framework," *Nat'l R.R. Passenger Corp*, 41 F.4th at 1152, confirms this straightforward reading of the statute's text.  In a neighboring subsection, Congress

- 23 -

announced its express intent not only "to remove disincentives" to voluntary self-policing, but also "to promote the continued development of the Internet" and to "preserve [a] vibrant and competitive free market … unfettered by Federal or State regulation."  47 U.S.C. §230(b).  This context confirms that §230(c)(1) precludes liability not only when an online service engages in "blocking and screening of offensive material," but also when it enables "post[ing]" of "content generated entirely by third parties" with limited or even no screening at all.  *Barnes*, 570 F.3d at 1105; *see also Fair Hous. Council*, 521 F.3d at 1175 (recognizing "the intent of Congress to preserve the free-flowing nature of Internet speech and commerce").

72.     In short, the broader statute makes clear *both* (1) that online services cannot be penalized for making an effort to remove objectionable third-party content, and (2) that online services cannot be forced to "tak[e] responsibility for all" such third-party speech, as the "sheer volume" of Internet-facilitated speech make it difficult or even "impossible" to review (let alone effectively filter) all of it. *Id.* at 1163.  Again, SB 1144 is flatly inconsistent with the latter directive, as it demands that an online marketplace "monitor" all third-party listings and imposes penalties if a marketplace "should [have] know[n] that a third-party seller is selling or attempting to sell stolen goods to a California resident," *id.* §6(a), (b)(1)(D).

73.     History provides further confirmation that §230(c)(1) preempts SB 1144.  At common law, publishers and speakers were generally responsible for any harmful content they published, regardless of whether it was originally someone else's speech.  *See* Restatement (Second) of Torts §578 & cmt. b (1977); *see also Peck v. Tribune Co.*, 214 U.S. 185, 189 (1909).  In contrast, one who merely distributed third-party content (e.g., a newsstand or bookstore) could not be held liable unless the distributor knew or had reason to know its substance.  *See* Restatement (Second) of Torts §581 & cmt. b.

74.     In the early 1990s, when courts attempted to apply this regime to the nascent Internet, it created a problematic dynamic.  In one early case, an online service that "perform[ed] some voluntary self-policing" by attempting to delete objectionable content from an online message board was treated as "publisher" of the entire board, and was therefore on the hook for *any* potentially defamatory message it failed to delete.  *Fair Hous. Council*, 521 F.3d at 1163 (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)).  By contrast, a similar online service that

- 24 -

1    "ignore[d] problematic posts altogether" was not considered a publisher or speaker, so it could

2    "altogether escape liability." *Id.*; *see Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 140

3    (S.D.N.Y.1991). Consequently, application of traditional rules created a perverse incentive for websites

4    to "bury their heads in the sand." *Fair Hous. Council*, 521 F.3d at 1163.

5       75. Congress responded by enacting §230's directive that an online service may not be

6    treated as "publisher or speaker of any" third-party content that it plays no role in creating. 47 U.S.C.

7    §230(c)(1); *see Fair Hous. Council*, 521 F.3d at 1163-64 (discussing this history). In effect, §230(c)(1)

8    overruled both *Prodigy* and *CompuServe*, declaring that an online service cannot be held liable as a

9    publisher of third-party content, period, regardless of whether it curates the content to some extent (like

10   a traditional publisher) or merely disseminates it (like a traditional distributor). SB 1144 is flatly

11   inconsistent with that nationwide regime.

12      76. In sum, the statutory text, context, and history all confirm that CDA §230 provides broad

13   and comprehensive protection against efforts to hold online services liable for the independent speech

14   of their users. *See, e.g.*, *Fair Hous. Council*, 521 F.3d at 1173-74; *Barnes*, 570 F.3d at 1100-01, 1105;

15   *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1042-43 (W.D. Tex. 2024).

16   Because SB 1144 is just such an effort, it is expressly preempted and thus invalid.

**COUNT THREE**

**First Amendment**

**(42 U.S.C. §1983)**

20      77. NetChoice re-alleges and incorporates by reference the preceding allegations as though

21   fully set forth herein.

22      78. SB 1144 not only is preempted but also violates the First Amendment. The law triggers

23   heightened scrutiny because it imposes major burdens on the rights to speak, listen, and associate. And

24   the exceedingly onerous obligations it imposes on online marketplaces—but not third-party sellers

25   engaged in the potential illegal activity it targets—cannot begin to satisfy that scrutiny.

26      79. SB 1144 triggers heightened scrutiny in multiple ways. First, it impinges on the First

27   Amendment rights of companies that operate online marketplaces, i.e., NetChoice's members. Just as

28   the First Amendment protects a newspaper's right to disseminate advertisements and classified listings,

- 25 -

it protects NetChoice members' right to disseminate third-party sellers' speech and to exercise editorial discretion over the listings, advertisements, and other content they wish to disseminate and display on their own platforms. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 730-33, 737-38 (2024); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).

80.    SB 1144 severely burdens those expressive activities.  First, the law's expanded definition of "[h]igh-volume third-party seller," SB 1144 §3(b), forces online marketplaces that disseminate speech (1) to investigate and maintain information about third-party sales that occur entirely off-platform, which they otherwise would have no reason or ability to track; (2) to mandate and carry disclosures by "high-volume third-party sellers"; and (3) to verify the accuracy of such information and disclosures.  Second, SB 1144 creates expansive duties to "monitor listings in order to affirmatively prevent and detect organized retail crime," and to detect and remove listings related to "stolen goods," coupled with significant liability based on what an online marketplace "knows or should know" about third-party listings. *See* SB 1144 §6(a), (b)(1)(A), (b)(1)(D).

81.    By imposing these onerous requirements, SB 1144 "exacts a penalty" from those who choose to disseminate third-party speech that entails any kind of offer of an item for sale (which itself is protected speech). *Cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).  Laws that impose such burdens on constitutionally protected speech are subject to heightened First Amendment scrutiny. *See Wash. Post v. McManus*, 944 F.3d 506, 515-17, 520 (4th Cir. 2019) (state law requiring "online platforms" to publicly post certain facts about the paid advertisements they carry triggered heightened scrutiny because it "deter[red] hosting" that constitutionally protected speech); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

82.    Second, SB 1144 compels speech—multiple times over.  For one, it forces online marketplaces to require anyone who could potentially qualify as a high-volume seller based on off-platform activity to turn over information sufficient for the online marketplace to make a judgment about whether further disclosures are mandated.  For another, if the third party qualifies as a high-volume seller, SB 1144 mandates disclosure of personal information, including sensitive items such as bank information and SSNs, to online marketplaces. Cal. Civil Code §1749.8.1(a).  Finally, it forces some of

- 26 -

those sellers to provide (and online marketplaces to convey) certain information to the general public. *Id.* §1749.8.2(a). Time and again, the Supreme Court has applied heightened scrutiny to laws that compel speech, including "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573-74 (1995); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 773-75 (2018); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-801 (1988).

83.    Third, SB 1144 will inevitably result in the suppression of significant amounts of constitutionally protected user posts and item listings on the online services it regulates. If it takes effect, SB 1144 will prompt some users to refrain from perfectly legitimate speech to avoid having to hand over their bank information and SSNs to online marketplaces commandeered to act as the state's enforcement agents. Moreover, given the steep compliance costs and hefty civil sanctions for non-compliance, online services will inevitably conclude that some user content they would otherwise display and disseminate raises too many risks. *See McManus*, 944 F.3d at 516-17. Indeed, some may attempt to stop doing business in California entirely, rather than attempt to monitor millions of third-party listings under threat of massive penalties if a jury later determines that they missed something they "should [have] know[n]," SB 1144 §6(a). The law thus not only overrides the online marketplaces' editorial discretion and restricts potential high-volume sellers' right to speak, but also burdens the First Amendment rights of users of online marketplaces who would willingly view the suppressed listings and advertisements. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (permitting bookseller to vindicate "the First Amendment rights of bookbuyers").

84.    SB 1144 burdens both non-commercial and commercial speech, and thus unquestionably triggers at least intermediate scrutiny, which requires the state to show that the law is "narrowly tailored to achieve" a substantial governmental interest.[19] *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556

---

[19] NetChoice reserves the right to argue that strict scrutiny applies because (1) SB 1144 burdens more than just commercial speech and (2) its heavy burdens on protected expression should receive strict scrutiny regardless of whether it affects only "commercial speech." *See Lorillard Tobacco*, 533 U.S. at 572 (Thomas, J., concurring in part and concurring in the judgment) ("I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial.'").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

(2001); *see, e.g., Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109, 1116-20 (9th Cir. 2023).  The state cannot satisfy that demanding test.

85.    According to its legislatively enacted statement of purpose, SB 1144 is supposed "to stop theft from retail stores and community theft by curtailing the sale of stolen property on online marketplaces."  SB 1144 §1.  While the state undoubtedly has a legitimate interest in combating theft and preventing the sale of stolen property, this law is not remotely tailored to advance those interests.

86.    To begin, SB 1144 is wildly overinclusive; it burdens huge swathes of constitutionally protected expression that have nothing to do with "theft from retail stores" or "community theft." Instead of targeting misleading or unlawful speech (or even consummated sales), the law imposes onerous obligations on online marketplaces—even classifieds platforms that do not participate in transactions and instead merely provide a forum for third-party speech that may or may not culminate in an off-platform sale.  And because it is practically impossible for classifieds platforms and other online services (1) to monitor the huge volume of *off-platform* transactions that their services in some way facilitate, which is essential to determine who is a "third-party seller" under SB 1144; and (2) to scrutinize the contents of the huge volume of third-party listings "in order to affirmatively prevent and detect organized retail crime," SB 1144 §6(b)(1)(D), the new regime will almost certainly suppress the speech of a host of small businesses (and potentially even individuals like Girl Scouts) that online marketplaces would prefer to carry and that have zero connection to retail theft or other unlawful conduct.  *See McManus*, 944 F.3d at 510 (attempt to combat foreign election interference by forcing "online platforms" to disclose information about third-party political ads was "too circuitous and burdensome" to satisfy heightened scrutiny).  Indeed, the onerous burdens that SB 1144 imposes may impel some online services to cease disseminating third-party classifieds altogether.

87.    On the flipside, SB 1144 is "wildly underinclusive when judged against its asserted justification."  *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011); *see also Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 904-06 (9th Cir. 2009); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 775-76 (S.D. Miss. 2024).  The law does not even prohibit (much less prevent) "theft" or impose any civil or criminal penalty on individuals who steal from "retail stores" or elsewhere in the "community."  *Cf.* SB 1144 §1.  Indeed, it does not *directly* regulate third-party sellers at all.  Rather

- 28 -

than require high-volume sellers, who have ready information about the volume, nature, and location of their own sales, to make certain disclosures whenever and wherever they offer an item for sale, SB 1144 instead imposes obligations and potential penalties *solely* on websites engaged in curating and disseminating speech (but not the processing of sales).  Regulating speakers rather than those involved in the primary activity the state purports to target is the antithesis of narrow tailoring.

88.    This misdirection of obligations and penalties will render SB 1144 nearly useless in stopping theft or illegal sales by organized criminals.  It will take little effort for actual criminals to evade the law's enhanced disclosure requirements.  At most, those requirements might inconvenience bad actors by impelling them to conduct more of their illegal activities entirely offline, to spread their online transactions among several different platforms, or to create multiple "seller" accounts.  "That is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802.

89.    Similarly, forcing classifieds platforms such as Facebook Marketplace, Nextdoor, and OfferUp to monitor millions of third-party listings for indicia of potential sales of stolen goods, *see* SB 1144 §6, "burden[s] substantially more speech than is necessary to further the government's legitimate interests," *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 948.

90.    Indeed, SB 1144's First Amendment problems in general and its lack of tailoring in particular are exacerbated by the reality that some of the means it employs are constitutionally problematic.  The government may have an interest in policing illegal activity, but it only has a legitimate interest in doing so consistent with the Fourth Amendment and other restrictions on government action. Courts have long recognized that requiring companies to give the government access to information they generate and collect in the ordinary course of business is consistent with the Fourth Amendment.  But there is no legitimate justification for forcing companies to investigate and collect otherwise private information that is not generated as an ordinary business record.  Extending the obligations of enterprises, especially enterprises engaged in First Amendment activity, from collecting and retaining ordinary business records to investigating, obtaining, and retaining private information they would otherwise not collect is no small leap.  The latter information is data the government could only obtain through compliance with the Fourth Amendment.  The government has no legitimate interest in evading the Fourth Amendment by foisting those obligations on NetChoice and its members.  *Cf. Nat'l Rifle*

- 29 -

*Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly.").

91.    In short, SB 1144's expansive, unprecedented burdens on online speech are flatly inconsistent with the First Amendment.

## COUNT FOUR

### Equitable Relief

92.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

93.    SB 1144 violates federal law and deprives NetChoice members and their users of enforceable federal rights.  Federal courts have the power to enjoin unlawful actions by state officials. *See Ex parte Young*, 209 U.S. 123; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

94.    This Court can and should exercise its equitable power to enter a preliminary and permanent injunction enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing SB 1144 against any NetChoice member by any means, including by bringing a lawsuit under California Civil Code §1749.8.4, as amended by SB 1144 §5.

## COUNT FIVE

### Declaratory Relief

95.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

96.    SB 1144 violates federal law and deprives NetChoice members and their users of enforceable federal rights.

97.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. §2201(a).

98.    This Court can and should exercise its power under §2201(a) and §2202 to enter a declaration that SB 1144 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice and its members.

**PRAYER FOR RELIEF**

NetChoice prays for the following relief from the Court:

1.      A declaration, pursuant to 28 U.S.C. §2201, that SB 1144 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice and its members.

2.      A preliminary injunction enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing SB 1144 against any NetChoice member by any means, including by bringing a lawsuit under California Civil Code §1749.8.4, as amended by SB 1144 §5.

3.      A permanent injunction enjoining Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing SB 1144 against any NetChoice member by any means, including by bringing a lawsuit under California Civil Code §1749.8.4, as amended by SB 1144 §5.

4.      Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5.      Any further relief that the Court deems just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          CASE NO. 5:25-CV-3178

1   Dated: April 9, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   /s/    *Adam S. Sieff*
                 Adam S. Sieff

Adam S. Sieff (Cal. Bar. # 302030)
**DAVIS WRIGHT TREMAINE LLP**
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: 213.633.8618
Email: adamsieff@dwt.com

Paul D. Clement (*PHV motion forthcoming*)
Erin. E. Murphy (*PHV motion forthcoming*)
James Y. Xi (*PHV motion forthcoming*)
Joseph J. DeMott (*PHV motion forthcoming*)
**CLEMENT & MURPHY PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: 202.742.8900
Email: paul.clement@clementmurphy.com
   erin.murphy@clementmurphy.com
   james.xi@clementmurphy.com
   joseph.demott@clementmurphy.com

*Attorneys for Plaintiff*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF       CASE NO. 5:25-CV-3178