Paul D. Clement (*admitted pro hac vice*)
Erin. E. Murphy (*admitted pro hac vice*)
James Y. Xi (*admitted pro hac vice*)
Joseph J. DeMott (*admitted pro hac vice*)
**CLEMENT & MURPHY PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: 202.742.8900
Email: paul.clement@clementmurphy.com
  erin.murphy@clementmurphy.com
  james.xi@clementmurphy.com
  joseph.demott@clementmurphy.com

Adam S. Sieff (Cal. Bar. # 302030)
**DAVIS WRIGHT TREMAINE LLP**
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: 213.633.8618
Email: adamsieff@dwt.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

|  |  |
|---|---|
| NETCHOICE, | Case No.: 5:25-cv-03178-SVK |
| Plaintiff, | |
| v. | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| ROB BONTA, Attorney General of California, | Date: May 20, 2025 |
| Defendant. | Time: 10:00 AM |
| | Dept.: Courtroom 6, 4th Floor |
| | Action Filed: April 9, 2025 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

    A.    NetChoice Members' Online Services.................................................................... 4

    B.    Uneven State-Level Regulation of Online Marketplaces....................................... 5

    C.    The Federal INFORM Act ..................................................................................... 6

    D.    NetChoice Obtains Preliminary Relief From Georgia's
           Expanded "Inform Act" .......................................................................................... 7

    E.    California Even More Radically Expands Its "Inform Act" Analog ..................... 8

ARGUMENT ....................................................................................................................... 10

I.    NetChoice Is Likely To Succeed On The Merits Of Its Claims ..................................... 11

    A.    The Federal INFORM Act Preempts SB 1144 ..................................................... 11

    B.    Section 230 of the Communications Decency Act Preempts SB 1144................ 14

    C.    SB 1144 Runs Afoul of the First Amendment ..................................................... 18

           1.    SB 1144 Triggers Heightened First Amendment Scrutiny ..................... 18

           2.    SB 1144 Cannot Survive Heightened Scrutiny....................................... 20

II.    The Other Preliminary Injunction Factors Overwhelmingly Weigh In Favor
     Of Maintaining The Status Quo ...................................................................................... 23

    A.    NetChoice Members Will Suffer Irreparable Harm Absent
           Preliminary Relief ................................................................................................ 24

    B.    The Balance of Equities and Public Interest Strongly Favor
           an Injunction ......................................................................................................... 25

CONCLUSION.................................................................................................................... 25

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION    CASE NO. 5:25-CV-03178

1

## TABLE OF AUTHORITIES

2

CASES

3

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ............................................................................. 13

4

*Airbnb, Inc. v. City of Boston*,
386 F.Supp.3d 113 (D. Mass. 2019) ....................................................................... 16

5

6

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
107 F.4th 934 (9th Cir. 2024) ........................................................................... 11, 14

7

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ...................................................................................... 13

8

9

*Am. Librs. Ass'n v. Pataki*,
969 F.Supp. 160 (S.D.N.Y. 1997) ........................................................................... 13

10

*Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021) ............................................................................. 11, 23

11

12

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ................................................................................................. 18

13

*Associated Press v. Otter*,
682 F.3d 821 (9th Cir. 2012) ................................................................................... 25

14

15

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .................................................................................. 25

16

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........................................................................ *passim*

17

18

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ................................................................................. 14

19

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................................... 22, 23

20

21

*Cal. Trucking Ass'n v. Bonta*,
996 F.3d 644 (9th Cir. 2021) ................................................................................... 11

22

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ................................................................................... 24

23

24

*City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
981 F.3d 742 (9th Cir. 2020) ................................................................................... 25

25

*Cleveland v. City of Los Angeles*,
420 F.3d 981 (9th Cir. 2005) ................................................................................... 11

26

27

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ................................................................................. 25

28

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011)......................................................................4, 21, 22, 25

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
   747 F. Supp. 3d 1011 (W.D. Tex. 2024).....................................................................18

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).....................................................................................................13

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019).......................................................................................24

*Cubby, Inc. v. CompuServe, Inc.*,
   776 F.Supp. 135 (S.D.N.Y.1991)................................................................................17

*Doe v. Grindr Inc.*,
   128 F.4th 1148 (9th Cir. 2025) .......................................................................15, 16, 18

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014)................................................................................19, 21

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019).....................................................................................15

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021).......................................................................................24

*Elrod v. Burns*,
   427 U.S. 347 (1976).....................................................................................................24

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*,
   112 F.4th 1168 (9th Cir. 2024) .........................................................................3, 14, 15

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008)...............................................................................*passim*

*Fireman's Fund Ins. Co. v. City of Lodi*,
   302 F.3d 928 (9th Cir. 2002).......................................................................................11

*Gentry v. eBay, Inc.*,
   121 Cal.Rptr.2d 703 (Cal. Ct. App. 2002) ................................................................16

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat) 1 (1824).........................................................................................11

*Green v. Am. Online (AOL)*,
   318 F.3d 465 (3d Cir. 2003)........................................................................................15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995).....................................................................................................19

*In re Anonymous Online Speakers*,
   661 F.3d 1168 (9th Cir. 2011).....................................................................................18

*Italian Colors Rest. v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018).....................................................................................22

- iii -

*Junior Sports Mags., Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) .......................................................................... 20

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) .......................................................................... 25

*La Park La Brea A LLC v. Airbnb, Inc.*,
  285 F.Supp.3d 1097 (C.D. Cal. 2017) ............................................................. 16

*Latta v. Otter*,
  771 F.3d 496 (9th Cir. 2014) ............................................................................ 25

*Life Techs. Corp. v. Promega Corp.*,
  580 U.S. 140 (2017) .......................................................................................... 12

*Lloyd v. Facebook, Inc.*,
  2024 WL 3325389 (9th Cir. July 8, 2024) ....................................................... 15

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) .......................................................................................... 20

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
  127 F.4th 516 (4th Cir. 2025) .......................................................................... 15

*Metro Lights, LLC v. City of Los Angeles*,
  551 F.3d 898 (9th Cir. 2009) ........................................................................... 22

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) .......................................................................................... 19

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .......................................................................................... 18

*Nat'l Ass'n of Wheat Growers v. Bonta*,
  85 F.4th 1263 (9th Cir. 2023) .......................................................................... 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) .......................................................................................... 20

*Nat'l R.R. Passenger Corp. v. Su*,
  41 F.4th 1147 (9th Cir. 2022) .................................................................... 11, 12

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) .......................................................................................... 23

*NetChoice, LLC v. Carr*,
  2024 WL 3262633 (N.D. Ga. June 30, 2024) ........................................... passim

*NetChoice, LLC v. Fitch*,
  738 F. Supp. 3d 753 (S.D. Miss. 2024) ........................................................... 22

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................................ 21

*Peck v. Tribune Co.*,
  214 U.S. 185 (1909) .......................................................................................... 17

- iv -

*Platt v. Moore*,
  15 F.4th 895 (9th Cir. 2021) ................................................................ 24

*Reno v. ACLU*,
  521 U.S. 844 (1997) .......................................................................... 18

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) .......................................................................... 20

*San Jose Christian Coll. v. City of Morgan Hill*,
  360 F.3d 1024 (9th Cir. 2004) ............................................................. 11

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .......................................................................... 19

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
  1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ...................................... 17

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) .......................................................................... 20

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ............................................................... 24

*Wash. Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) ................................................... 19, 20, 23

*Zepeda v. INS*,
  753 F.2d 719 (9th Cir. 1983) ............................................................... 25

**STATUTES**

15 U.S.C. §45f(c)(2) ............................................................................. 12

15 U.S.C. §45f(d)(1) ............................................................................. 12

15 U.S.C. §45f(d)(2) ............................................................................. 13

15 U.S.C. §45f(d)(3) ............................................................................. 13

15 U.S.C. §45f(d)(4)-(5) ........................................................................ 13

15 U.S.C. §45f(f)(3) ......................................................................... *passim*

15 U.S.C. §45f(f)(5)-(6) .......................................................................... 6

15 U.S.C. §45f(g) ............................................................................ *passim*

47 U.S.C. §230(b) ............................................................................... 16

47 U.S.C. §230(c)(1) ....................................................................... 14, 18

47 U.S.C. §230(e)(3) ............................................................................ 14

Cal. Civ. Code §§1749.8-1749.8.5 .............................................................. 1

Cal. Civil Code §1749.8(b)(1) ................................................................ 6

Cal. Civil Code §1749.8(b)(2) ................................................................ 9

Cal. Civil Code §1749.8(d) ................................................................... 6

Cal. Civil Code §1749.8.1 .................................................................... 6

Cal. Civil Code §1749.8.1(a) ............................................................... 19

Cal. Civil Code §1749.8.2 ................................................................... 14

Cal. Civil Code §1749.8.2(a) ........................................................... 6, 19

Cal. Civil Code §1749.8.2(c) ................................................................ 6

Cal. Civil Code §1749.8.3 ................................................................... 14

Cal. Penal Code §484 ........................................................................ 22

Cal. Penal Code §490.4 ................................................................. 22, 25

Cal. Penal Code §490.5 ................................................................. 22, 25

Cal. Penal Code §496 .................................................................... 22, 25

Cal. Penal Code §496.5 ................................................................. 22, 25

Cal. Penal Code §496.6 ................................................................. 22, 25

15 Okla. Stat. §799A.7(C) .................................................................... 7

Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022) ................................ 6

2022 Cal. Legis. Serv. Ch. 857 .............................................................. 5

2022 Ga. Laws Act 820 ....................................................................... 8

2024 Ga. Laws Act 564 ....................................................................... 8

**OTHER AUTHORITIES**

*Am. Heritage Dictionary of the Eng. Language,*
  https://tinyurl.com/bdfh8mpc (last visited Apr. 10, 2025) .................. 11

*Merriam-Webster Dictionary* ................................................................ 11

*Oxford English Dictionary* (3d ed. 2010) ................................................ 11

Restatement (Second) of Torts (1977) .................................................... 17

**NOTICE OF MOTION**

Plaintiff NetChoice hereby moves for a preliminary injunction under Federal Rule of Civil Procedure 65 before the Honorable Susan van Keulen, sitting in Courtroom 6 of the United States District Court for the Northern District of California located at San Jose, California, at 10:00 AM on May 20, 2025, or as soon as the matter may be heard. NetChoice seeks a preliminary injunction prohibiting enforcement of California Senate Bill 1144 of 2024 ("SB 1144"),[1] attached hereto as Exhibit A, against any NetChoice member by any means.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

SB 1144 imposes unprecedented and unconstitutional burdens on widely used online services that serve as the modern-day analog of the classifieds section in print newspapers, enabling millions of prospective buyers and sellers to communicate about potential in-person, offline sales. California law currently requires "online marketplaces" to (1) retain information about third-party sales for which payment is processed by the marketplace; (2) use that information to identify "high-volume" sellers; and (3) require those sellers to make various disclosures. *See* Cal. Civ. Code §§1749.8-1749.8.5 ("Title 1D"). These requirements mirror those of the federal INFORM Act, 15 U.S.C. §45f, and they apply only when an online marketplace processes payment for an on-platform sale, which incidentally generates the information necessary to comply. They do not apply when the marketplace merely connects buyers and sellers, who then meet in person to consummate the transaction and exchange payment on their own terms. That makes sense. While online services like Craigslist, Facebook Marketplace, Nextdoor, and OfferUp can keep track of third-party sales for which they process an electronic payment, they have no realistic way to track which items end up being sold (much less where they are sold, to whom, or for how much) when a sale is completed off platform—for example, when the buyer and seller meet in person to exchange an item for cash.

---

[1] The operative provisions of SB 1144 are §§3, 5, and 6. This motion uses "SB 1144" as a shorthand for these three sections. (As for SB 1144's other provisions: Section 1 contains a statement of legislative intent, while §2 and §4 merely recodify the preexisting versions of Cal. Civil Code §1749.8 and §1749.8.4, adding a sunset date of July 1, 2025, and a repeal date of January 1, 2026.)

Effective July 1, 2025, however, SB 1144 will radically expand online marketplaces' obligations by forcing them to keep track of not only third-party sales of consumer products for which payment is processed through the online marketplace, but also additional sales "entered into … utilizing [an] online marketplace." SB 1144 §3(b) (emphasis added). Unless this Court intervenes, that change will transform Title 1.4D from a workable burden applicable to a limited set of e-commerce marketplaces into a virtually impossible mandate that all manner of online services—including classifieds platforms that merely facilitate third-party speech—investigate and retain information they would not otherwise collect on transactions that occur entirely off-platform, merely because the platform plays a role in facilitating third-party speech.

In addition, SB 1144 expressly orders online marketplaces to maintain "policies, systems, and staff to monitor" millions of third-party classified ads "in order to affirmatively prevent and detect organized retail crime." SB 1144, §6(b)(1)(D). And the law imposes steep penalties for insufficient "monitor[ing]" of online classifieds: If an online marketplace "knows or should know that a third-party seller is selling or attempting to sell stolen goods to a California resident" but fails to "alert" law enforcement, the marketplace "shall be liable for a civil penalty" of up to $10,000, plus attorney's fees, costs, and other litigation expenses. *Id.* §§5, 6(a) (emphasis added).

SB1144 is invalid for multiple reasons. First, it is preempted by the federal INFORM Act, which forbids any "State" from "establish[ing] or continu[ing] in effect any law, regulation, rule, requirement, or standard that conflicts with [its] requirements." 15 U.S.C. §45f(g). As a federal court recently held with respect to a materially identical provision in Georgia law, SB 1144 §3(b) defies the INFORM Act's command that online marketplaces "shall *only be required* to count" on-platform transactions by requiring them to count off-platform transactions as well. *NetChoice, LLC v. Carr*, 2024 WL 3262633, at *3 (N.D. Ga. June 30, 2024) (quoting 15 U.S.C. §45f(f)(3)(B)), *appeal pending*, No. 24-12273 (11th Cir.). In so doing, SB 1144 §3 expands online marketplaces' obligations well beyond what Congress permitted—vitiating Congress' express intent to create a single, nationwide rule for online marketplaces. The conflict is so direct that even if one were to ignore the INFORM Act's express-preemption clause, SB 1144 §3(b) would be invalid under implied-preemption principles. *Id.* at *4-5.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION          CASE NO. 5:25-CV-03178

Second, SB 1144 runs afoul of §230 of the Communications Decency Act ("CDA"), which preempts state laws that impose "a duty [that] would necessarily require an internet company to monitor third-party content." *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177 n.3 (9th Cir. 2024). As explained, SB 1144 expressly requires online marketplaces "to monitor [third-party] listings," under threat of severe civil penalties. SB 1144, §6(b)(1)(D). Similarly, SB 1144's requirements to "establish and maintain a policy prohibiting the sale of stolen goods on the online marketplace"; punish violations with "consequences," including "suspension or termination of the seller's account"; and alert law enforcement whenever an online marketplace "knows or should know that a third-party seller is selling or attempting to sell stolen goods to a California resident," *id.* §6(a), (b)(1)(A) (emphasis added), necessarily require monitoring and removal of third-party content. SB 1144 is thus inconsistent with— and preempted by—§230. *See, e.g., Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

Finally, SB 1144 violates the First Amendment. Its onerous regulations significantly burden both non-commercial and commercial speech: The law imposes sizable costs and potential liability on classifieds platforms, as the price of carrying third-party sellers' speech; it compels speech by online marketplaces and third-party sellers alike; and it will inevitably suppress a significant number of constitutionally protected online classifieds. SB 1144 thus triggers at least intermediate scrutiny, which it plainly flunks. Forcing online marketplaces to investigate off-platform activity, obtain and maintain sensitive information that they would not ordinarily collect, and ensure that third-party sellers comply with disclosure obligations that the state does not directly impose or enforce on the sellers (who actually have the requisite data)—as SB 1144 §3(b) requires—discourages the dissemination of information, and is not remotely tailored to the state's interest in "stop[ping] theft from retail stores and community theft," SB 1144 §1. Indeed, commandeering online platforms to gather private information they do not generate as an incidental byproduct of processing transactions not only furthers no legitimate government interest but raises Fourth Amendment concerns by forcing private entities to gather information the state could otherwise only gather in conformity with the Fourth Amendment. Similarly, forcing classifieds

platforms such as Craigslist, Facebook Marketplace, Nextdoor, and OfferUp to monitor millions of third-party listings for indicia of potential sales of stolen goods, as SB 1144 §6 demands, "burden[s] substantially more speech than is necessary to further the government's legitimate interests," *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc).

There is an acute need for immediate intervention:  Unless this Court enjoins enforcement of SB 1144 before July 1, 2025, NetChoice members will suffer significant irreparable injury.  If forced to try to comply with the law, the companies that operate Facebook Marketplace, Nextdoor, and OfferUp (among others) would suffer irreparable injury in at least two forms: (1) the loss of First Amendment freedoms; and (2) massive, unrecoverable expenditures of resources.  Users of online services would lose First Amendment freedoms as well, as SB 1144's substantial penalties and enormous practical burdens will inevitably cause NetChoice members to remove lawful content.  In contrast, California has no valid interest in enforcing an unconstitutional law, and Title 1.4D as it exists today and the federal INFORM Act (which this lawsuit does not challenge) will adequately protect any valid state interests if SB 1144 is enjoined.

The Court should preliminarily enjoin Attorney General Bonta, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing SB 1144 against any NetChoice member.  NetChoice respectfully asks the Court to issue an injunction before SB 1144 takes effect on July 1, 2025.

## BACKGROUND

### A.    NetChoice Members' Online Services.

NetChoice is an Internet trade association whose members operate a variety of popular online services.  Ex.B ¶¶3-4.  Several NetChoice members, including Amazon, eBay, and Etsy, operate e-commerce marketplaces where consumers can purchase products from third-party sellers practically anywhere in the country and complete the sale online. Ex.B ¶4.  The marketplace processes the payment and charges the seller a fee, which is calculated as a percentage of the total sales price.  Ex.1; Ex.2; Ex.3.[2]  Other services operated by NetChoice members, including Facebook Marketplace, Nextdoor,

---

[2] All numbered exhibits are attached to Exhibit E, Declaration of Adam S. Sieff.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION          CASE NO. 5:25-CV-03178

and OfferUp, operate in the space that was once dominated by classified advertisements in print newspapers. These platforms enable users to market items online and then sell them offline (often for cash) to buyers in their local community. Ex.C ¶¶12-13; Ex.D ¶¶3-7; Ex.4; Ex.5; Ex.6; Ex.7.[3] Because Facebook Marketplace, Nextdoor, and OfferUp are not involved in these offline sales, they have no realistic way to track which listed items are sold—much less where they are sold, to whom, or for how much. Ex.C ¶14; Ex.D ¶8; Ex.8.

NetChoice members also operate social networking services. On Facebook, users can post status updates, photos, videos, and links; follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities); join Groups or attend Events that relate to topics of interest; post ads; and privately message one another via Meta's Messenger app. Ex.C ¶7. While these features are not specifically designed for promoting, buying, and selling products, they are often used for such purposes. Ex.C ¶16. And on Nextdoor, users are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services. Ex.9. Among other things, Nextdoor allows a merchant (1) to create a "business page" through which it can market its products to local Nextdoor users; (2) to post content on users' "newsfeed"; and (3) to run paid advertisements. Ex.10.

### B.    Uneven State-Level Regulation of Online Marketplaces.

In recent decades, online shopping has grown exponentially. In the absence of federal legislation regulating online marketplaces, states started to step in—California among them. On September 30, 2022, California enacted Title 1.4D. *See* 2022 Cal. Legis. Serv. Ch. 857 (S.B. 301) (codified at Cal. Civil Code §1749.8 through §1749.8.5). Title 1.4D's linchpin is its definition of "high-volume third-party seller," which determines the extent of the regulatory burden on online marketplaces and their users. The statute defines "high-volume third-party seller" as a "person or entity, independent of an online marketplace," "who, in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete transactions through an online marketplace for the sale of new or

---

[3] OfferUp also gives users an e-commerce option to buy and sell certain items using OfferUp's shipping service, but it estimates that this option is used for only about 2% of the items sold using its platform. Ex.D ¶9. Meta similarly allows Facebook Marketplace users to buy and sell using Meta Pay or PayPal, but this option is used for only "a small percentage of items" sold using Marketplace. Compl.¶22.

unused consumer products to buyers located in California," generating "$5,000 or more in gross revenues." Cal. Civil Code §1749.8(b)(1), (d).

Title 1.4D requires online marketplaces (1) to collect contact information, a bank account number, and a tax identification number from any "high-volume third-party seller" and (2) verify that information and periodically prompt the high-volume seller to keep it up to date. *Id.* §1749.8.1. For most, this tax identification number is a Social Security Number ("SSN"). Title 1.4D further provides that "[a]n online marketplace shall require a high-volume third-party seller with at least twenty thousand dollars ($20,000) of gross annual revenues from transactions with buyers in California through the online marketplace in either of the two prior calendar years" to disclose (1) its full name, its physical address, contact information that will "allow users of the online marketplace to have direct and unhindered communication with the seller," and (2) "[w]hether or not another party is responsible for supplying the product to the consumer upon purchase." *Id.* §1749.8.2(a). If a high-volume third-party seller fails to comply with these requirements, the online marketplace "shall suspend [the seller's] future sales activity" until the seller comes into compliance. *Id.* §1749.8.2(c).

As of September 2022, 12 other states had enacted similar, but not identical, statutes. *See* Dkt.1 ("Compl.") ¶¶30 & n.16. While all 13 state "Inform Consumers" statutes use the same "high-volume" thresholds, there are a host of other differences among them, which created an uneven patchwork of state-level regulation of online marketplaces. *See* Compl. ¶¶30-31.

**C.    The Federal INFORM Act.**

In December 2022, Congress stepped in, enacting the INFORM Act. *See* Pub. L. No. 117-328, §301, 136 Stat. 4459, 5555-62 (Dec. 29, 2022) (codified at 15 U.S.C. §45f). In doing so, Congress replaced the emerging patchwork of state-by-state regulation with a single, nationwide framework. *See* Compl. ¶¶32-40. Like the state laws that preceded it, the INFORM Act defines "high-volume, third party seller" as a person who "sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform" and "in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products and an aggregate total of $5,000 or more in gross revenues." 15 U.S.C. §45f(f)(3), (5)-(6).

1    Importantly, the INFORM Act limits its scope to transactions "made through the online

2  marketplace and for which payment was processed by the online marketplace," *id.* §45f(f)(3)(B), as

3  opposed to off-platform transactions conducted directly by private parties. The INFORM Act thus

4  sensibly requires online marketplaces to collect, maintain, and ensure dissemination of sellers'

5  information only when they, as payment processors, have ready access to the relevant data to determine

6  who qualifies as a "high-volume third party seller."

7    Congress underscored its intent to supplant the existing state-by-state patchwork by enacting a

8  broad express-preemption clause: "No State or political subdivision of a State, or territory of the United

9  States, may establish or continue in effect any law, regulation, rule, requirement, or standard that

10 conflicts with the requirements of this section." *Id.* §45f(g). Congress' decision to expressly preempt

11 state regulations reflects the reality that online marketplaces invariably operate across state lines, and

12 the express-preemption clause played a vital role in marshaling political support for the law. For

13 example, NetChoice initially raised concerns about the law, but ultimately concluded in light of the

14 express-preemption provision that the law reflected a sensible "compromise" that "avoid[s] a complex

15 patchwork of state laws related to seller vetting." Ex.11; *cf.* Ex.12. Amazon and eBay likewise publicly

16 stated that they supported the INFORM Act because they recognized that it would "establish[] a federal

17 standard, preventing an unworkable patchwork of state-level regulations." Ex.13; *see* Ex.14.

18    Congress' enactment of the INFORM Act came as no surprise to the states. Indeed, Oklahoma's

19 law expressly anticipated the possibility that it would be overtaken by federal legislation. *See* 15 Okla.

20 Stat. §799A.7(C) ("If no federal law that requires online marketplaces to verify and disclose information

21 as described in this act goes into effect prior to January 1, 2023, the Attorney General may promulgate

22 rules necessary to implement and enforce this act."). And to the best of NetChoice's knowledge, no

23 state has enacted a new "Inform Consumers" analog since the INFORM Act was signed into law; nor

24 has any state attempted to enforce an existing state-level "Inform Consumers" statute. Most states thus

25 appear to understand that the federal INFORM Act broadly preempts state-law analogs.

26    **D.    NetChoice Obtains Preliminary Relief From Georgia's Expanded "Inform Act"**

27    Georgia did not get the message. As originally enacted, the Georgia Inform Consumers Act was,

28 like the federal INFORM Act, limited to transactions "for which payment was processed by the online

- 7 -

marketplace"—in other words, information that companies generate in the ordinary course and transactions about which an online marketplace can reasonably be expected to maintain records. *See* 2022 Ga. Laws Act 820, §2; 15 U.S.C. §45f(f)(3)(B). Last year, however, Georgia amended its statute to remove that crucial guardrail, expanding the statute's scope to encompass all sales "*made by utilizing* [an] online marketplace." 2024 Ga. Laws Act 564, §2 (May 6, 2024). Under the guise of that ostensibly minor definitional change, Georgia sought to force classifieds platforms such as Craigslist, Facebook Marketplace, Nextdoor, and OfferUp to investigate, maintain information about, and impose disclosure obligations on third-party sellers based on sales that occur entirely offline—in-person, cash transactions that these platforms have no realistic way to monitor.

NetChoice promptly challenged Georgia Act 564 on behalf of its members, and, on June 30, 2024, a federal district court preliminarily enjoined its enforcement. *See Carr*, 2024 WL 3262633. The court held that the INFORM Act expressly preempts Georgia's attempted expansion of "Inform Act" liability. The court explained that while federal law provides that "an online marketplace *shall only* be required to count sales or transactions made through the online marketplace," the amended Georgia law "conflicts with" that "requirement[]" by ordering online marketplaces to also count additional, off-platform transactions. *Id.* at *3 (quoting 15 U.S.C. §45f(f)(3)(B), (g)). The court further held that the INFORM ACT preempts the Georgia law under implied-preemption principles too, as it undermines the "calibrated middle path" of the INFORM Act—a single, nationwide standard that balances the potential benefits of requiring disclosures from "high-volume" sellers against the burdens of requiring online marketplaces to attempt to track transactions for which they do not process payment. *See id.* at *4-5.

### E.    California Even More Radically Expands Its "Inform Act" Analog

Undeterred, less than two months later, California enacted a materially identical amendment to its analogous statute (Title 1.4D). Just like the currently enjoined Georgia law, California SB 1144 dramatically expands the regulatory burdens that Title 1.4D imposes on online marketplaces, jumping the tracks between permissible recordkeeping and disclosure obligations as to readily available data, versus impermissible investigation mandates. SB 1144 is set to take effect on July 1, 2025.

In its original (and, until July 1, present) form, Title 1.4D closely tracks the INFORM Act: It specifies that, when determining whether a third-party seller has met the "high-volume" thresholds, an

online marketplace needs to count "only those transactions … for which payment is processed by the online marketplace," Cal. Civil Code §1749.8(b)(2).  This limitation is critical to ensuring that the Act's burdens are reasonable and constitutional.  After all, it is relatively easy for a company that handles payment processing (like Amazon or eBay) to identify high-volume sellers, as the company can readily track each user's total sales and gross revenue based on existing records of *online* transactions.  But it would be extraordinarily burdensome—indeed, virtually impossible—for companies like Meta Platforms, Nextdoor, and OfferUp to gather accurate information about which third-party listings lead to *off-platform* transactions between two private parties, where payment is often made in cash, for amounts that may not even have been determined through online communications. Ex.C ¶¶35-46; Ex.D ¶¶22-30.  Yet SB 1144 removes this crucial payment-processing guardrail, expanding the California statute's coverage to encompass all sales "*utilizing* [an] online marketplace."  SB 1144 §3(b) (emphasis added).

Consequently, as of July 1, 2024, California will require platforms that disseminate third-party classifieds, including Facebook Marketplace, Nextdoor, and OfferUp, to investigate, maintain information about, and impose disclosure obligations on third-party sellers based on sales that occur entirely offline—in-person, cash transactions that these classifieds platforms have no realistic way to monitor.  To even attempt to comply, such platforms would need to ask every individual who lists an item whether the listing led to a sale, where the sale occurred, and what the buyer paid.  But the platform would have no realistic way of requiring sellers to answer those questions—or of knowing whether those who respond are telling the truth.  And if platforms have no feasible way to confidently determine who is a "high-volume" seller (which seems likely), then they will be forced to remove protected speech to avoid the risk of noncompliance.  Ex.C ¶¶41-46; Ex.D ¶29.

Moreover, SB 1144 is so broadly worded that it appears to encompass not only individuals who post a "for sale" listing on a classifieds platform, but also those who advertise products for sale, whether formally or informally, on social-networking services such as Facebook and Nextdoor—both of which arguably meet SB 1144's expanded definition of "online marketplace."  *See* SB 1144 §3(c); Compl. ¶¶23-24, 47-48.  SB 1144 thus appears to require these online services to track all activity on their sites that might lead to an off-platform sale, investigate whether such sales occur, collect enough information

about those sales to determine who is a "high volume seller," then maintain and compel disclosure of information about those who meet that threshold. This would be hugely burdensome, if not impossible.

On top of that, SB 1144 expressly orders NetChoice members to perform a number of investigatory functions as the price of facilitating third-party speech. The law requires "online marketplaces" to create not only a "policy prohibiting the sale of stolen goods," which may result in "suspension or termination of the seller's account," but also "written policies, systems, and staff to monitor listings in order to *affirmatively prevent and detect* organized retail crime." SB 1144 §6(b)(1)(A), (D) (emphasis added). In addition, "[a]n online marketplace shall alert local, regional, or state law enforcement agencies in California if it knows or should know that a third-party seller is selling or attempting to sell stolen goods to a California." SB 1144 §6(a). Online marketplaces must also create a special "mechanism" (e.g., "a dedicated web page" or "online portal") to "ensure timely replies to law enforcement requests, including warrants, subpoenas, and other legal processes." SB 1144 §6(b)(1)(C). This duty to monitor third-party speech, in hopes of detecting and preventing crime, has no analog in the INFORM Act or even in (currently enjoined) Georgia Act 564.

SB 1144 imposes harsh penalties on companies whose efforts to track offline purchases and monitor millions of third-party listings are deemed insufficient. While SB 1144 does not impose or enforce any legal obligations on third-party sellers themselves, it subjects online marketplaces to a civil penalty of up to $10,000 *for each violation*; injunctive relief; and "reasonable attorney's fees and costs, including expert witness fees and other litigation expenses." SB 1144 §5(b). Notably, liability does not require any demonstration of consumer harm. For example, if the government establishes that an online marketplace "should [have] know[n]" that a third party was "attempting to sell stolen goods to a Californian" and failed to "alert" the authorities, SB 1144 authorizes "the Attorney General, a district attorney in any county, a city attorney in any city or city and county, or a county counsel in any county" to obtain a large civil penalty, with attorneys' fees and litigation costs to boot. SB 1144 §§5(a), 6(a).

### ARGUMENT

NetChoice is entitled to a preliminary injunction if it shows that: (1) it is likely to succeed on the merits of its claims; (2) at least one of its members will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public

1    interest.  *See, e.g.*, *Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir.

2    2021).   A preliminary injunction is amply warranted here.   NetChoice is overwhelmingly likely to

3    succeed on the merits of its claims, and the other preliminary injunction factors tip decidedly in favor of

4    maintaining the status quo.

5    **I.    NetChoice Is Likely To Succeed On The Merits Of Its Claims.**

6    **A.    The Federal INFORM Act Preempts SB 1144.**

7    "Under the Supremacy Clause of the United States Constitution, state laws that 'interfere with,

8    or are contrary to the laws of Congress' are preempted and are therefore invalid."  *Fireman's Fund Ins.*

9    *Co. v. City of Lodi*, 302 F.3d 928, 941 (9th Cir. 2002) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1,

10   211 (1824)).   "Express preemption is a question of statutory construction, requiring a court to look to

11   the plain wording of the statute and surrounding statutory framework to determine whether Congress

12   intended to preempt state law."  *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 939 (9th

13   Cir. 2024).   In this case, text, context, statutory structure, and common sense all point to the same

14   conclusion:  The federal INFORM Act preempts SB 1144.

15   "When, as here, a federal statute includes an express preemption provision, 'the task of statutory

16   construction must in the first instance focus on the plain wording of the clause.'"  *Nat'l R.R. Passenger*

17   *Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022) (quoting *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644,

18   654 (9th Cir. 2021)).   The INFORM Act's express-preemption clause provides: "No State or political

19   subdivision of a State, or territory of the United States, may establish or continue in effect any law,

20   regulation, rule, requirement, or standard that *conflicts with* the requirements of this section."  15 U.S.C.

21   §45f(g) (emphasis added).   The Act does not supply any specialized definition of "conflict," so the term

22   must be given "its 'ordinary, contemporary, common meaning.'"  *Cleveland v. City of Los Angeles*, 420

23   F.3d 981, 989 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024,

24   1034 (9th Cir. 2004)).   In ordinary usage, the verb "conflict" connotes that two things "differ" or are "at

25   variance"; that they are not "in agreement or accord"; or that they "clash."  *See* Conflict, *Merriam-*

26   *Webster   Dictionary*;   Conflict,   *Am.   Heritage   Dictionary   of   the   Eng.   Language*,

27   https://tinyurl.com/bdfh8mpc (last visited Apr. 10, 2025); Conflict, *Oxford English Dictionary* (3d ed.

28   2010).

- 11 -

As a federal court recently held with respect to a materially identical provision of Georgia law, SB 1144 "conflicts with" the federal INFORM Act under "[a]ny ordinary meaning of 'conflict.'" *Carr*, 2024 WL 3262633, at *3. As the court explained, one of the INFORM Act's key "requirements" is that, when determining who is a "high-volume third party seller," "an online marketplace shall *only be required* to count sales or transactions ... for which payment was processed by the online marketplace." *Id.* (quoting 15 U.S.C. §45f(f)(3)(B)). "[B]y using the word 'only,'" the federal INFORM Act "provides a ceiling on the recordkeeping requirements of online marketplaces." *Id.* (quoting 15 U.S.C. §45f(f)(3)(B)). SB 1144 "goes beyond that ceiling," as it requires online marketplaces to count *not only* sales for which payment is processed through the online marketplace, but additional sales for which payment is exchanged through other means. *Id.* That is a clear conflict. Indeed, there is "no scenario where [SB 1144]'s expansion upon the reach of the federal INFORM Act does not run afoul of its explicit limiting term: 'only.'" *Id.* Accordingly, the plain text of the INFORM Act expressly preempts SB 1144's "conflict[ing]" requirements. 15 U.S.C. §45f(g).

The phrases surrounding "conflict[]" in §45f(g) reinforce that conclusion. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017). The clause defines the political entities to which it applies in the broadest possible terms: Its preemptive force reaches every "State," "political subdivision of a State," and "territory of the United States." 15 U.S.C. §45f(g). The clause also describes *what* is preempted in the broadest possible terms—"any law, regulation, rule, requirement, or standard." *Id.* The clause's temporal reach is similarly expansive. It forbids states not only from "establish[ing]" new measures but also from "continu[ing]" existing measures "in effect." *Id.* The breadth of these neighboring phrases confirms that the INFORM Act's preemption clause has a wide scope that readily encompasses SB 1144.

The INFORM Act's enforcement provisions, 15 U.S.C. §45f(c)(2)(A), (d)(1), likewise support reading its preemption clause to displace any inconsistent state requirement, as they expressly contemplate that the FTC and state attorneys general will work together to enforce a single federal standard. *See Nat'l R.R. Passenger Corp.*, 41 F.4th at 1152. Indeed, the Act takes pains to ensure that federal and state authorities will not initiate duplicative or overlapping actions. When a state attorney general brings a suit to enforce the INFORM Act, he or she must notify the Federal Trade Commission

("FTC"), which is expressly authorized to intervene and "be heard on all matters arising therein." *Id.* §45f(d)(2), (3). Similarly, if the FTC initiates an enforcement action, a state may join that action but may not file a separate action. *Id.* §45f(d)(4)-(5). Those provisions presuppose that states cannot impose burdens on online marketplaces vis-à-vis off-platform transactions that the federal law leaves unregulated.

The historical context confirms that the INFORM Act precludes states from adopting their own divergent standards. As explained, the federal law followed a wave of state laws imposing similar—but not identical—requirements. *See supra* pp.5-6. That patchwork of state-level regulation prompted Congress to enact the INFORM Act and to include an express-preemption clause. *See supra* pp.6-7. And, to the best of NetChoice's knowledge, *no state* has sought to enforce its own, similar law since the enactment of the INFORM Act. That is hardly surprising; as courts have emphasized time and again, when it comes to inherently interstate technology like the Internet, federal rules are generally preferable to state ones. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999). After all, given the impracticality of complying with 50 state laws and 50 different standards, allowing state-by-state legislation would likely make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Commerce Clause concerns. *Am. Librs. Ass'n v. Pataki*, 969 F.Supp. 160, 183 (S.D.N.Y. 1997).

In short, the tools of statutory interpretation overwhelmingly confirm that the federal INFORM Act "provides a ceiling" for online marketplaces' recordkeeping requirements with respect to high-volume third party sellers, expressly prohibiting states from extending those requirements beyond "transactions consummated through the marketplace or its payment processor." *Carr*, 2024 WL 3262633, at *3, *5. Because SB 1144 "goes beyond that ceiling," the federal INFORM Act preempts it. *Id.* at *3. Indeed, the conflict is so stark that the INFORM Act would preempt SB 1144 even if the INFORM Act did not contain an express-preemption clause, because SB 1144 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at *4 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)). Congress enacted a nationwide standard reflecting a careful balance between the burdens of data collection and the potential benefits of

1   disclosure requirements. SB 1144 "punches a hole through the calibrated middle path that Congress

2   intended." *Id.* at *5.

3       California may not defy Congress' command that "an online marketplace shall only be required

4   to count" online transactions, 15 U.S.C. §45f(f)(3)(B), by demanding that online marketplaces count

5   offline transactions as well.

6       **B.     Section 230 of the Communications Decency Act Preempts SB 1144.**

7       SB 1144 is also expressly preempted by §230 of the CDA, which Congress enacted "to

8   encourage the unfettered and unregulated development of free speech on the Internet, and to promote

9   the development of e-commerce," while "keep[ing] government interference in the medium to a

10  minimum." *Batzel v. Smith,* 333 F.3d 1018, 1027 (9th Cir. 2003). As explained, preemption is "a

11  question of statutory construction" that begins with "the plain wording of the statute." *Am. Apparel*,

12  107 F.4th at 939. Like the federal INFORM Act, §230 contains a broad express-preemption clause:

13  "[N]o liability may be imposed under any State or local law that is inconsistent with this section." 47

14  U.S.C. §230(e)(3). And, as pertinent here, §230(c)(1) declares that "[n]o provider … of an interactive

15  computer service shall be treated as the publisher or speaker of any information provided by another

16  information content provider." 47 U.S.C. §230(c)(1).

17      The Ninth Circuit has construed these provisions to extend "robust immunity" to "(1) a provider

18  or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of

19  action, as a publisher or speaker (3) of information provided by another information content provider.'"

20  *Est. of Bride*, 112 F.4th at 1176 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir.

21  2009)). The first requirement for §230 immunity is plainly met here. SB 1144 expressly regulates

22  "provider[s] of … an interactive computer service," *id.*, which encompasses websites and other online

23  services. *Fair Hous. Council*, 521 F.3d at 1162 n.6. "Online marketplace[s]," such as Facebook,

24  Nextdoor, and OfferUp, unquestionably fit the bill. *See* SB 1144 §3(c). The third requirement is also

25  unquestionably satisfied. "[I]nformation provided by another information content provider" means

26  "content created by third parties," *Fair Hous. Council*, 521 F.3d at 1162, and SB 1144 expressly imposes

27  liability on online marketplaces based on the "independent" speech of "third-party sellers," SB 1144

28  §3(d); *see id.* §§5, 6; Cal. Civil Code §§1749.8.2, 1749.8.3. Accordingly, SB 1144 is "inconsistent with"

- 14 -

§230(c)(1), and thus preempted, if it "seeks to treat" online marketplaces "as a publisher or speaker" with respect to third-party listings. *Barnes*, 570 F.3d at 1100-01.

Because "the CDA does not define 'publisher,'" *id.*, the Ninth Circuit has given the term its plain and ordinary meaning. "[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102. The Ninth Circuit has accordingly held that §230(c)(1) "shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Id.* at 1105. "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council*, 521 F.3d at 1170-71; *accord Barnes*, 570 F.3d at 1103 ("to impose liability on the basis of [a failure to remove content] necessarily involves treating the liable party as a publisher of the content it failed to remove").

Applying these principles, courts (including the Ninth Circuit) have repeatedly held that §230(c)(1) preempts any state from imposing a "duty [that] would necessarily require an internet company to monitor third-party content." *Est. of Bride*, 112 F.4th at 1177 n.3; *see, e.g.*, *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (Section 230 preempted claim that sought "to hold Facebook liable for disseminating 'improper content' on its website"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (holding that §230 expressly preempts "attempts to hold [a defendant] liable for decisions relating to the monitoring, screening, and deletion of content from its network," as these are "actions quintessentially related to a publisher's role"). For example, the Ninth Circuit recently held that §230 bars state-law claims for defective design, defective manufacturing, and negligence against Grindr, a dating app, that "fault[] Grindr for facilitating communication among users" engaged in "illegal activity, including the exchange of child sexual abuse material." *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152-53 (9th Cir. 2025). As that decision explains, "[t]hese claims necessarily implicate Grindr's role as a publisher of third-party content," as they impose a "duty [that] would require Grindr to monitor third-party content," and so they are barred by §230. *Id.* at 1153. Similarly, the Ninth Circuit has held that §230 bars efforts to hold "a social networking website" liable for "facilitat[ing] the communication and content of others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019); *accord Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (§230

barred "negligence claim … based on defendants' failure to stop third parties from 'harassing and bullying'" the plaintiff "through the Facebook platform" (brackets omitted)).  And courts have likewise found that §230 precludes efforts to impose liability on an online marketplace "for having notice of illegal activities conducted by others on its web site" and failing to "take action against those third parties." *Gentry v. eBay, Inc.*, 121 Cal.Rptr.2d 703, 718 (Cal. Ct. App. 2002); *see, e.g.*, *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F.Supp.3d 1097, 1105-08 (C.D. Cal. 2017) (§230 precluded claim attempting to hold Airbnb liable for failing "[t]o prevent unauthorized subleases"); *Airbnb, Inc. v. City of Boston*, 386 F.Supp.3d 113, 123-24 (D. Mass. 2019) (§230 preempted law that "facially compel[ed]" Airbnb "to monitor and remove third-party content" related to unauthorized short-term rentals);

SB 1144 runs headlong into those precedents.  For one thing, the enactment expressly requires online marketplaces "to monitor [third-party] listings," and specifically directs them to "[m]aintain … written policies, systems, and staff" to perform such monitoring, all in service of "prevent[ing] and detect[ing] organized retail crime" on their services.  SB 1144, §6(b)(1)(D).  And SB 1144 reinforces this monitoring requirement by imposing significant liability if an online marketplace "knows *or should know* that a third-party seller is selling or attempting to sell stolen goods to a California resident" but fails to "alert" law enforcement.  *Id.* §6(a) (emphasis added).  SB 1144 also requires online marketplaces to remove third-party content, directing them to impose "consequences … including, but not limited to, suspension or termination of the seller's account," upon determining that a user has knowingly sold stolen goods on the platform.  *Id.* §6(b)(1).  Each of those provisions impermissibly treats online marketplaces as "publisher[s]" of third-party speech within the meaning of §230(c)(1).  *See, e.g.*, *Grindr Inc.*, 128 F.4th at 1152-53.

While this Court's §230 analysis could end there, *see Barnes*, 570 F.3d at 1104-05, the surrounding statutory framework confirms the Ninth Circuit's straightforward reading of the statute's text.  In a neighboring subsection, Congress announced its express intent not only "to remove disincentives" to voluntary self-policing, but also "to promote the continued development of the Internet" and to "preserve [a] vibrant and competitive free market, unfettered by Federal or State regulation." 47 U.S.C. §230(b).  This context confirms that §230(c)(1) precludes liability not only when an online service engages in "blocking and screening of offensive material," but also when it enables

- 16 -

"post[ing]" of "content generated entirely by third parties" with limited or even no screening at all. *Barnes*, 570 F.3d at 1105; *see also Fair Hous. Council*, 521 F.3d at 1175 (recognizing "the intent of Congress to preserve the free-flowing nature of Internet speech and commerce"). The statute thus makes clear *both* (1) that online services cannot be penalized for making an effort to remove objectionable third-party content, and (2) that online services cannot be forced to "tak[e] responsibility for all" such third-party speech, as the "sheer volume" of Internet-facilitated speech make it difficult or even "impossible" to review (let alone effectively filter) all of it. *Fair Hous. Council*, 521 F.3d at 1163. Again, SB 1144 is flatly inconsistent with the latter directive, as it demands that an online marketplace "monitor" all third-party listings and imposes penalties if a marketplace "should [have] know[n] that a third-party seller is selling or attempting to sell stolen goods to a California resident," SB 1144 §6(a), (b)(1)(D).

History provides further confirmation that §230(c)(1) preempts SB 1144. At common law, publishers and speakers were generally responsible for any harmful content they published, regardless of whether it was originally someone else's speech. *See* Restatement (Second) of Torts §578 & cmt. b (1977); *see also Peck v. Tribune Co.*, 214 U.S. 185, 189 (1909). In contrast, one who merely distributed third-party content (e.g., a newsstand or bookstore) could not be held liable unless the distributor knew or had reason to know its substance. *See* Restatement (Second) of Torts §581 & cmt. b. In the early 1990s, when courts attempted to apply this regime to the nascent Internet, it created a problematic dynamic. In one early case, an online service that "perform[ed] some voluntary self-policing" by attempting to delete objectionable content from an online message board was treated as "publisher" of the entire board, and was therefore on the hook for *any* potentially defamatory message it failed to delete. *Fair Hous. Council*, 521 F.3d at 1163 (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)). By contrast, a similar online service that "ignore[d] problematic posts altogether" was not considered a publisher or speaker, so it could "altogether escape liability." *Id.*; *see Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 140 (S.D.N.Y.1991). Traditional rules thus created a perverse incentive for websites to "bury their heads in the sand." *Fair Hous. Council*, 521 F.3d at 1163. Congress responded by enacting §230's directive that an online service may not be treated as "publisher or speaker of any" third-party content that it plays no role in creating. 47 U.S.C.

§230(c)(1); *see Fair Hous. Council*, 521 F.3d at 1163 (discussing this history). In effect, §230(c)(1) overruled both *Prodigy* and *CompuServe*, declaring that an online service cannot be held liable as a publisher of third-party content, period, regardless of whether it curates the content to some extent (like a traditional publisher) or merely disseminates it (like a traditional distributor). SB 1144 is flatly inconsistent with that nationwide regime.

In sum, the statutory text, context, and history all confirm that CDA §230 provides broad and comprehensive protection against efforts to hold online services liable for the independent speech of their users. *See, e.g.*, *Grindr*, 128 F.4th at 1152-53; *Barnes*, 570 F.3d at 1100-01, 1105; *Fair Hous. Council*, 521 F.3d at 1173-74; *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1042-43 (W.D. Tex. 2024). Because SB 1144 is just such an effort, it is expressly preempted.

**C.    SB 1144 Runs Afoul of the First Amendment.**

SB 1144 violates the First Amendment as well. The law triggers heightened scrutiny because it imposes major burdens on the rights to speak, listen, and associate. And the exceedingly onerous obligations it imposes on online marketplaces—but not third-party sellers engaged in the potential illegal activity it targets—cannot begin to satisfy that scrutiny.

**1.    SB 1144 Triggers Heightened First Amendment Scrutiny.**

SB 1144 triggers heightened scrutiny in multiple ways. First, it impinges on the First Amendment rights of companies that operate online marketplaces, i.e., NetChoice's members. "[O]nline speech stands on the same footing as other speech—there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). Accordingly, just as the First Amendment protects a newspaper's right to disseminate advertisements and classified listings, it protects NetChoice members' right to disseminate third-party sellers' speech over the Internet and to exercise editorial discretion over the listings, advertisements, and other content they wish to disseminate and display on their own platforms. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 730-33, 737-38 (2024); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).

SB 1144 severely burdens those expressive activities. The law's expanded definition of "high-volume third-party seller," SB 1144 §3(b), forces online marketplaces that disseminate speech (1) to

- 18 -

investigate and maintain information about third-party sales that occur entirely off-platform, which they otherwise would have no reason or ability to track; (2) to mandate and carry disclosures by "high-volume third-party sellers"; and (3) to verify the accuracy of such information and disclosures. In addition, SB 1144 creates expansive duties to "monitor listings in order to affirmatively prevent and detect organized retail crime," and to detect and remove listings related to "stolen goods," coupled with significant liability based on what an online marketplace "knows or should know" about third-party listings. *See* SB 1144 §6(a), (b)(1)(A), (b)(1)(D). By imposing these onerous requirements, SB 1144 "exacts a penalty" from those who choose to disseminate third-party speech that entails any kind of offer of an item for sale (which itself is protected speech). *Cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974). Laws that impose such burdens on constitutionally protected speech are subject to heightened First Amendment scrutiny. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."); *Doe v. Harris*, 772 F.3d 563, 568, 574-76 (9th Cir. 2014) (state law imposing "sex offender registration requirements related to Internet usage" triggered heightened scrutiny because it "impose[d] a substantial burden on sex offenders' ability to engage in legitimate online speech, and to do so anonymously"); *Wash. Post v. McManus*, 944 F.3d 506, 515-17, 520 (4th Cir. 2019) (state law requiring "online platforms" to publicly post certain facts about the paid advertisements they carry triggered heightened scrutiny because it "deter[red] hosting" that constitutionally protected speech).

Second, SB 1144 compels speech—multiple times over. For one, it forces online marketplaces to require anyone who could potentially qualify as a high-volume seller based on off-platform activity to turn over information sufficient for the online marketplace to make a judgment about whether further disclosures are mandated. For another, if the third party qualifies as a high-volume seller, SB 1144 mandates disclosure of personal information, including sensitive items such as bank information and SSNs, to online marketplaces. Cal. Civil Code §1749.8.1(a). Finally, it forces some of those sellers to provide (and online marketplaces to convey) certain information to the general public. *Id.* §1749.8.2(a). Time and again, the Supreme Court has applied heightened scrutiny to laws that compel speech, including "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*

- 19 -

1   ("*NIFLA*"), 585 U.S. 755, 773-75 (2018); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781,

2   795-801 (1988).

3            Third, SB 1144 will inevitably result in the suppression of significant amounts of constitutionally

4   protected user posts and item listings on the online services it regulates.  If it takes effect, SB 1144 will

5   prompt some users to refrain from perfectly legitimate speech to avoid having to hand over their bank

6   information and SSNs to online marketplaces commandeered to monitor and investigate third parties'

7   activities.  Moreover, given the steep compliance costs and hefty civil sanctions for non-compliance,

8   online services will inevitably conclude that some user content they would otherwise display and

9   disseminate raises too many risks.  *See McManus*, 944 F.3d at 516-17.  Indeed, some may attempt to

10  stop doing business in California entirely, rather than attempt to monitor millions of third-party listings

11  under threat of massive penalties if a jury later determines that they missed something they "should

12  [have] know[n]," SB 1144 §6(a).  The law thus not only overrides the online marketplaces' editorial

13  discretion and restricts potential high-volume sellers' right to speak, but also burdens the First

14  Amendment rights of users of online marketplaces who would willingly view, comment on, and

15  exchange consumer feedback regarding the suppressed listings and advertisements absent the State's

16  incursion.  *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (permitting

17  bookseller to vindicate "the First Amendment rights of bookbuyers").

18            **2.    SB 1144 Cannot Survive Heightened Scrutiny.**

19            SB 1144 burdens both non-commercial and commercial speech, and thus unquestionably triggers

20  at least intermediate scrutiny, which requires the state to show that the law is "narrowly tailored to

21  achieve" a substantial governmental interest.[4]  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556

22  (2001); *see, e.g.*, *Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109, 1116-20 (9th Cir. 2023).  The state

23  cannot satisfy that demanding test.  According to its legislatively enacted statement of purpose, SB 1144

24  is supposed "to stop theft from retail stores and community theft by curtailing the sale of stolen property

25  _____

26       [4] NetChoice reserves the right to argue that strict scrutiny applies because (1) SB 1144 burdens more than just commercial speech and (2) its heavy burdens on protected expression should receive strict scrutiny regardless of whether it affects only "commercial speech." *See Lorillard Tobacco*, 533

27  U.S. at 572 (Thomas, J., concurring in part and concurring in the judgment) ("I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict

28  scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial.'").

on online marketplaces." SB 1144 §1. While the state has a legitimate interest in combating theft and preventing the sale of stolen property, this law is not remotely tailored to advance those interests.

To begin, SB 1144 is wildly overinclusive, as it burdens huge swathes of constitutionally protected expression that have nothing to do with "theft from retail stores" or "community theft." Instead of targeting misleading or unlawful speech (let alone the underlying non-speech activities that the state seeks to prevent), the law requires online marketplaces "to monitor" the contents of millions of third-party listings, SB 1144 §6(b)(1)(D), under threat of sizable civil penalties, even though the overwhelming majority of those listings are perfectly lawful. On top of that, SB 1144 saddles online marketplaces—including classifieds platforms that do not participate in transactions and instead merely provide a forum for third-party speech—with the impossible task of attempting to monitor the huge volume of *off-platform* transactions that their services in some way facilitate, which is essential to determine who is a "third-party seller" under SB 1144 §3.

These requirements "burden substantially more speech than is necessary to further the government's legitimate interests." *Cf. Packingham v. North Carolina*, 582 U.S. 98, 106 (2017). As the Supreme Court and the Ninth Circuit have repeatedly held, such overinclusiveness is fatal. In *Packingham*, for example, the Supreme Court concluded that a law prohibiting registered sex offenders from accessing any "social networking Web site" with members under 18 years of age burdened far too much legitimate First Amendment activity to survive heightened scrutiny. *Id.* at 107-09. Similarly, in *Doe v. Harris*, the Ninth Circuit preliminarily enjoined a law requiring sex offenders to inform the government within 24 hours of using a new Internet identifier, holding that this "onerous," "across-the-board" registration requirement would "unnecessarily deter[] registered sex offenders from engaging in legitimate expressive activity." 772 F.3d at 581-82. And in *Redondo Beach*, the Ninth Circuit held that a local ordinance restricting solicitation of employment, business, or contributions from any occupant of a motor vehicle was unconstitutional because it suppressed many types of protected speech—e.g., "Girl Scouts selling cookies on the sidewalk outside of their school" and "signbearers on sidewalks seeking patronage"—that do not implicate the government's "interest in promoting traffic flow and safety." 657 F.3d at 947-50. SB 1144 likewise burdens far too much protected speech to pass muster.

Underscoring SB 1144's overinclusiveness problem, California "has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *See id.* at 949. Instead of burdening constitutionally protected expression on online marketplaces, California could combat "organized retail theft" by enforcing its numerous existing laws that prohibit "theft," *e.g.*, Cal. Penal Code §484, "organized retail theft," *id.* §490.4, "theft of retail merchandise," *id.* §490.5, and the possession or sale of stolen goods, *see, e.g.*, *id.* §§496, 496.5, 496.6. The Ninth Circuit has repeatedly held that speech-restrictive laws fail heightened scrutiny when, as here, there are obvious "alternatives" that "would restrict less speech and would more directly advance [the government's] asserted interest." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1178 (9th Cir. 2018); *see id.* at 1178-79 (restriction on merchants' description of credit-card surcharges was not narrowly tailored to "preventing consumer deception" since "California could … enforce its existing laws banning unfair business practices and misleading advertising in pricing"); *Redondo Beach*, 657 F.3d at 949-50 (restriction on soliciting business from motor vehicles was not narrowly tailored to "protect traffic safety and flow" since the city could "enforce laws against jaywalking, stopping traffic alongside a red-painted curb, and stopping a car 'so as to obstruct the normal movement of traffic'" (citations and footnote omitted)).

On the flipside, SB 1144 is "wildly underinclusive when judged against its asserted justification." *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011); *see also Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 904-06 (9th Cir. 2009); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 775-76 (S.D. Miss. 2024). The law does not even prohibit (much less prevent) "theft" or impose any civil or criminal penalty on individuals who steal from "retail stores" or elsewhere in the "community." *Cf.* SB 1144 §1. Indeed, it does not *directly* regulate third-party sellers at all. Rather than require high-volume sellers, who have ready information about the volume, nature, and location of their own sales, to make certain disclosures whenever and wherever they offer an item for sale, SB 1144 imposes obligations and potential penalties *solely* on websites engaged in curating and disseminating speech (but not the processing of sales). Regulating speakers rather than those involved in the primary activity the state purports to target is the antithesis of narrow tailoring. This misdirection of obligations and penalties will render SB 1144 nearly useless in stopping theft or illegal sales by organized criminals. It will take little effort for actual criminals to evade the law's enhanced disclosure requirements. At

- 22 -

most, those requirements might inconvenience bad actors by impelling them to conduct more of their illegal activities entirely offline, to spread their online transactions among several different platforms, or to create multiple "seller" accounts. "That is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802; *see McManus*, 944 F.3d at 510 (attempt to combat election interference by forcing "online platforms" to disclose information about third-party political ads was "too circuitous and burdensome" to satisfy heightened scrutiny).

Indeed, SB 1144's First Amendment problems in general and its lack of tailoring in particular are exacerbated by the reality that some of the means it employs are constitutionally problematic. The government may have an interest in policing illegal activity, but it only has a legitimate interest in doing so consistent with the Fourth Amendment and other restrictions on government action. Courts have long recognized that requiring companies to give the government access to information they generate and collect in the ordinary course of business is consistent with the Fourth Amendment. But there is no legitimate justification for forcing companies to investigate and collect otherwise private information that is not generated as an ordinary business record. Extending the obligations of enterprises, especially enterprises engaged in First Amendment activity, from collecting and retaining ordinary business records to investigating, obtaining, and retaining private information they would otherwise not collect is no small leap. The latter information is data the government could only obtain through compliance with the Fourth Amendment. The government has no legitimate interest in evading the Fourth Amendment by foisting those obligations on NetChoice and its members. *Cf. Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly.").

In sum, SB 1144's expansive, unprecedented burdens on online speech come nowhere close to satisfying heightened scrutiny, and are flatly inconsistent with the First Amendment.

## II.    The Other Preliminary Injunction Factors Overwhelmingly Weigh In Favor Of Maintaining The Status Quo.

While "[l]ikelihood of success on the merits is the most important factor" in determining whether preliminary relief is warranted, *Apartment Ass'n of L.A. Cnty.*, 10 F.4th at 912, all the remaining factors also tip decidedly in NetChoice's favor.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION          CASE NO. 5:25-CV-03178

A.      **NetChoice Members Will Suffer Irreparable Harm Absent Preliminary Relief.**

If permitted to go into effect, SB 1144 will inflict at least two distinct forms of irreparable harm on NetChoice members.  First, it is well established that "[t]he deprivation of 'First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Indeed, under Ninth Circuit precedent, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."  *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005); *accord CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) ("Irreparable harm is relatively easy to establish in a First Amendment case.").  NetChoice's First Amendment claim is far more than just "colorable"; it is likely to succeed.  *See supra* pp.18-23.  That alone satisfies the irreparable-injury requirement.

Second, SB 1144 will inflict irreparable harm in the form of unrecoverable compliance costs.  *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("[W]here parties cannot typically recover monetary damages flowing from their injury … economic harm can be considered irreparable."); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (similar).  If forced to comply with SB 1144 §3, NetChoice members will have to devote massive amounts of resources to establish, test, and implement processes to monitor hundreds of millions of third-party listings to determine which may have led to off-platform sales, where the sales occurred, and what the buyer paid.  Ex.B ¶8; Ex.C ¶40; Ex.D ¶25.  In addition, SB 1144 §6 would force NetChoice members to hire additional staff and implement new systems to attempt to monitor this massive volume of third-party speech in hopes of "affirmatively prevent[ing] and detect[ing] organized retail crime."  *See* Ex.B ¶8; Ex.C ¶44; Ex.D ¶28.  Even if that were feasible, it would be extremely costly, and there is no way to recover those costs if the Court ultimately determines that SB 1144 is invalid.  *See Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021) ("[S]tate sovereign immunity protects state officer defendants sued in federal court in their official capacities from liability in damages.").

**B.      The Balance of Equities and Public Interest Strongly Favor an Injunction.**

The balance of hardships and the public interest both favor a preliminary injunction as well.  The Ninth Circuit has held that when—as here—a plaintiff "raise[s] serious First Amendment questions," it "compels a finding that … the balance of hardships tips sharply in [the plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007); *accord Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) ("[P]laintiffs who are able to 'establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" (alterations omitted).  The Ninth Circuit has also recognized that it is appropriate to grant preliminary relief to relieve plaintiffs of "financial burdens" inflicted by a law that is likely invalid.  *See City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020).  Further, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012); *see, e.g.*, *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Here, the public interest will be affirmatively harmed if SB 1144 goes into effect, as companies may be forced to remove all sorts of otherwise unproblematic listings in California out of an abundance of caution.  *See* Ex.C ¶¶41-46; Ex.D ¶¶29-30.

In contrast, California "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird*, 81 F.4th at 1042 (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)).  And "to the extent" the state may "suffer an abstract form of harm whenever one of its acts is enjoined," that "is not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (per curiam) (brackets omitted).  Moreover, there are "various other laws … that would allow [California] to achieve its stated interests" while the parties litigate the merits of NetChoice's claims.  *Cf. Redondo Beach*, 657 F.3d at 949.  For example, it could enforce the federal INFORM Act and existing state laws that directly prohibit "organized retail theft," "theft of retail merchandise," and the possession or sale of stolen goods.  *See, e.g.*, Cal. Penal Code §§490.4, 490.5, 496, 496.5, 496.6.  All relevant factors thus tip strongly in favor of maintaining the status quo.

**CONCLUSION**

NetChoice's motion for preliminary injunction should be granted.

- 25 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: April 14, 2025

/s/ *Paul D. Clement*
Paul D. Clement (*pro hac vice*)
Erin. E. Murphy (*pro hac vice*)
James Y. Xi (*pro hac vice*)
Joseph J. DeMott (*pro hac vice*)
**CLEMENT & MURPHY PLLC**
706 Duke Street
Alexandria, VA 22314
Telephone: 202.742.8900
Email: paul.clement@clementmurphy.com
   erin.murphy@clementmurphy.com
   james.xi@clementmurphy.com
   joseph.demott@clementmurphy.com

Adam S. Sieff (Cal. Bar. # 302030)
**DAVIS WRIGHT TREMAINE LLP**
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: 213.633.8618
Email: adamsieff@dwt.com

*Attorneys for Plaintiff*

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION        CASE NO. 5:25-CV-03178