1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Rob Bonta in his Official Capacity as*
   *Attorney of the State of California*

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                     SAN JOSE DIVISION

12

13  | | |
    |---|---|
    | **NETCHOICE,** | Case No: 5:25-cv-03178-BFL |
    | Plaintiff, | **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
    | v. | |
    | | Date:         June 26, 2025 |
    | **ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,** | Time:         9:00 a.m. |
    | | Courtroom:  1, 5th Floor |
    | | Judge:        Hon. Beth Labson Freeman |
    | Defendant. | Trial Date:   n/a |
    | | Action Filed: April 9, 2025 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Statutory Background .................................................................................................. 3

    I.     Title 1.4D ................................................................................................... 3

    II.    The Federal INFORM Act .......................................................................... 4

Argument ..................................................................................................................... 5

    I.     Plaintiff Is Unlikely to Succeed on the Merits of Its Claims ................................. 5

           A.     Plaintiff Is Unlikely to Succeed on Its Express Preemption Claim As to the INFORM Act .................................................................... 5

           B.     Plaintiff Is Unlikely to Succeed on Its Express Preemption Claim As to Section 230 of the Communications Decency Act ......................... 11

           C.     Plaintiff Is Unlikely to Succeed on Its First Amendment Claim ............. 15

           D.     Plaintiff Is Unlikely to Succeed on the Merits of Any of Its Claims Because It Cannot Bring a Facial or an As-Applied Challenge ............... 21

    II.    Plaintiff Has Not Met Its Burden of Showing That Its Members Will Suffer Irreparable Harm in the Absence of an Injunction ................................................. 23

    III.   The Merged Factors of the Balance of Equities and the Public Interest Weigh Against the Issuance of an Injunction .................................................... 25

Conclusion .................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*A.B. v. Salesforce, Inc.*
   123 F.4th 788 (5th Cir. 2024) ................................................................. 12

*Advoc. Health Care Network v. Stapleton*
   581 U.S. 468 (2017) ................................................................................. 6

*Airbnb, Inc. v. City & Cnty. of San Francisco*
   217 F. Supp. 3d 1066 (N.D. Cal. 2016) ................................................. 14

*Altria Grp., Inc. v. Good*
   555 U.S. 70 (2008) ................................................................................ 5, 6

*Anderson v. TikTok, Inc.*
   116 F.4th 180 (3d Cir. 2024) ................................................................. 12

*Ariz. Att'ys for Crim. Justice v. Mayes*
   127 F.4th 105 (9th Cir. 2025) ................................................................ 21

*Ark. Educ. Television Comm'n v. Forbes*
   523 U.S. 666 (1998) ............................................................................... 20

*Ass'n of Christian Sch. Int'l v. Stearns*
   362 F. App'x 640 (9th Cir. 2010) ......................................................... 22

*Barnes v. Yahoo!, Inc.*
   570 F.3d 1096 (9th Cir. 2009) ........................................... 11, 12, 13, 15

*Calise v. Meta Platforms, Inc.*
   103 F.4th 732 (9th Cir. 2024) ................................................ 11, 13, 15

*Chamber of Com. of U.S. v. Whiting*
   563 U.S. 582 (2011) ................................................................................. 9

*Chamberlan v. Ford Motor Co.*
   314 F. Supp. 2d 953 (N.D. Cal. 2004) ................................................. 10

*Cipollone v. Liggett Grp., Inc.*
   505 U.S. 504 (1992) ................................................................................. 9

*City of Auburn v. U.S. Gov't*
   154 F.3d 1025 (9th Cir. 1998), (Oct. 20, 1998) ..................................... 9

*Colvin v. Roblox Corp.*
   725 F. Supp. 3d 1018 (N.D. Cal. 2024) ............................................... 13

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*CTIA - The Wireless Ass'n v. City of Berkeley, California*
    928 F.3d 832, 842 (9th Cir. 2019) ................................................................... 17, 18

4

*Doe v. Grindr Inc.*
    128 F.4th 1148 (9th Cir. 2025) ................................................................... 14

5

6

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ................................................................... 25

7

*Exxon Corp. v. Governor of Maryland*
    437 U.S. 117 (1978) ................................................................... 9

8

9

*Fair Housing Council of San Fernando Valley v. Roommates.com, Inc.*
    521 F.3d 1152 (9th Cir. 2008) ................................................................... 11, 14, 15

10

11

*Firestone v. Yellen*
    2024 WL 4250192 (D. Or. Sept. 20, 2024) ................................................................... 16

12

13

*Full Value Advisors, LLC v. S.E.C.*
    633 F.3d 1101 (D.C. Cir. 2011) ................................................................... 16, 17

14

15

*Garcia v. Google, Inc.*
    786 F.3d 733, 746 (9th Cir. 2015) ................................................................... 24

16

17

*Haskell v. Brown*
    677 F. Supp. 2d 1187 (N.D. Cal. 2009) ................................................................... 25

18

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*
    736 F.3d 1239 (9th Cir. 2013) ................................................................... 24

19

*Hoang v. Reunion.com, Inc.*
    2010 WL 1340535 (N.D. Cal. Mar. 31, 2010) ................................................................... 10

20

21

*HomeAway.com, Inc. v. City of Santa Monica*
    918 F.3d 676 (9th Cir. 2019) ................................................................... 13, 15, 19

22

23

*Hous. & Redevelopment Auth. of Duluth v. Lee*
    852 N.W.2d 683 (Minn. 2014) ................................................................... 6

24

*Hunt v. Washington State Apple Advert. Comm'n*
    432 U.S. 333 (1977) ................................................................... 21

25

26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*
    515 U.S. 557 (1995) ................................................................... 19

27

28

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3
4

*In re Anonymous Online Speakers*
   661 F.3d 1168 (9th Cir. 2011) ................................................................. 19

5
6

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*
   625 F. Supp. 3d 971 (N.D. Cal. 2022) ...................................................... 15

7

*Jones v. Google LLC*
   73 F.4th 636 (9th Cir. 2023) ......................................................... 7, 8, 9

8
9

*Jordan v. Nationstar Mortg., LLC*
   240 F. Supp. 3d 1114 (E.D. Wash. 2017) .................................................. 8

10

*Junior Sports Mags., Inc. v. Bonta*
   80 F.4th 1109 (9th Cir. 2023) ................................................................. 18

11
12

*Lemmon v. Snap, Inc.*
   995 F.3d 1085 (9th Cir. 2021) ..................................................... 12, 13, 15

13
14

*Lewis v. USIS Com. Servs., Inc.*
   2009 WL 10751553 (C.D. Cal. Oct. 5, 2009) .......................................... 9

15

*Loan Payment Admin. LLC v. Hubanks*
   821 F. App'x 687 (9th Cir. 2020) ............................................................ 18

16
17

*Lorillard Tobacco Co. v. Reilly*
   533 U.S. 525 (2001) .............................................................................. 18

18
19

*M.P. by & through Pinckney v. Meta Platforms Inc.*
   127 F.4th 516 (4th Cir. 2025) .................................................................. 14

20

*Maryland v. King*
   567 U.S. 1301 (2012) ............................................................................. 25

21
22

*Maynard v. Snapchat, Inc.*
   346 Ga. App. 131 (2018) ........................................................................ 12

23
24

*Medtronic, Inc. v. Lohr*
   518 U.S. 470 (1996) ................................................................................. 5

25

*Moody v. NetChoice, LLC*
   603 U.S. 707 (2024) ........................................................................ 20, 21

26
27

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
   585 U.S. 755 (2018) ........................................................................ 16, 19

28

iv

1
2

### TABLE OF AUTHORITIES
#### (continued)

Page

3
4
*National Meat Association v. Harris*
565 U.S. 452 (2012).............................................................................. 6

5
6
*Nationwide Biweekly Admin., Inc. v. Owen*
873 F.3d 716 (9th Cir. 2017).............................................................. 18

7
*NetChoice v. Bonta*
761 F. Supp. 3d 1202 (N.D. Cal. 2024) ........................................... 22

8
9
*NetChoice, LLC v. Bonta*
--- F. Supp. 3d. --- (N.D. Cal. Mar. 13, 2025)................................. 9

10
*NetChoice, LLC, v. Bonta*
Case No. 25-cv-03178-SVK, Dkt. 20–20-5 ..................................... 24

11
12
*NetChoice, LLC v. Carr*
2024 WL 3262633 (N.D. Ga. June 30, 2024) ................................. 10

13
14
*NetChoice, LLC, v. Carr*
Case No. 24-cv-02485-SDG, Dkt. 2–2-6 ......................................... 24

15
*Oakland Trib., Inc. v. Chron. Pub. Co.*
762 F.2d 1374 (9th Cir. 1985)............................................................ 24

16
17
*Orion Wine Imports, LLC v. Appelsmith*
837 F. App'x 585 (9th Cir. 2021) ..................................................... 16

18
19
*Rutledge v. Pharm. Care Mgmt. Ass'n*
592 U.S. 80 (2020)................................................................................ 6

20
*S. California Inst. of L. v. Biggers*
613 F. App'x 665 (9th Cir. 2015) ..................................................... 18

21
22
*Sciortino v. Pepsico, Inc.*
108 F. Supp. 3d 780 (N.D. Cal. 2015) ............................................... 6

23
24
*Sorrell v. IMS Health Inc.*
564 U.S. 552 (2011).............................................................................. 20

25
*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*
585 F. App'x 390 (9th Cir. 2014)...................................................... 24

26
27
*United States v. Arnold*
740 F.3d 1032 (5th Cir. 2014)............................................................ 17

28

1

## TABLE OF AUTHORITIES
### (continued)

2
Page

3    *United States v. Nader*
        542 F.3d 713 (9th Cir. 2008)................................................................ 8
4

5    *United States v. Salerno*
        481 U.S. 739 (1987)....................................................................... 21
6

7    *United States v. Sindel*
        53 F.3d 874 (8th Cir. 1995)................................................................ 17

8    *Wash. State Grange v. Wash. State Republican Party*
        552 U.S. 442 (2008)....................................................................... 21
9

10   *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*
        471 U.S. 626 (1985)................................................................ 16, 17

11   STATUTES

12   15 U.S.C. § 45f............................................................................. *passim*

13   47 U.S.C. § 230.................................................................... 11, 12, 13

14   California Civil Code
        § 1749.8................................................................................ *passim*
15      § 1749.8.1....................................................................... 3, 4, 25
        § 1749.8.2.......................................................................... 3, 4
16      § 1749.8.3............................................................................ 12
        § 1749.8.4............................................................................. 3
17      § 1749.8.9....................................................................... 14, 19
        § 1749.8.9(a)..................................................................... 4, 12
18

19   CONSTITUTIONAL PROVISIONS

20   United States Constitution
        art. VI, cl. 2........................................................................ 8
21

22

23

24

25

26

27

28

# INTRODUCTION

To address the online sale of stolen merchandise, in 2022 California passed Senate Bill 301, codified at Title 1.4D. That law requires online marketplaces to collect certain identifying information from "high-volume sellers," defined as sellers who used those marketplaces to process payment for more than 200 sales of greater than $5,000 over the preceding 24 months. In 2024, California amended Title 1.4D, through the passage of Senate Bill 1144. Among other things, SB 1144 also requires: (a) in calculating whether sellers qualify as "high-volume," all sales that utilized the online marketplace be included, even if payment was not processed through the marketplace; (b) online marketplaces must establish and maintain a policy prohibiting the sale of stolen goods, as well as procedures for individuals to contact the marketplace and the marketplace to contact law enforcement; and (c) those policies and procedures must be posted the marketplace's website.

Plaintiff, a trade association of online businesses, has moved to enjoin SB 1144 before it takes effect July 1, 2025. But because Plaintiff has not shown a likelihood of success on the merits of its claims, the prospect of irreparable harm, or that the equities tilt in its favor, its motion should be denied.

First, SB 1144 is not preempted by the federal INFORM Act. The INFORM Act preempts only those state laws that "conflict" with it, and Plaintiff does not argue that its members cannot comply with both SB 1144 and the INFORM Act. Instead, Plaintiff seeks to stretch the meaning of "conflict" into "non-identical," which it plainly does not mean. Had Congress wanted to preempt state laws that were not identical to federal law on the issue of reporting requirements for high-volume sellers and the online marketplaces which they utilize, it could have done so. It did not.

Second, Plaintiff's preemption argument as to Section 230 of the Communications Decency Act fares no better. The Ninth Circuit has repeatedly emphasized that Section 230 immunity does not extend beyond cases in which the plaintiff's theory of liability is premised on an online company being treated as the "speaker" or "publisher" of third-party information. In this case, the challenged law does not require publication of the information provided to online marketplaces

1    by third parties and requires those marketplaces to protect that information from disclosure. The

2    requirement that marketplaces maintain a policy for preventing the sale of stolen goods likewise

3    does not treat online marketplaces as "speakers" or "publishers" of sellers' listings for Section

4    230 purposes.

5        Plaintiff is also unlikely to succeed on its First Amendment claim because, as a threshold

6    matter, it lacks standing as to much of that allegedly compelled speech. Even if this Court were to

7    enjoin the enforcement of SB 1144, Plaintiff's members would still be subject to many of the

8    same purportedly objectionable provisions of the law under the unamended (and unchallenged)

9    version of Title 1.4D as well as under the INFORM Act, and thus redressability is not satisfied. In

10   any event, Plaintiff will not succeed on the merits of this claim because the requirement that high-

11   volume sellers provide information to online marketplaces is not "compelled speech" given that

12   SB 1144 does not compel Plaintiff's members to publicly convey any information provided to

13   them by high-volume sellers. Nor does the requirement that online marketplaces and some high-

14   volume sellers provide certain factual, uncontroversial information to consumers violate the First

15   Amendment because such the disclosure of that information, which is reasonably related to a

16   substantial government interest, is properly regulated commercial speech.

17       Additionally, Plaintiff is unlikely to succeed on the merits of any of its claims because it

18   fails to satisfy the standard for a facial challenge (i.e., the law is unconstitutional in all or most of

19   its applications), and it lacks associational standing to bring an as-applied challenge because

20   relevant factual differences in the operation of its member organizations means that the

21   participation of those individual members is required.

22       The other preliminary injunction factors do not tip in Plaintiff's favor. Its argument that its

23   members will suffer irreparable harm in the form of increased monitoring costs is belied by

24   Plaintiff's declarations revealing its members already engage in such monitoring. And the public

25   interest and equities weigh against issuing an injunction given the state's interest in preventing

26   theft.

27       Plaintiff's motion for a preliminary injunction attacks SB 1144's wisdom at every turn. But

28   that disagreement on the Legislature's policy decision does not give rise to any constitutional

1    claims. Plaintiff's motion for a preliminary injunction is, at base, an effort to shoehorn its

2    disagreement with the Legislature's decision into inapplicable constitutional doctrines. The

3    motion should be denied.

## STATUTORY BACKGROUND

4

5    ### I.    TITLE 1.4D

6        On September 30, 2022, the Governor signed Senate Bill 301, codified at Cal. Civil Code

7    § 1749.8 through §1749.8.5, Title 1.4D. This original version of Title 1.4D imposed, *inter alia*,

8    several requirements. First, online marketplaces must require high-volume sellers, defined as

9    those sellers who completed at 200 transactions worth more than $5,000 over the preceding 24

10   months for which payment is processed by the online marketplace directly or through its payment

11   processor, to provide certain identifying information, including a bank account number or the

12   name of the payee for payments issued by the marketplaces, and those marketplaces must verify

13   that information. *See* Cal Civ. Code § 1749.8.1(a)–(b) (prior to amendment). In addition, online

14   marketplaces must require high-volume sellers with at least $20,000 in annual revenue over the

15   previous two years from transactions with California buyers to disclose certain information about

16   the high-volume seller to consumers who have made a purchase with them. *Id.* at § 1749.8.2(a)

17   (prior to amendment). Online marketplaces must also disclose to consumers, on the product

18   listing of a high-volume third-party seller, a reporting mechanism for suspicious activity by the

19   high-volume third-party seller. *Id.* at (b) (prior to amendment). In addition, online marketplaces

20   must suspend future sales activity of a high-volume seller that makes false representations to the

21   marketplace or consumer and may suspend future sales activity of a high-volume seller that has

22   not answered consumer inquiries within a reasonable timeframe. *Id.* at (c)(1)–(2) (prior to

23   amendment). And online marketplaces must institute policies and procedures to protect the

24   information provided to it by high-volume sellers from unauthorized use, disclosure, access,

25   destruction, and modification, *id.* at 1749.8.3(a) (prior to amendment). As originally enacted,

26   Title 1.4D permitted only the Attorney General to enforce its provisions, subjecting violators to a

27   civil penalty not to exceed $10,000 for each violation, *id.* at § 1749.8.4 (prior to amendment).

28

On August 16, 2024, the Governor signed SB 1144, which amended Title 1.4D. The amendments, among other things, revise the high-volume seller calculation to include all sales to California residents "utilizing the online marketplace," regardless of whether the marketplace processed payment directly or through its payment processor. Cal. Civ. Code § 1749.8(b). They also require online marketplaces to "[e]stablish and maintain a policy prohibiting the sale of stolen goods," including providing for the "suspension or termination" of sellers who sell stolen goods, and to share that policy with consumers, *id.* at § 1749.8.9(b). In addition, the amendments require online marketplaces to "alert local, regional, or state law enforcement agencies in California" if they "know[] or should know that a third-party seller is selling or attempting to sell stolen goods to a California resident," *id.* at § 1749.8.9(a). And the amended Title 1.4D permits district attorneys and county attorneys to enforce the statutes. *Id.* at 1749.8.4(a).

Thus, Title 1.4D as amended by SB 1144 sets forth the following requirements relevant to Plaintiff's motion. It requires the transmission of identifying information from high-volume sellers to the online marketplace, Cal. Civ. Code § 1749.8.1, and the transmission of identifying information from certain high-volume sellers to consumers, *id.* at § 1749.8.2(a). It also imposes the obligation to maintain a policy which prohibits the sale of stolen goods and which provides for the suspension or termination of sellers who knowingly sell stolen goods, *id.* at § 1749.8.9(b)(1), and to transmit information about those policies and procedures from the online marketplace to consumers, *id.* at § 1749.8.9(b)(D)(2). And it requires the creation of a reporting mechanism for a consumer to inform the online marketplace that a seller is or may be selling stolen goods, *id.* at § 1749.8.9(b)(1)(B), and places on online marketplaces the obligation to alert law enforcement officials if they know or should know that a third-party seller is selling or attempting to sell stolen goods to a California resident, *id.* at § 1749.8.9(a).

## II.    THE FEDERAL INFORM ACT

On December 29, 2022, Congress passed the Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act (INFORM Act). The requirements of the INFORM Act closely mirror those of Title 1.4D in its original form. Like Title 1.4D, it requires high-volume sellers to provide online marketplaces with identifying information. 15 U.S.C. § 45f(a)(1)(A). It

4

also requires online marketplaces to suspend high-volume sellers for failure to provide that information, *id*. at (a)(1)(C), verify information provided by high-volume sellers, *id*. at (a)(2), and use that information for no other purpose, *id* at (a)(3). Online marketplaces must maintain procedures and practices to protect the information from disclosure, *id*. at (a)(4), require that some high-volume sellers provide certain information to consumers*, id*. at (b)(1), and provide a reporting mechanism for consumers to report suspicious marketplace activity to the marketplace, *id*. at (b)(3). The INFORM Act also contains a clause, entitled to "Relationship to State Laws," which states that "[n]o State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section." *Id*. at (g).

## ARGUMENT

### I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

#### A.    Plaintiff Is Unlikely to Succeed on Its Express Preemption Claim As to the INFORM Act

As an initial matter, the burden Plaintiff must meet to establish that SB 1144 is preempted by the INFORM Act is a heavy one. Because "the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action," and thus courts should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). Against those background principles, Plaintiff is unlikely to succeed in demonstrating that the INFORM Act's preemption clause requires SB 1144 to be invalidated.

The INFORM Act's preemption clause is narrowly drawn, contrary to Plaintiff's repeated assertions about its supposed breadth, *see* Mot. at 7, 12. That clause prevents the enactment or enforcement of any state law which "conflicts" with the Act. 15 U.S.C. §45f(g). Plaintiff asks this Court to interpret "conflict" to mean to "differ" or be "at variance," Mot. at 11, in other words, to

5

not be identical or the same.[1] Congress has enacted expansive preemption clauses with that meaning many times, not with the strained reading Plaintiff attempts here, but rather in clear and unmistakable language. *See, e.g., Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 458–60 (2012) (federal law preempted any state law requirements "in addition to, or different than" the federal law); *Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 796 (N.D. Cal. 2015) (federal law preempted state law requirement that is "not 'identical to' the requirements of" federal law). Congress chose not to do so here.

Congress's refusal to use a broader word than "conflict" is fatal to Plaintiff's express preemption claim, because "our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Altria Grp., Inc.*, 555 U.S. at 76 (2008). Congress knows how to broadly preempt state laws which impose "different" requirements, and here chose to more narrowly preempt only those that "conflict" with the INFORM Act. Where, as here, legislators did not adopt "obvious alternative" language, "the natural implication is that they did not intend" the alternative. *See Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (quotation omitted); *see also Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 93 (2020) (Thomas, J., concurring) ("Congress knows how to write sweeping pre-emption statutes. But it did not do so here."); *Hous. & Redevelopment Auth. of Duluth v. Lee*, 852 N.W.2d 683, 692 (Minn. 2014) (in the preemption context, the "most natural and logical interpretation of 'conflicts with' . . . is that the two standards differ in the sense that they are in opposition to each other or are incompatible").

---

[1] Digging deeper, Plaintiff's argument on the preemptive scope of the INFORM Act is a moving target. At some points, Plaintiff suggests that "the federal INFORM ACT provides a ceiling" and SB 1144 is preempted because "it goes beyond that ceiling," Mot. at 13, while at other points Plaintiff suggests that SB 1144 (and presumably all other state laws, including the unamended version of Title 1.4D) are preempted because "Congress replaced the emerging patchwork of state-by-state regulation with a single, nationwide framework," Mot. at 6.

6

1        *Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2023), is instructive. In that case, the defendant

2   asserted that a state law was preempted by a federal law's preemption clause which invalidated

3   "inconsistent" state laws. *Id.* at 639. But the Ninth Circuit determined that the defendant's

4   interpretation of the clause "would effectively read the word 'inconsistent' out of COPPA's

5   preemption provision" and "would preempt all state law claims protecting children's online

6   privacy." *Id.* at 642. Such "an interpretation ignores Congress's distinction between 'inconsistent'

7   and 'consistent' state laws and contravenes the command that courts must give effect, if possible,

8   to every clause and word of a statute." *Id.* Just as the Ninth Circuit rejected the defendant in

9   *Jones*'s attempt to read the word "inconsistent" out of COPPA's preemption provision, so should

10  this court refuse to read the word "conflicts" out of the INFORM Act's preemption clause.

11       Plaintiff's preemption argument also relies heavily on the use, in subdivision (f)(3)(B) of

12  the INFORM Act, of "only" in the clause "an online marketplace shall only be required to count

13  sales or transactions made through the online marketplace and for which payment was processed

14  by the online marketplace," Mot. at 12. This argument is a red herring, not a silver bullet,

15  however. The immediately preceding clause qualifies the significance of the "only" clause as to

16  be "[f]or purposes of calculating the number of discrete sales or transactions or the aggregate

17  gross revenues under subparagraph (A)," and indeed subdivision (f)(3)(B) is entitled

18  "Clarification." Tellingly, Title 1.4D, which was enacted before the INFORM Act, contains very

19  similar language: "The number of discrete transactions referenced in paragraph (1) includes only

20  those transactions through the online marketplace for which payment is processed by the online

21  marketplace directly or through its payment processor." Cal. Civ. Code § 1749.8(b)(2) (prior to

22  amendment). And as Plaintiff acknowledges, the INFORM Act was "[f]ollowing the lead of state

23  laws" in "limit[ing] its scope to transactions processed by the relevant online marketplace" with

24  the use of the word "only." Compl., Dkt. 1, ¶ 35. Far from being evidence of the INFORM Act's

25  supposedly sweeping preemptive effect then, the use of "only" is merely a limitation on the reach

26  of the INFORM Act patterned on the language that California and other states used in drafting

27  their own laws.

28

1    Plaintiff's other arguments about the language of the INFORM Act's preemption clause are

2    similarly unpersuasive. Plaintiff argues that the clause should be read broadly because it "defines

3    the political entities to which it applies in the broadest possible terms," including "every 'State,'"

4    "political subdivision of a State," and "territory of the United States." Mot. at 12. But Defendant

5    is unaware of any preemption clause that only preempts the laws of certain states, or certain

6    political subdivisions within those states but not others. Plaintiff also contends that the INFORM

7    Act's preemptive force should be read broadly because it preempts "any law, regulation, rule,

8    requirement, or standard." Mot. at 12. But this language is simply an unremarkable

9    acknowledgment that state "law" can come in many different forms (e.g., statutory, regulatory, or

10   judge-made), and all must give way, if preempted, because the Supremacy Clause provides that

11   federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. And Plaintiff's

12   assertion that the clause is broad because it forbids states from both enforcing existing preempted

13   laws and implementing new ones (Mot. at 12) ignores the fact that if a law is preempted, it is

14   irrelevant whether that law was enacted before or after the passage of the federal law. Finally,

15   Plaintiff's suggestion that the ability of state attorneys general to enforce the statute (in addition

16   to that of the FTC) supports a broad preemption reading (Mot. at 12) has not persuaded the Ninth

17   Circuit. *See Jones*, 73 F.4th at 641 (finding no express preemption despite "the statute confer[ing]

18   enforcement authority on the FTC and on state attorneys generals").

19       Even the title of the INFORM Act's preemption clause suggests a narrow, not broad,

20   interpretation of its reach. "Titles are also an appropriate source from which to discern legislative

21   intent." *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008); *see also Jordan v. Nationstar

22   Mortg., LLC*, 240 F. Supp. 3d 1114, 1122 (E.D. Wash. 2017) (holding that "[e]ven textual

23   decisions about which words form a heading are presumed to be deliberate indicia of

24   congressional intent," noting that some federal statutes "explicitly include[] a 'Preemption'

25   heading," and finding no preemption where the statute in question did not). In this case, the

26   INFORM Act's subdivision (g) is merely entitled "Relationship to State laws," which further

27   indicates Congress did not intend the sweeping preemptive effect that Plaintiff asserts here.

28

Beyond the language of the preemption clause itself, the mere fact that SB 1144 may require more of online marketplaces than the INFORM Act does not render the former in "conflict" with the latter. "[S]tate laws that supplement, or require the same thing, as federal law, do not stand as an obstacle to Congress's objectives, and so are not inconsistent." *Jones*, 73 F.4th at 642 (quotation omitted); *NetChoice, LLC v. Bonta*, --- F. Supp. 3d. ---, 2025 WL 807961, at *31 (N.D. Cal. Mar. 13, 2025) (similar); *Lewis v. USIS Com. Servs., Inc.*, 2009 WL 10751553, at *6 (C.D. Cal. Oct. 5, 2009) (federal Fair Credit Reporting Act did not preempt state law because a state law which "merely requires more of" private parties "is not inconsistent with" federal law). Plaintiff does not argue that compliance with the state law would prevent compliance with the federal law, and indeed its members' compliance with SB 1144 would necessarily mean they comply with the INFORM Act. And the fact that both laws are motivated by an almost identical purpose, *compare* 15 U.S.C. § 45f ("To require online marketplaces to collect, verify, and disclose certain information regarding high-volume third party sellers of consumer products to inform consumers.") *with* SB 1144 ("[R]equir[ing] an online marketplace to require a high-volume third-party seller on the online marketplace to make certain disclosures."), weighs heavily against preemption. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 132 (1978) ("This Court is generally reluctant to infer pre-emption, and it would be particularly inappropriate . . . [where] the basic purposes of the state statute and the [federal law] . . . are similar.").

Plaintiff's entreaties to this Court to search beyond the INFORM Act's language for evidence of an obscured contrary intent should be rejected. "Congress's authoritative statement is the statutory text, not the legislative history." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 599 (2011); *see City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1030 (9th Cir. 1998), *as amended* (Oct. 20, 1998) ("[W]here statutory command is straightforward, there is no reason to resort to legislative history."). In this case, the statute is clear, and in any event, Plaintiff does not point to any legislative history regarding the INFORM Act. Instead, Plaintiff points to its members' own contemporary interpretation of the INFORM Act as evidence of the INFORM Act's purportedly broad preemptive effect, Mot. at 7 (describing why Amazon and eBay supported the INFORM Act), but "[i]nferences" from beyond the statutory text "cannot rest on so slender a reed." *See*

9

1    *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 520 (1992). Finally, if the Inform Act were

2    intended to "preclude[] states from adopting their own divergent standards," as Plaintiff contends

3    (Mot. at 13), then Congress would have done so in clear language, particularly given that Plaintiff

4    admits the law was enacted against a "patchwork of state level-regulation" that imposed "similar–

5    but not identical–requirements," *id*. *See Hoang v. Reunion.com, Inc.*, 2010 WL 1340535, at *6

6    (N.D. Cal. Mar. 31, 2010) ("Congress is presumed to have been aware of" states law when

7    enacting federal law.); *see also Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 962–963

8    (N.D. Cal. 2004) (noting that "[t]he clearest possible expression of legislative purpose is provided

9    in the first section of the Act itself," and concluding that "[w]hile legislative history demonstrates

10   a federal interest in uniformity of motor vehicle safety regulation and administration of recalls,

11   uniformity is at best a secondary goal"). In this case, unlike *Chamberlain*, there is no legislative

12   history, or anything else besides Plaintiff's ipse dixit statements (Mot. at 6), to suggest that

13   uniformity was even a secondary goal in passing the INFORM Act.

14         With this background, it is clear why this Court should not adopt the district court's logic in

15   *NetChoice, LLC v. Carr*, 2024 WL 3262633 (N.D. Ga. June 30, 2024). In that case, the court

16   found that a similar Georgia statute was preempted based on its conclusion that (a) "the dictionary

17   definition of conflict," which "is to 'fail to be in accord with' or to 'clash or be at a variance,'"

18   controls the meaning of the term "conflict[]" in the INFORM Act, and (b) the use of the word

19   "only" in the Inform Act set a ceiling which state laws may not exceed. *Id*. at *3. Plaintiff

20   advances both arguments here, Mot. at 11 – 12. But this Court should not follow *Carr* as to (a)

21   because clear and manifest intention of preemption is required, Congress frequently uses terms

22   such as "different from" or "not identical to" in preemption clauses but chose not to do so here,

23   and most dictionary definitions of "conflict" involve more than mere difference between two

24   things, *see, e.g., Conflict*, Merriam-Webster, available at https://www.merriam-

25   webster.com/dictionary/conflict ("to be different, *opposed, or contradictory*"); *Conflict,* Oxford

26   English, available at https://www.oed.com/dictionary/conflict_v?tl=true ("be *incompatible* or at

27   variance; *clash*"). And this Court should not follow *Carr* as to (b), because as explained above,

28   the word "only" in the statute was included in the INFORM Act because that law was patterned

1   on state law analogues, not because Congress intended to preempt state laws that had additional

2   requirements.[2]

3   **B.    Plaintiff Is Unlikely to Succeed on Its Express Preemption Claim As to
        Section 230 of the Communications Decency Act**

4

5       Plaintiff is also unlikely to succeed on the merits of its claim that SB 1144 is preempted by

6   Section 230 of the Communications Decency Act because nothing in SB 1144 requires Plaintiff's

7   members to be treated as the "publisher or speaker" of another's content. Section 230 prohibits a

8   "provider or user of an interactive computer service" from being "treated as the publisher or

9   speaker of any information provided by another information content provider." 47 U.S.C.

10  §230(c)(1). But section 230 does not create a "blanket" immunity, *Calise v. Meta Platforms, Inc.*,

11  103 F.4th 732, 739 (9th Cir. 2024), nor was section 230 "meant to create a lawless no-man's-land

12  on the Internet." *Fair Housing Council of San Fernando Valley v. Roommates.com, Inc.*, 521 F.3d

13  1152, 1164 (9th Cir. 2008). Thus, "it is not enough that a claim, including its underlying facts,

14  stems from third-party content for § 230 immunity to apply." *Calise*, 103 F.4th at 742. Indeed, in

15  *Calise* the Ninth Circuit rejected the defendant's proposed "'but-for' test: if Plaintiffs' claims

16  hinge on publishing-related activity, then § 230(c)(1) bars that claim." *Id*. In this case, Plaintiff

17  cannot meet its burden of showing that SB 1144 treats it as a "publisher or speaker" of any third-

18  party content (i.e., the information provided to it by high-volume sellers).

19      As an initial matter, Plaintiff is not treated as a "publisher or speaker" of the identifying

20  information provided to it by "high-volume" sellers under SB 1144 because that information is

21  not disseminated to the public. "[P]ublication involves reviewing, editing, and deciding whether

22  to publish or to withdraw from publication third-party content," a definition "rooted in the

23  common sense and common definition of what a publisher does," i.e., "the reproduc[tion] of a

24  work intended for *public consumption*." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir.

25  _____

26  [2] Plaintiff does not argue in its Motion that it is likely to succeed on the merits of an implied

27  preemption claim (or any Fifth or Fourteenth Amendment due process claims), so the Attorney

28  General does not address any such claims in his Opposition.

11

2009) (emphasis added); *see also Publication*, Black's Law Dictionary (12th ed. 2024) ("Generally, the act of declaring or announcing to the public."). Not only does SB 1144 not require online marketplaces to publish or disseminate the third-party to the public the information required of high-volume sellers, the law contains provisions requiring online marketplaces to take steps to *prevent* dissemination of the information collected, Cal. Civ. Code § 1749.8.3(a)(3).

Nor does the statute treat Plaintiff's members as the "speakers" or "publishers" of the sales listings of high-volume sellers. Where a "claim does not seek to hold" an online company "responsible as a publisher or speaker, but merely seeks to hold" that online company "liable for its own conduct, . . . § 230(c)(1) immunity is unavailable." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021) (cleaned up); *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) ("the section-230 analysis" focuses "on the specific claims and allegations advanced by a plaintiff"); *Maynard v. Snapchat, Inc.*, 346 Ga. App. 131, 136 (2018) (Section 230 immunity only applies where "the claims depended on the content of the posts themselves," and not where plaintiff "seek[s] to hold" online company "liable for its own conduct"). In this case, the only liability Plaintiff's members are exposed to under the statute is for their own conduct, e.g., the failure to have a policy prohibiting the sale of stolen goods on the online marketplace, Cal. Civ. Code § 1749.8.9(a), and the failure to alert law enforcement of the sale or attempted sale of stolen goods, *id.* By contrast, no claim is available against online marketplaces under SB 1144 for theft, conversion, the sale of stolen goods, or any other tort. To adopt Plaintiff's argument here would be to accept a near limitless version of Section 230 immunity, which would mean that Section 230 "ride[s] in to rescue corporations from virtually any claim loosely related to content posted by a third party, no matter the cause of action and whatever the provider's actions," and "permit[s] platforms to ignore the ordinary obligation that most businesses have to take reasonable steps to prevent their services from causing devastating harm." *Anderson v. TikTok, Inc.*, 116 F.4th 180, 191 (3d Cir. 2024) (Matey, J., concurring in part and dissenting in part).

Indeed, the nature of the claim available under SB 1144, an enforcement action brought by the government for failure to comply with certain reporting, compliance, and notification requirements, is far afield from the causes of action Section 230 was designed to preempt. "The

1   cause of action most frequently associated with the cases on section 230 is defamation." *Barnes*,

2   570 F.3d at 1101. While "the language of the statute does not limit its application to defamation

3   cases," *id.*, it was designed "to encourage internet companies to monitor and remove offensive

4   content without fear that they would thereby becom[e] liable for all defamatory or otherwise

5   unlawful messages that they didn't edit or delete." *Calise*, 103 F.4th at 739. In this case, liability

6   under the statute does not turn on the message of any sales listings, but rather on an online

7   marketplaces' own conduct (e.g., failure to comply with reporting, compliance, and notification

8   requirements).

9       Put another way, SB 1144's requirements that online marketplaces take various actions,

10  including enacting a policy which suspends or terminates the future sales activity of high-volume

11  third-party sellers that are not in compliance with the law, do not fall within Section 230's ambit

12  because those requirements apply prospectively to *future conduct by the online marketplace*, not

13  retrospectively to past speech by a third-party. As one court has said, "§ 230(c)(1) cuts off

14  liability only when a plaintiff's claim faults the defendant for information provided by third

15  parties." *Lemmon*, 995 F.3d at 1093. In this case, a government entity bringing an enforcement

16  action under Title 1.4D would not be faulting the online marketplace for any information

17  provided by third parties (e.g., by attempting to hold them liable for the common law tort of theft

18  under California law), but instead for failing to enact policies to ensure the collection of

19  identifying information and the prevention of future sales of stolen goods or failing to notify law

20  enforcement of the sale of stolen goods.

21      Plaintiff's repeated invocation of the word "monitor," which some courts have used to

22  describe in part the duty which Section 230 prevents states from imposing, is of little help to its

23  argument. According to Plaintiff, because the statute requires marketplaces in part to "monitor

24  listings in order to affirmatively prevent and detect organized retail crime," Mot. at 16, its

25  members are being treated as publishers. But Section 230 immunity does not "attach[] any time a

26  legal duty might lead a company to respond with monitoring or other publication activities."

27  *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Colvin v.

28  Roblox Corp.*, 725 F. Supp. 3d 1018, 1027 (N.D. Cal. 2024) (similar, and concluding that Plaintiff

13

"is not facing liability for the content posted on its platform," but rather "is facing liability for allegedly facilitating transactions . . . that enable illegal gambling, and for allegedly failing to take sufficient steps to warn . . . ."); *see also Est. of Bride by & through Bride, Inc.*, 112 F.4th at 1177 n.3 (immunity does not simply "attach[] anytime" an online platform "*could* respond to a legal duty by removing content"); *Airbnb, Inc. v. City & Cnty. of San Francisco*, 217 F. Supp. 3d 1066, 1075 (N.D. Cal. 2016) (while plaintiff insists that the challenged law "will have the practical effect of compelling them to monitor listings and remove postings . . . [, and they] might indeed voluntarily choose to screen listings, . . . [t]he record before the Court simply does not support a finding that the Ordinance will inevitably or necessarily treat plaintiffs as publishers or speakers of user content"). Thus, SB 1144's requirement that an online marketplace "[m]aintain internal written policies, systems, and staff to monitor listings in order to affirmatively prevent and detect organized retail crime," Cal. Civ. Code § 1749.8.9(b)(1)(D), is insufficient to confer Section 230 immunity upon those marketplaces, regardless of whether Plaintiff's members choose to increase monitoring efforts in response to the law.

The cases Plaintiff cites in support of its Section 230 argument only demonstrate that the mere existence of third-party content or of an online company's "monitoring" of that content are not talismans that litigants can invoke to obtain Section 230 immunity. *See, e.g., Est. of Bride.*, 112 F.4th at 1179 (Section 230 immunity is not available where "the underlying duty being invoked by the Plaintiffs" does not stem from defendant's status as a speaker or publisher, even if "content moderation is one possible solution for [defendant] . . . to fulfill its" duty); *Fair Hous. Council of San Fernando Valley*, 521 F.3d at 1175 (rejecting "prophesies [of] doom and gloom for countless Internet services" and holding that Section 230 "does not provide immunity to [defendant] . . . for all of the content of its website and email newsletters"); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (reaffirming earlier holding that no immunity is available under Section 230 where "plaintiff's claim was not based on the content of that speech but rested on the characteristics of the product itself") (emphasis omitted); *Doe v. Grindr Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025) (Section 230 analysis "require[s] us to

14

consider each cause of action alleged to determine whether a plaintiff's *theory of liability* would treat a defendant as a publisher or speaker of third-party content").

Again and again, the Ninth Circuit has rejected efforts by litigants to expand Section 230's reach beyond the strictures set forth in *Barnes*, cautioning that Section 230 immunity "does not provide internet companies with a one-size-fits-all body of law." *HomeAway.com, Inc.*, 918 F.3d at 683; *see also, e.g., Calise*, 103 F.4th at 743 (permitting breach of contract and breach of covenant of good faith and fair dealing claims to go forward); *Lemmon*, 995 F.3d at 1087, 1092 (permitting a state law negligent design claim to go forward based on the conclusion that "the duty that Snap allegedly violated springs from its distinct capacity as a product designer," not a publisher or speaker).

So it is here. The liability that the statute may impose on online marketplaces does not hinge on the publication of material by third parties on those marketplaces, but rather from a failure by the marketplaces to collect certain information from sellers, to maintain policies prohibiting the sale of stolen goods on their website, or to alert the authorities if it knows or should have known a seller is using their marketplace to sell stolen goods. These requirements simply do not implicate Section 230 because like "their brick-and-mortar counterparts, internet companies must also comply with any number of local regulations concerning, for example, employment, tax, or zoning." *HomeAway.com, Inc.*, 918 F.3d at 683; *Fair Hous. Council of San Fernando Valley*, 521 F.3d at 1164 n.15 ("The Internet is no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations applicable to brick-and-mortar businesses."); *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 989 (N.D. Cal. 2022) ("[W]ebsites may not evade federal, state, and local regulation simply because they host third-party content.").

## C.    Plaintiff Is Unlikely to Succeed on Its First Amendment Claim

Plaintiff is unlikely to succeed on the merits of its First Amendment claim for three reasons: (1) it lacks standing as to the information transmitted to it by third-party sellers and the information which third-party sellers must disclose to consumers; (2) the information that SB 1144 requires sellers to provide to online marketplaces and that it requires online marketplaces to

15

1   provide to law enforcement is not "speech" within the meaning of the compelled speech doctrine;

2   and (3) the limited disclosures to the public that SB 1144 requires of online marketplaces and

3   certain high-volume sellers are plainly constitutional under the *Zauderer* test for "commercial

4   speech.

5        First, Plaintiff lacks standing to bring a First Amendment claim for much of the information

6   at issue because the disclosure of that information, which allegedly constitutes "compelled

7   speech," would still be "compelled" even if the Court granted the relief Plaintiff seeks. Where

8   unchallenged provisions of a law would "inflict the same injury" that Plaintiff complains of, "the

9   connection between Plaintiffs' alleged injury and the challenged provision . . . is too attenuated

10  for Article III standing." *Orion Wine Imports, LLC v. Appelsmith*, 837 F. App'x 585, 586 (9th

11  Cir. 2021). In this case, the information that high-volume sellers must transmit to online

12  marketplaces and that certain high-volume sellers must disclose to consumers is required to be

13  disclosed by the unamended version of Title 1.4D and thus prohibiting only enforcement of SB

14  1144 (*see* Proposed Order, Dkt. 21, at 2) would not remedy that alleged injury.

15       Second, SB 1144's requirement for sellers to communicate certain information to online

16  marketplaces does not violate the First Amendment because SB 1144 does not require any public

17  disclosure of that information. The compelled speech doctrine applies when the government

18  requires an individual to publicly to convey a "particular message." *Nat'l Inst. of Fam. & Life

19  Advocs. v. Becerra*, 585 U.S. 755, 766 (2018); *see also Firestone v. Yellen*, 2024 WL 4250192, at

20  *9 (D. Or. Sept. 20, 2024) (no compelled speech where the challenged state law "does not require

21  Plaintiffs *publicly* to convey any particular message, let alone one with ideological implications")

22  (emphasis added). And a reporting requirement to the government "does not raise . . .

23  constitutional concerns" because it is "not the public," but rather the government, that "is

24  [plaintiff's] only audience." *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101, 1108 (D.C. Cir.

25  2011). In this case, Title 1.4D protects the sellers' disclosures to online marketplaces by requiring

26  that online marketplaces adopt procedures to protect that information.  And the online

27  marketplaces' obligation to issue an alert of the sale of stolen goods extends only to the

28

1    government. Because these disclosure requirements do not compel anyone to convey any

2    messages publicly, they do not violate the First Amendment.

3        In addition, Plaintiff's First Amendment claim as to its required disclosure of the sale of

4    stolen goods to the government runs afoul of another limitation. In requiring marketplaces to

5    disclose criminal activity, the government is merely conducting an "essential operation of the

6    government, just as it does when it requires individuals to disclose information for tax collection"

7    or "sex offenders to register their residence." *See United States v. Arnold*, 740 F.3d 1032, 1035

8    (5th Cir. 2014) (cleaned up); *see also Full Value Advisors, LLC*, 633 F.3d at 1109 (the

9    Government can "require[] individuals to submit income tax information to the IRS"); *United*

10   *States v. Sindel*, 53 F.3d 874, 877–78 (8th Cir. 1995) (rejecting claim that "completion of [IRS]

11   Form 8300 constitutes compelled speech"). Such requirements which are part of the "essential

12   operation" of government do not violate the compelled speech doctrine.

13       Third, SB 1144's requirement that online marketplaces and some high-volume sellers post

14   certain information publicly does not violate the First Amendment because those limited

15   disclosure requirements are properly regulated commercial speech. Under the Supreme Court's

16   test in *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626 (1985), the

17   government "may compel truthful disclosure in commercial speech as long as the compelled

18   disclosure is 'reasonably related' to a substantial governmental interest, and involves 'purely

19   factual and uncontroversial information' that relates to the service or product provided." *CTIA -*

20   *The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 842 (9th Cir. 2019) (quoting

21   *Zauderer*, 471 U.S. at 651). Plaintiff does not dispute that the governmental interest embodied by

22   the statute is substantial, *see* Mot. at 20–21 (conceding that "the state has a legitimate interest in

23   combating theft and preventing the sale of stolen property"), or that the reporting of their own

24   policies (and the reporting by certain high-volume sellers of their name, physical address, and

25   contact information to consumers) would be non-factual or controversial. Thus, to show that these

26   disclosure requirements violate the First Amendment, Plaintiff must show that they are not

27   "reasonably related" to the undisputed government interest.

28

17

1      Plaintiff is incorrect in arguing that a standard higher than "reasonably related" applies. In

2  *CTIA - The Wireless Ass'n*, the Ninth Circuit concluded that "*Central Hudson*'s intermediate

3  scrutiny test," which requires that the "restriction or prohibition must directly advance the

4  governmental interest asserted," "does not apply to compelled, as distinct from restricted or

5  prohibited, commercial speech." 928 F.3d at 842. Notwithstanding this binding precedent,

6  Plaintiff argues that a statute regulating commercial speech must be "narrow tailor[ed]." Mot. at

7  20. But the Ninth Circuit has expressly rejected that approach. *See Nationwide Biweekly Admin.,*

8  *Inc. v. Owen*, 873 F.3d 716, 732 (9th Cir. 2017) ("[Plaintiff] argues that . . . all content-based

9  restrictions (or compelled disclosures) of commercial speech are now subject to strict scrutiny.

10  [Plaintiff] is incorrect."). The cases Plaintiff cites, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525

11  (2001) and *Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023), were decided under

12  the *Central Hudson* test because they involved restrictions on speech, 533 U.S. at 556 and 80

13  F.4th at 1115, a test which is inapplicable here given Plaintiff's compelled speech claim.

14      Under the applicable (and deferential) standard, the Attorney General can easily show that

15  SB 1144 is "reasonably related" to its interest in combating theft and the sale of stolen property,

16  as numerous Ninth Circuit cases applying that standard suggest. *See, e.g., CTIA - The Wireless*

17  *Ass'n*, 928 F.3d at 846 ("We are not in a position to disagree with the conclusions of FCC and

18  Berkeley that this compelled disclosure is 'reasonably related' to protection of the health and

19  safety of consumers."); *Nationwide Biweekly Admin., Inc.*, 873 F.3d at 734 (finding no First

20  Amendment violation where "the disclosure requirements *have a relationship* to preventing

21  deception") (emphasis added); *Loan Payment Admin. LLC v. Hubanks*, 821 F. App'x 687, 690

22  (9th Cir. 2020) (required disclosures "reasonably relate to California's substantial interest in

23  preventing consumer deception because they inform consumers that Nationwide's offered

24  services are not sponsored or authorized by their lenders."); *S. California Inst. of L. v. Biggers*,

25  613 F. App'x 665, 666 (9th Cir. 2015) ("required disclosure of past bar exam results . . . is

26  reasonably related to CBE's legitimate interest in ensuring that prospective law students do not

27  overestimate their prospects of passing the bar after attending an accredited law school"). If the

28  Ninth Circuit determined in *Biggers* that the disclosure of past bar results is reasonably related to

1   informing prospective law students of the future likelihood they will pass the bar, then surely the

2   disclosure of policies to prohibit the sale of stolen goods by online marketplaces and of certain

3   identifying information by certain high-volume sellers is reasonably related to informing

4   prospective shoppers of future likelihood of them purchasing stolen goods.

5       In the absence of any compelled speech or commercial speech which is protected by the

6   First Amendment, Plaintiff falls back on suggesting that SB 1144 impermissibly "burdens"

7   Plaintiff's members' "right to disseminate third-party sellers' speech over the Internet," given that

8   its members will purportedly "conclude that some user content they would otherwise display and

9   disseminate raises too many risks." Mot. at 18, 20. But Plaintiff cannot transform a law that does

10  not impermissibly restrict or compel speech into one that does merely by pointing to the decisions

11  their members may make in response to the law. *See HomeAway.com, Inc.*, 918 F.3d at 686

12  ("[E]ven accepting that the Platforms will need to engage in efforts to validate transactions before

13  completing them, incidental burdens like these are not always sufficient to trigger First

14  Amendment scrutiny.").

15      None of the cases Plaintiff cites in support of its First Amendment claim are persuasive

16  here. In *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995), the

17  Court struck down a law that "require[d] private citizens who organize a parade to include among

18  the marchers a group imparting a message the organizers do not wish to convey." *Id.* at 559. Here,

19  by contrast, NetChoice's members publicize and require compliance with their policies and

20  procedures as a matter of course, O'Connell Decl., Dkt. 20-3, ¶ 8 ("Facebook's publicly available

21  Terms of Service (to which all Facebook users must agree) and Community Standards (which all

22  Facebook users agree not to violate) describe what content is acceptable on Facebook.").

23  Similarly, *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. 755, involved in a part a "government-

24  drafted script" that "compell[ed] individuals to speak a particular message," *id.* at 766, whereas

25  here the required disclosures are created by the online marketplaces and certain high-volume

26  sellers themselves, not the government. Cal. Civ. Code § 1749.8.2; *id.* at § 1749.8.9(b)(1).

27      The other cases relied on by Plaintiffs are easily distinguishable. Plaintiffs quote *In re*

28  *Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) for the proposition that

19

1   "[o]nline speech stands on the same footing as other speech," Mot. at 18. But in this case, it is

2   Plaintiff, not the Attorney General, who has suggested that "online speech" requires different

3   treatment, Mot. at 24 (suggesting that online marketplaces are more likely to suffer irreparable

4   harm from a First Amendment violation because "they have hundreds of millions of third-party

5   listings"). Plaintiff also cites *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) and *Ark. Educ.*

6   *Television Comm'n v. Forbes*, 523 U.S. 666 (1998), Mot. at 18. *Moody* involved challenges to

7   restrictions on "content-moderation practices that giant social-media platforms use on their best-

8   known services to filter, alter, or label their users' posts" and requirements that those platforms

9   provide "an individualized explanations to a user if it removes or alters her posts," 603 U.S. at

10  717, 724, and *Forbes* involved whether a candidate debate on state-owned public television

11  broadcaster was a public or non-public fora, 523 U.S. at 674. SB 1144 does not require that online

12  marketplaces "filter, alter, or label" any third-party content or provide any explanations of any

13  kind to sellers, and there is no contention that this case raises the question of whether online

14  marketplaces are public fora. Plaintiff also contends that "SB 1144 'exacts a penalty' from those

15  who choose to disseminate third-party speech that entails any kind of offer of an item for sale,"

16  Mot. at 19, citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974), but the "penalty" in

17  question in that case was the monetary costs of publishing a political viewpoint which the

18  newspaper did not wish to publish, i.e., a clear example of compelled speech, *id*. at 256, not as

19  here a requirement that a marketplace post factual and uncontroversial disclosures to its

20  customers, i.e., commercial speech–which Plaintiff does not allege imposes a meaningful

21  financial burden on its members. And *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011),

22  invalidated a law that "restrict[ed] the sale, disclosure, and use of pharmacy records that reveal

23  the prescribing practices of individual doctors" because it "silence[d] unwanted speech," *id*. at

24  557, 566, and the Supreme Court noted there that "the First Amendment does not prevent

25  restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id*. at

26  567.

27

28

1

### D.    Plaintiff Is Unlikely to Succeed on the Merits of Any of Its Claims Because It Cannot Bring a Facial or an As-Applied Challenge

2

3    Plaintiff's motion should also be denied because neither a facial nor as-applied challenge

4    can properly be brought by Plaintiff. Plaintiff's facial challenge fails because Title 1.4D is not

5    unconstitutional in all or most of its applications, and its as-applied challenge cannot be brought

6    by Plaintiff as an association because the participation of its members is required.

7    Plaintiff cannot bring a facial challenge to SB 1144 because it has not shown that Title 1.4D

8    is unconstitutional in all or most of its applications. "Facial challenges are disfavored." *Wash.*

9    *State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). In a typical facial

10   challenge, the burden is on the plaintiff to show that "no set of circumstances exists under which

11   the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). On a facial

12   challenge under the First Amendment's free speech clause, a plaintiff must show that the law's

13   "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at

14   724; *see also Ariz. Att'ys for Crim. Justice v. Mayes*, 127 F.4th 105, 112 (9th Cir. 2025) (even in

15   the First Amendment context, "Plaintiffs in a facial challenge must prove that the statute's

16   unconstitutional applications [are] realistic, not fanciful, and their number must be substantially

17   disproportionate to the statute's lawful sweep"). In this case, far from establishing that SB 1144 is

18   unconstitutional in all (or even most of) its applications, Plaintiff indicates that the statute

19   presents no constitutional infirmity for at least some of its members. *See* Mot. at 9 (stating that "it

20   is relatively easy for a company that handles payment processing (like Amazon or eBay)," two of

21   NetChoice's members, "to identify high-volume sellers"). Plaintiff's failure is particularly

22   apparent because the determination of the ratio of constitutional to unconstitutional applications

23   of SB 1144 must "also include[] the law's unchallenged applications," i.e., the unamended

24   provisions of Title 1.4D. *See Arizona Att'ys for Crim. Just.*, 127 F.4th at 112.

25   Nor can Plaintiff bring an as-applied claim as an association because the participation of its

26   members is required to adjudicate the challenge to SB 1144.[3] A plaintiff seeking to establish

27   associational standing must establish that "(a) its members would otherwise have standing to sue

28   _____

[3] Plaintiff only alleges it has associational, not organizational, standing. Compl., ¶ 9.

21

in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). And where a plaintiff's "as-applied claims and the relief they seek . . . require individualized proof," that plaintiff does not satisfy the test for associational standing because the participation of individual members is required. *Ass'n of Christian Sch. Int'l v. Stearns*, 362 F. App'x 640, 644 (9th Cir. 2010); *see also NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1215 (N.D. Cal. 2024) (where adjudication of the constitutionality of a statute "require[s] deep factual inquiries into how a particular" online company "works," and "each separate as-applied challenge on behalf of each separate NetChoice member requires its own ad hoc factual inquiry," it is "necessary for NetChoice's individual members to participate in this lawsuit" and thus the organization lacks standing to bring claims on behalf of those individual members).

While Plaintiff's Complaint alleges that "[n]o individual participation of members is necessary in this purely legal challenge," Compl., ¶ 12, the motion reveals that each of NetChoice's members likely operates in uniquely different ways. For example, "Amazon, eBay, and Etsy, operate e-commerce marketplaces . . . [which] process[] the payment and charge[] the seller a fee," Mot. at 4, while other members "including Facebook Marketplace, Nextdoor, and OfferUp . . . enable users to market items online and then sell them offline (often for cash) to buyers in their local community," *id*. at 4-5. And even within the latter category, differences appear to abound. *Compare id*. at 5 ("On Facebook, users . . . follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities) . . . and privately message one another via Meta's Messenger app.") *with id*. ("[O]n Nextdoor, users are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services."); *see also id*. at 5 n.3 ("OfferUp also gives users an e-commerce option to buy and sell certain items using OfferUp's shipping service" while "Meta similarly allows Facebook Marketplace users to buy and sell using Meta Pay or PayPal, but this option is used for only 'a small percentage of items' sold using Marketplace."). Indeed, it is unclear whether some of its members (e.g., Amazon, eBay, and Etsy) would even have standing to bring

22

1   these claims, given that Plaintiff suggests SB 1144's amendment of Title 1.4D does not impact

2   them, Mot. at 9. Thus, at a minimum, claims that SB 1144 violates the constitutional rights of

3   Plaintiff's members would require the participation of those individual members.

4   **II.    PLAINTIFF HAS NOT MET ITS BURDEN OF SHOWING THAT ITS MEMBERS WILL
        SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION**

5

6        Plaintiff has not met its burden of establishing irreparable harm if an injunction does not

7   issue. First, because enforcement of the statute would not violate the First Amendment (*see supra*,

8   section I.C), the argument that irreparable harm results from supposed deprivation of First

9   Amendment freedoms, even for minimal periods of time, Mot. at 24, is not applicable here.

10       Moreover, Plaintiff's claim that its members will suffer irreparable harm because they will

11  need to "devote massive amounts of resources to establish, test, and implement processes to

12  monitor hundreds of millions of third-party listings," Mot. at 24, is undercut by the declaration it

13  submitted to this Court which acknowledges that its members already invest "substantial

14  resources" in monitoring those listings and suspend or terminate accounts on its own accord.

15  O'Connell Decl., Dkt. 20-3, ¶¶ 9, 11, 17 (stating that "Facebook's Community Standards prohibit

16  attempts . . . to purchase, sell, . . . or trade certain sorts of goods or services" and that "[f]ailure to

17  comply with Meta's policies may result in . . . removal of listings and other content . . . or

18  suspension or termination of access"). Indeed, Meta has invested in "automated and human

19  review to enforce its terms and policies at scale across its global services," *id*. at ¶ 18, "[t]eams

20  across the company work together . . . to prevent prohibited posts and listings from getting posted

21  to, or to remove such posts or listings from, Facebook and Facebook Marketplace," *id*. at ¶ 22,

22  and "Meta continues to refine these policies and practices based on its experience, *evolving laws*,

23  and *changing regulations*," *id*. at ¶ 20 (emphasis added). And Plaintiff's members are

24  incentivized to collect information about sales made utilizing their platforms so they can glean it

25  for insights about their platforms that can later be monetized, Egelman Decl., filed herewith, ¶¶

26  22–25, and at least one member already seeks to collect the information at issue in this case by

27  encouraging sellers to mark the item as sold in order to remove the listing, *id*. at ¶ 16. Plaintiff's

28  members, among the most sophisticated and well-resourced companies in the world, may feel

1    wronged that they will have to use the tools that they have already developed and the resources

2    they are already expending to comply with a law with which they disagree, but that subjective

3    feeling does not constitute irreparable harm.

4            Plaintiff's contentions about how they would suffer in the absence of an injunction are also

5    too vague and conclusory to constitute irreparable harm. "Those seeking injunctive relief must

6    proffer evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed Enters., LLC*

7    *v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013); *see also Titaness Light Shop, LLC*

8    *v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) ("To establish a likelihood of

9    irreparable harm, conclusory or speculative allegations are not enough."). Plaintiff both asserts

10   that (a) its members already devote substantial resources to monitoring and policing the third-

11   party content on their websites, *see, e.g.,* O'Connell Decl., ¶ 17; Garnett Decl., Dkt. 20-4, ¶¶ 10–

12   14, and that (b) complying with SB 1144 will require a "massive amount of resources," Mot. at

13   24. But the failure to provide any specific numerical figures or an understanding of how much

14   more compliance with SB 1144 will cost (as opposed to what its members already spend on their

15   own volition) renders its claim of irreparable harm too vague and conclusory.

16           Moreover, Plaintiff's irreparable harm argument cannot be taken seriously given their delay

17   in bringing this lawsuit and motion. A "[p]laintiff's long delay before seeking a preliminary

18   injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub.*

19   *Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir.

20   2015) (district court did not abuse its discretion by finding that the plaintiff's decision to "wait[]

21   months to seek an injunction . . . undercut [plaintiff']s . . . claim of irreparable harm"). SB 1144

22   was signed by the Governor and chaptered on August 16, 2024, nearly eight months before this

23   motion was filed. Moreover, Plaintiff challenged, in its own words, a "materially identical

24   provision" of Georgia last year, Mot. at 2 (citing *Carr*, 2024 WL 3262633, at *3), making

25   essentially the same arguments and using the same declarants (i.e., Messrs. O'Connell and

26   Garnett). *Compare NetChoice, LLC, v. Carr*, Case No. 24-cv-02485-SDG, Dkt. 2-2–6 *with*

27   *NetChoice, LLC, v. Bonta*, Case No. 25-cv-03178-SVK, Dkt. 20-2–5. Plaintiff does not explain

28   why it waited almost eight months to file a very similar motion to one it filed last year.

1    Plaintiff's failure to challenge SB 301, the law which originally enacted Title 1.4D, is

2    further evidence of lack of irreparable harm. Many of the purported constitutional infirmities

3    Plaintiff identifies in Title 1.4D exist in the original version passed in 2022. For example,

4    Plaintiff argues that "SB 1144 severely burdens . . . expressive activities" by "mandat[ing] and

5    carry[ing] disclosures by 'high-volume third-party sellers" and requiring marketplaces to "verify

6    the accuracy of such information and disclosures." Mot. at 18–19. But those requirements are a

7    part of the original Title 1.4D, Cal. Civ. Code § 1749.8.1 (prior to amendment), and the INFORM

8    Act, 15 U.S.C. § 45f(a). Plaintiff has never challenged (and indeed seems to have accepted) the

9    constitutionality of those laws. *Cf.* Mot. at 2 (original Title 1.4D imposed "a workable burden").

10   **III.    THE MERGED FACTORS OF THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST THE ISSUANCE OF AN INJUNCTION**

11

12   The public interest and equities factors merge "[w]hen the government is a party." *Drakes*

13   *Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), and that merged factor weighs

14   against the issuance of an injunction here. The public has a strong interest in enforcing a statute

15   that deters retail theft and the sale of stolen property online. "[A]ny time a State is enjoined by a

16   court from effectuating statutes enacted by representatives of its people, it suffers a form of

17   irreparable injury," particularly when there is "an ongoing and concrete harm to . . . [the State's]

18   law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012)

19   (Roberts, C.J., in chambers); *see also Haskell v. Brown*, 677 F. Supp. 2d 1187, 1203 (N.D. Cal.

20   2009) (public interest weighs against issuance of an injunction where "the government identifies

21   public interest[] in swiftly and accurately solving crimes"). Plaintiff contends that an injunction

22   will not harm the public because California could enforce the federal INFORM Act or existing

23   state law (Mot. at 25), but the Legislature determined those statutes were insufficient (as

24   evidenced by its passage of SB 1144). The State's strong interest, weighed against Plaintiff's

25   admission that its members already engage in the type of regulation of their marketplaces that SB

26   1144 requires (*e.g.,* O'Connell Decl., ¶¶ 17–22), counsels against the issuance of an injunction.

27                                           **CONCLUSION**

28   For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

1

2  Dated:  May 15, 2025                          Respectfully submitted,

3                                                ROB BONTA
                                                 Attorney General of California
4                                                MARK R. BECKINGTON
                                                 Supervising Deputy Attorney General
5

6
                                                 *s/ Robert L. Meyerhoff*
7                                                ROBERT L. MEYERHOFF
                                                 Deputy Attorney General
8                                                *Attorneys for Rob Bonta in his official*
                                                 *capacity as Attorney General of the State of*
9                                                *California*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28