**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NETCHOICE,<br><br>        Plaintiff,<br><br>    v.<br><br>ROB BONTA, Attorney General of the State of California,<br><br>        Defendant. | Case No. 25-cv-03178-BLF<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Re: ECF 20] |

This suit concerns the enforceability of California Senate Bill 1144 ("SB 1144"), which amends Title 1.4D of the California Civil Code, governing online marketplaces' record-keeping and disclosure obligations with respect to third-party sellers. *See* 2024 Cal. Legis. Serv. Ch. 172 (S.B. 1144). The stated purpose of the amendments is "to stop theft from retail stores and community theft by curtailing the sale of stolen property on online marketplaces." SB 1144 § 1. SB 1144 expands online marketplaces' statutory obligations under Title 1.4D, previously limited to third-party sales processed "through" the online marketplace, to all third-party sales entered into "utilizing" the online marketplace, whether processed through the online marketplace or conducted off-platform in direct transactions between buyers and sellers. SB 1144 § 3. SB 1144 also imposes new obligations on online marketplaces to monitor third-party content, remove third-party content, and alert law enforcement whenever the online marketplace "knows or should know" of sales or attempted sales of stolen goods to California residents. SB 1144 § 6.

Plaintiff NetChoice ("NetChoice"), an internet trade association whose members include online marketplaces, claims that SB 1144 is preempted by two federal statutes and violates the First Amendment to the United States Constitution. *See* Compl., ECF 1. NetChoice moves for a

1    preliminary injunction to enjoin enforcement of SB 1144 by Defendant Rob Bonta, Attorney

2    General of the State of California ("the State"). *See* Pl.'s Mot., ECF 20. The Court advanced the

3    hearing on NetChoice's motion from July 17, 2025 to June 26, 2025, so it could be heard before

4    SB 1144's operative date of July 1, 2025. *See* Order, ECF 27. At the close of the hearing on June

5    26, 2025, the Court inquired whether the State would consider staying enforcement of SB 1144 for

6    a brief period to allow the Court to address the parties' arguments in an orderly fashion. *See* Hrg.

7    Tr. 87:17-21, ECF 37. However, the parties filed a joint status report on June 30, 2025, advising

8    that there would be no stay of enforcement. *See* Joint Status Report, ECF 38.

9        Although NetChoice couches its motion as seeking preliminary injunctive relief with

10   respect to SB 1144 in its entirety, NetChoice challenges only certain provisions of SB 1144 in its

11   papers. As NetChoice does not argue that the challenged provisions of SB 1144 are not

12   volitionally severable from the remainder of SB 1144, the Court understands NetChoice's motion

13   to be limited to those challenged provisions. Whether the valid remainder is separately

14   enforceable is not before the Court. As so limited, NetChoice's motion for preliminary injunction

15   is GRANTED on federal preemption grounds for the reasons discussed below.

16   **I.    BACKGROUND**

17   *NetChoice Members' Online Services*

18       NetChoice is an internet trade association whose members operate a variety of online

19   services. *See* Pl.'s Ex. B (Cleland Decl.) ¶¶ 3-4, ECF 20-2. Several NetChoice members,

20   including Amazon.com, eBay Inc., and Etsy, Inc., operate online marketplaces where consumers

21   can purchase products from third-party sellers in transactions conducted wholly through the online

22   marketplace. *See id.* ¶ 4. The online marketplace processes the payment and charges the seller a

23   fee, which is calculated as a percentage of the total sale price. *See* Pl.'s Ex. E (Sieff Decl.) Exs. 1-

24   3, ECF 20-5.

25       Other NetChoice members, including Facebook Marketplace, Nextdoor, and OfferUp,

26   operate online marketplaces that work more like classified advertisements in a print newspaper.

27   Those platforms enable users to offer items for sale online and then sell them offline to buyers in

28   their local communities. *See* Pl.'s Ex. C (O'Connell Decl.) ¶¶ 12-13, ECF 20-3; Ex. D (Garnett

Decl.) ¶¶ 3-7, ECF 20-4; Ex. E (Sieff Decl.) Ex. 4-7.  Facebook Marketplace, Nextdoor, and OfferUp generally do not know whether a sale resulted from a listing on their platform, nor do they know the final sale price negotiated by the parties with respect to such a transaction.  *See* Pl.'s Ex. C (O'Connell Decl.) ¶ 14; Ex. D (Garnett Decl.) ¶ 8; Ex. E (Sieff Decl.) Ex. 8.

Some NetChoice members, including Facebook and Nextdoor, operate social networking services.  Although those services are not primarily intended for product sales, they often are used to post items for sale.  *See* Pl.'s Ex. C (O'Connell Decl.) ¶¶ 7, 16; Ex. E (Sieff Decl.) Exs. 9-10.  Facebook and Nextdoor generally do not know whether a sale resulted from such a posting.  *See* Pl.'s Ex. C (O'Connell Decl.) ¶¶ 7, 16; Ex. E (Sieff Decl.) Exs. 9-10.

*Title 1.4D of the California Civil Code*

On September 30, 2022, California added Title 1.4D – "Online Marketplaces" – to the California Civil Code.  *See* 2022 Cal. Legis. Serv. Ch. 857 (S.B. 301) (codified at California Civil Code §1749.8 through §1749.8.5).  Title 1.4D requires online marketplaces to collect and periodically verify certain identification, contact, and banking information from "high-volume third-party sellers," defined as sellers making a minimum number of sales meeting certain statutory criteria that are processed through the online marketplace.  *See* Cal. Civ. Code §§ 1749.8(b), 1749.8.1(a), (b).  If a high-volume third-party seller fails to provide information to the online marketplace as required by Title 1.4D, the online marketplace must suspend any future sales activity of the seller pending the seller's compliance.  *See* Cal. Civ. Code §§ 1749.8.1(c), 1749.8.2(c).  An online marketplace that violates Tile 1.4D may be subject to a civil enforcement action brought by the State.  *See* Cal. Civ. Code § 1749.8.4.

*Federal INFORM Act*

On December 29, 2022, approximately three months after California's passage of Title 1.4D, Congress enacted a federal statute addressing the same subject matter – the Integrity, Notification, and Fairness in the Online Retail Marketplace for Consumers Act ("INFORM Act").  *See* Pub. L. No. 117-328, §301, 136 Stat. 4459, 5555-62 (Dec. 29, 2022) (codified at 15 U.S.C. §45f).  One district court has suggested that the INFORM Act was passed in response to a "handful of state regulations" addressing rising sales of stolen goods in the wake of increased

3

online consumer transactions. *See NetChoice, LLC v. Carr*, No. 1:24-CV-02485-SDG, 2024 WL 3262633, at *1 (N.D. Ga. June 30, 2024). The INFORM Act contains an express preemption clause providing that, "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section." 15 U.S.C. § 45f(g).

Like Title 1.4D and similar state statues, the INFORM Act requires online marketplaces to collect and periodically verify certain identification, contact, and banking information from high-volume third-party sellers. *See* 15 U.S.C. § 45f(a), (b). If a high-volume third-party seller fails to provide the information required by the INFORM Act, the online marketplace must suspend any future sales activity of the seller until the seller complies. *See* 15 U.S.C. § 45f(b)(4). An online marketplace that violates the INFORM Act is subject to a civil enforcement action, which may be brought by the Federal Trade Commission or State attorneys general. *See id*. §§ 45f(c), (d).

Importantly for purposes of the present case, the INFORM Act provides that when determining who is a high-volume third-party seller, "an online marketplace shall *only* be required to count sales or transactions made *through* the online marketplace and for which *payment was processed by* the online marketplace, either directly or through its payment processor." 15 U.S.C. § 45f(f)(3)(B) (emphasis added).

*SB 1144's Amendments to Title 1.4D of the California Civil Code*

On August 16, 2024, California adopted SB 1144, amending Title 1.4D of the California Civil Code. *See* 2024 Cal. Legis. Serv. Ch. 172 (S.B. 1144). SB 1144 contains six sections, but NetChoice challenges only certain provisions of Section 3 and Section 6, summarized below.

Section 3 of SB 1144 expands the definition of "high-volume third-party seller" in California Civil Code § 1749.8(b). Prior to amendment, § 1749.8(b) provided that the threshold number of transactions necessary to qualify as a high-volume third-party seller included "only" transactions "through" the online marketplace, with payment being processed by the online marketplace or its payment processor. Cal. Civ. Code § 1749.8(b) (prior version). As amended, § 1749.8(b)'s definition of "high-volume third-party seller" is expanded to encompass third-party sales entered into "utilizing" the online marketplace, whether processed through the online

4

1  marketplace or conducted off-platform in direct transactions between buyers and sellers.  Cal. Civ.

2  Code § 1749.8(b) (as amended 2024).

3        Section 6 of SB 1144 adds a new section to Title 1.4D, codified at California Civil Code §

4  1749.8.9.  *See* SB 1144 § 6.  The new section requires an online marketplace to alert law

5  enforcement "if it knows or should know that a third-party seller is selling or attempting to sell

6  stolen goods to a California resident[.]"  Cal. Civ. Code § 1749.8.9(a).  In addition, online

7  marketplaces must do all of the following:  "Establish and maintain a policy prohibiting the sale of

8  stolen goods on the online marketplace"; "Provide a mechanism on the online marketplace that

9  allows any individual to notify the online marketplace that a seller is or may be selling stolen

10 goods"; "Provide a mechanism on the online marketplace that allows the online marketplace and

11 law enforcement to communicate in a timely and confidential manner"; and "Maintain internal

12 written policies, systems, and staff to monitor listings in order to affirmatively prevent and detect

13 organized retail crime."  *Id.* § 1749.8.9(b).

14      *Current Lawsuit*

15       NetChoice filed this lawsuit on April 9, 2025, alleging that "SB 1144 will radically expand

16 online marketplaces' obligations" in a manner inconsistent with the INFORM Act, with Section

17 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), and with the First

18 Amendment.  Compl. ¶¶ 3-7, ECF 1.  NetChoice asserts the following claims:  (1) preemption

19 under the INFORM Act; (2) preemption under Section 230 of the Communications Decency Act,

20 47 U.S.C. § 230 ("Section 230"); (3) violation of the First Amendment; (4) equitable relief in the

21 form of a preliminary and permanent injunction; and (5) declaratory relief.

22       Shortly after filing suit, NetChoice filed the present motion for preliminary injunction.  *See*

23 Pl.'s Mot.  After the motion was filed, the case was reassigned to the undersigned judge.  *See*

24 Order Reassigning Case, ECF 23.  The motion has been fully briefed, and oral argument was

25 heard on June 26, 2025.  *See* Def.'s Opp., ECF 30; Pl.'s Reply, ECF 31; Minute Entry, ECF 34.

26 **II.    LEGAL STANDARD**

27       "The Supreme Court has explained that plaintiffs seeking a preliminary injunction must

28 establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable

United States District Court
Northern District of California

harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 859 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit employs a sliding scale approach to the four *Winter* factors, under which a strong showing on the balance of hardships may compensate for a lesser showing of likelihood of success. *See Where Do We Go Berkeley*, 32 F.4th at 859.

**III.   DISCUSSION**

The Court begins its analysis with the first *Winter* factor, the likelihood of success on the merits, and then takes up the remaining factors, the likelihood of irreparable harm, the balance of equities, and the public interest.

**A.   Likelihood of Success on the Merits**

NetChoice contends that it is likely to succeed on the merits of its claims that SB 1144 is preempted by the INFORM Act (Count 1) and Section 230 (Count 2), and that SB 1144 violates the First Amendment (Count 3). At the hearing, NetChoice's counsel clarified that the preemption claim grounded in the INFORM Act (Count 1) is directed only to Section 3 of SB 1144, while the preemption claim grounded in Section 230 (Count 2) is directed only to Section 6 of SB 1144. NetChoice's First Amendment claim (Count 3) is directed to both Section 3 and Section 6 of SB 1144. The State argues that NetChoice is not likely to succeed on any of its claims.

**1.   Whether NetChoice Raises Proper Facial and As-Applied Challenges**

Before taking up NetChoice's claims, the Court addresses the State's contention that NetChoice cannot show likelihood of success on the merits of its claims because NetChoice has not raised a proper facial challenge to SB 1144 and lacks standing to bring an as-applied challenge to SB 1144 on behalf of its members.

NetChoice's complaint does not allege whether its federal preemption and constitutional claims are brought as facial or as-applied challenges to SB 1144, although the complaint does seek a declaration "that SB 1144 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice and its members." Compl. Prayer ¶ 1. NetChoice's motion does not indicate whether it raises facial or

as-applied challenges to SB 1144 in support of its request for injunctive relief. In its reply, NetChoice argues that it has raised a proper facial challenge and that it has associational standing to bring an as-applied challenge on behalf of its members that are regulated by SB 1144.

Even if the Court were to assume that NetChoice has associational standing to bring an as-applied challenge to SB 1144, NetChoice has not done so in any meaningful way here. "Where a plaintiff seeks to challenge a statute prior to enforcement, there must be a genuine threat of imminent prosecution." *Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025). "To determine whether a plaintiff has established such a threat, we consider: [1] whether the plaintiffs have articulated a concrete plan to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Id.* (internal quotation marks and citation omitted). NetChoice does not address any of these factors. "[T]he mere existence of a statute is insufficient to create a ripe controversy[.]" *Id.* (internal quotation marks and citation omitted). Accordingly, the Court finds that NetChoice has not demonstrated a likelihood of success on the merits of its claims to the extent they are as-applied challenges to SB 1144.

The Court therefore considers whether NetChoice has shown that it likely to succeed on the merits of a facial challenge to SB 1144 on federal preemption or First Amendment grounds. "As the Supreme Court explained in *United States v. Salerno*, 'a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'" *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 938 (9th Cir. 2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "The *Salerno* rule applies to a federal preemption facial challenge to a state statute." *Id.* "However, *Salerno* does not require a plaintiff to show that every provision within a particular multifaceted enactment is invalid." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1049 (9th Cir. 2007). "In other words, some of the provisions might be facially invalid, and [some] might not." *Id.* Accordingly, when considering NetChoice's facial challenge to SB 1144 on express preemption grounds, the Court will determine

whether each challenged provision satisfies the *Salerno* rule.

NetChoice's facial challenge to SB 1144 under the First Amendment is subject to "a less demanding though still rigorous standard." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "The question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. (internal quotation marks, citation, and brackets omitted).

In summary, the Court analyzes NetChoice's motion for preliminary injunction as based on facial challenges to SB 1144 on federal preemption and First Amendment grounds. With respect to the facial challenge on federal preemption grounds, NetChoice must show that it is likely to succeed in showing that there is no set of circumstances under which the challenged provisions of SB 1144 would be valid. With respect to the facial challenge on First Amendment grounds, NetChoice must show that it is likely to succeed in showing that a substantial number of each challenged provision's applications are unconstitutional judged in relation to the provision's plainly legitimate sweep.

### 2.  Preemption under the INFORM Act (Count 1)

NetChoice argues in its motion that Section 3 of SB 1144 is expressly preempted under the INFORM Act. In its papers, this argument is limited to SB 1144 Section 3's amendment to the definition of "high-volume third-party seller" in California Civil Code § 1749.8(b). At the hearing, NetChoice's counsel made the additional argument that SB 1144 Section 3's amendment to the definition of "online marketplace" in California Civil Code § 1749.8(c) also is preempted by the INFORM Act. The State contends that Section 3 does not fall within the scope of the INFORM Act's express preemption clause.

#### a.  Legal Standard Re Express Preemption

"The Supremacy Clause provides that the laws of the United States 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1152 (9th Cir. 2022) (quoting U.S. Const. art. VI, cl. 2.). "As a result, it has long been settled that state laws that conflict with federal law are without effect." *Id*. (internal quotation marks and citation omitted).

8

"Congress may expressly preempt state law by enacting a clear statement to that effect." *Baden*, 107 F.4th at 939 (9th Cir. 2024) (internal quotation marks and citation omitted). "Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Id*. "[C]ongressional purpose is the ultimate touchstone in every pre-emption case, and the plain wording of the express preemption clause necessarily contains the best evidence of Congress's preemptive intent." *Id*. (internal quotation marks, citation, and brackets omitted).

### b.      INFORM Act's Express Preemption Clause

The INFORM Act's express preemption clause reads as follows: "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section." 15 U.S.C. § 45f(g).

The statute does not provide any specialized definition of "conflict," so the "court should construe that term in accordance with its ordinary, contemporary, common meaning." *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) (internal quotation marks and citation omitted). NetChoice argues that Congress's use of the word "conflict" indicates an intent to broadly preempt any state law that "differs," is "at variance," or is not "in agreement or accord" with the INFORM Act. The State argues that use of the word "conflict" indicates that Congress intended only narrow preemption, limited to state laws that are "in opposition to" or "incompatible" with the INFORM Act.

### c.      SB 1144 Section 3's Amendment to Cal. Civ. Code § 1749.8(b)

Even accepting the State's narrower construction of the word "conflict" as used in the INFORM Act's express preemption clause, this Court finds that NetChoice is likely to prevail on its claim that Section 3 of SB 1144 is preempted to the extent it amends the definition of "high-volume third-party seller" in California Civil Code § 1749.8(b).

The INFORM Act provides that when determining who is a high-volume third-party seller, "an online marketplace shall *only* be required to count sales or transactions made *through* the

9

online marketplace and for which *payment was processed by* the online marketplace, either directly or through its payment processor." 15 U.S.C. § 45f(f)(3)(B) (emphasis added).

While the prior version of California Civil Code § 1749.8(b) contained a similar provision expressly limiting sales counted when determining who is a high-volume third-party seller to sales made "through" the online marketplace, and for which payment was processed by the online marketplace, SB 1144 Section 3 eliminated those limitations. As amended, California Civil Code § 1749.8(b) reads as follows:

> "High-volume third-party seller" means a third-party seller on an online marketplace who, in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete transactions *utilizing* the online marketplace for the sale of new or unused consumer products to buyers located in California resulting in the accumulation of an aggregate total of five thousand dollars ($5,000) or more in gross revenues.

Cal. Civ. Code § 1749(b) (as amended 2024) (emphasis added). There is no dispute that under the amended version of § 1749(b), an online marketplace must determine who is a high-volume third-party seller by counting third-party sales entered into "utilizing" the online marketplace, whether processed through the online marketplace or conducted off-platform in direct transactions between buyers and sellers.

A straightforward comparison between the INFORM Act and the amended version of California Civil Code § 1749.8(b) makes clear that the two are in opposition and incompatible. Section § 1749.8(b) now requires an online marketplace to count *both* transactions made through the online marketplace and transactions made outside of the online marketplace when determining who is a high-volume third-party seller, while the INFORM Act requires an online marketplace to count *only* transactions made through the online marketplace. Both requirements cannot be satisfied simultaneously. The only other court to address this issue concluded that an identical provision of Georgia law is expressly preempted by the INFORM Act, observing that "[o]nly means only." *Carr*, 2024 WL 3262633, at *3. Given this Court's reading of the two statutes, and the holding of the only relevant case to date, the Court finds unpersuasive the State's arguments that the two statutes are not incompatible.

NetChoice argues that because SB 1144 Section 3's amendment to California Civil Code §

1749.8(b) is expressly preempted by the INFORM Act, it is invalid in all its applications and therefore meets the *Salerno* standard. The Court agrees. Accordingly, the Court finds that NetChoice has shown a likelihood of success on the merits of Count 1 to the extent based on SB 1144 Section 3's amendment to California Civil Code § 1749.8(b).

### d.      SB 1144 Section 3's Amendment to Cal. Civ. Code § 1749.8(c)

As noted above, the Court does not understand NetChoice's papers to argue that the INFORM Act also preempts SB 1144 Section 3's amendment to the definition of "online marketplace" in California Civil Code § 1749.8(c). However, because NetChoice's counsel made that argument at the hearing, the Court addresses it here. The Court finds that NetChoice has not shown it is likely to prevail on its claim that Section 3 of SB 1144 is preempted to the extent it amends the definition of "online marketplace" in California Civil Code § 1749.8(c).

The INFORM Act limits the definition of "online marketplace" to platforms having "a contractual or similar relationship with consumers governing their use of the platform to purchase consumer products." 15 U.S.C. § 45f(f)(4). Prior to amendment, § 1749.8(c) contained a similar limitation that the online marketplace have "a contractual relationship with consumers governing their use of the platform to purchase consumer products." Cal. Civ. Code § 1749.8(c) (prior version). The amended version of California Civil Code § 1749.8(c) omits that limitation, now reading as follows:

> "Online marketplace" means a consumer-directed, electronically accessed platform that includes features that allow for, facilitate, or enable a third-party seller to engage in the sale, purchase, payment, storage, shipment, or delivery of a consumer product in this state.

Cal. Civ. Code § 1749.8(c) (as amended 2024).

The Court is not persuaded that this amended definition of California Civil Code § 1749.8(c) is in opposition to or incompatible with the INFORM Act. The state law definition of online marketplace certainly is broader than the INFORM Act's definition of online marketplace. However, that a state law imposes requirements additional to a federal law does not mean the two are in conflict. *See Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023) (state law that supplements federal law, and does not stand as obstacle to federal objectives, is not inconsistent

1   with federal law for preemption purposes).  Unlike its argument with respect to the definition of

2   high-volume third-party seller, which NetChoice supports with case law finding express

3   preemption on identical facts, the present argument is not supported by any case cited in the briefs

4   or at the hearing.

### e. Conclusion Re Express Preemption of SB 1144 Section 3

In conclusion, the Court finds that NetChoice has shown that it is likely to succeed on the merits of its claim that Section 3 of SB 1144 is preempted by the INFORM Act (Count 1), but only to the extent Section 3 of SB 1144 amends the definition of "high-volume third-party seller" in California Civil Code § 1749.8(b).

### 3. Preemption under Section 230 (Count 2)

NetChoice asserts that Section 6 of SB 1144 is expressly preempted by Section 230. Section 6 adds a new provision to Title 1.4D, California Civil Code § 1749.8.9, imposing new obligations on online marketplaces to monitor third-party content, remove third-party content, and alert law enforcement whenever the online marketplace "knows or should know" of sales or attempted sales of stolen goods to California residents.  SB 1144 § 6.  The State contends that Section 6 of SB 1144 does not fall within Section 230's express preemption clause.

### a. Section 230's Express Preemption Clause

Section 230 contains an express preemption clause providing that: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

### b. Scope of Section 230

"Under § 230 of the Communications Decency Act of 1996, interactive computer service providers are immune from state law liability when plaintiffs seek to treat those providers as publishers of third-party content."  *Doe v. Grindr Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025).  As applied to state law claims, Section 230 "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id*. (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009)).

Here, there is no question that Title 1.4D, as amended by SB 1144 Section 6, gives rise to potential liability of interactive computer services, that is, online marketplaces (first prong), and regulates content provided by third parties rather than the online marketplaces themselves (third prong). Accordingly, the Court focuses on the second prong, which "require us to consider . . . whether a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content." *Grindr*, 128 F.4th at 1151 (internal quotation marks and citation omitted).

"[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). Thus, if a duty imposed by state law "requires that [the defendant] moderate content to fulfill its duty, then § 230 immunity attaches." *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177 (9th Cir. 2024). Finally, if the duty imposed by state law "obliges the defendant to monitor third-party content – or else face liability – then that too is barred" by Section 230. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024) (internal quotation marks and citation omitted).

### c. SB 1144 Section 6's Addition of Cal. Civ. Code § 1749.8.9

The new section of the California Civil Code added by Section 6 of 1144 reads:

(a) An online marketplace shall alert local, regional, or state law enforcement agencies in California if it knows or should know that a third-party seller is selling or attempting to sell stolen goods to a California resident, unless the online marketplace has received a notice from the law enforcement agency that the same third-party seller is suspected of selling or attempting to sell the same stolen goods on the online marketplace to a California resident.

(b)(1) An online marketplace shall do all of the following:

(A) Establish and maintain a policy prohibiting the sale of stolen goods on the online marketplace, which shall include consequences for knowingly selling stolen goods on the online marketplace, including, but not limited to, suspension or termination of the seller's account.

(B) Provide a mechanism on the online marketplace that allows any individual to notify the online marketplace that a seller is or may be selling stolen goods.

(C) Provide a mechanism on the online marketplace that allows the online marketplace and law enforcement to communicate in a timely and confidential manner, including by means of a link to a dedicated web page, online portal, or point of contact and ensure timely replies to law enforcement requests, including warrants, subpoenas, and other legal processes.

13

    (D) Maintain internal written policies, systems, and staff to monitor listings in order to affirmatively prevent and detect organized retail crime.

    (2) The policy and mechanism required by this subdivision shall be publicly posted and readily accessible to users.

    (c) This section shall become operative on July 1, 2025.

Cal. Civ. Code § 1749.8.9. An online marketplace's failure to comply with these provisions may subject it to civil penalties of up to $10,000 per violation and reasonable attorneys' fees and costs, as well as appropriate injunctive relief. *See* Cal. Civ. Code § 1749.8.4.

    NetChoice argues that three provisions of newly added California Civil Code § 1749.8.9 are preempted by Section 230: §§ 1749.8.9(a), (b)(1)(A), and (b)(1)(D). The Court finds that NetChoice is likely to prevail on the merits of Count 2 with respect to those provisions. Most obviously, California Civil Code § 1749.8.9(b)(1)(D) requires online marketplaces to "[m]aintain internal written policies, systems, and staff to *monitor* listings in order to affirmatively prevent and detect organized retail crime." Cal. Civ. Code § 1749.8.9(b)(1)(D) (emphasis added). Based on information obtained through the required monitoring, an online marketplace must take certain actions, including alerting law enforcement if the online marketplace "knows or should know that a third-party seller is selling or attempting to sell stolen goods to a California resident." *Id*. § 1749.8.9(a). The "alerting" requirement can be fulfilled only by monitoring third-party sellers' online content. In addition, online marketplaces must establish policies prohibiting the sale of stolen goods on the online marketplace, and impose "consequences for knowingly selling stolen goods on the online marketplace, including, but not limited to, suspension or termination of the seller's account." *Id*. § (b)(1)(A). That is, the online marketplace must moderate third-party content, deciding whether to publish or to withdraw it from the platform. The Court finds that NetChoice is likely to prevail on its preemption claim grounded in Section 230 (Count 2) as to SB 1144 Section 6's addition of California Civil Code §§ 1749.8.9(a), (b)(1)(A), and (b)(1)(D).

    The other provisions of California Civil Code § 1749.8.9 do not implicate an online marketplace's role as a publisher. For example, § 1749.8.9(b)(1)(B) requires that an online marketplace provide a mechanism to allow individuals to report suspicious conduct by third-party sellers, while § 1749.8.9(b)(1)(C) requires that an online marketplace provide a mechanism to

14

facilitate communication with law enforcement. Those requirements do not involve publication of third-party content and thus does not trigger Section 230. While § 1749.8.9(b)(2) requires publication of the policy and mechanism mandated by other subsections, such publication is not of third-party content. Finally, § 1749.8.9(c) merely states the effective date of the new statutory section.

The State's opposition focuses largely on provisions of SB 1144 that are not implicated by NetChoice's Section 230 claim, and for that reason those arguments are not persuasive. The Court likewise is not persuaded by the State's attempts to characterize controlling case law as less than definite with respect to Section 230's bar on liability flowing from a state law requiring an online service to publish, withdraw, moderate, or monitor third-party content. In the Court's view, *Grindr*, *Calise*, *Estate of Bride*, and *Barnes* make clear that the identified provisions of California Civil Code § 1749.8.9 fall within Section 230's preemption clause. Finally, the State's reliance on legislative purpose is misplaced where, as here, the text of Section 230 is clear as construed by controlling case law.

### d. Conclusion Re Express Preemption of SB 1144 Section 6

The Ninth Circuit has emphasized that "§ 230 immunity is extraordinarily powerful, granting complete immunity where it applies and, in the process, preempting even the will of the people as expressed in their state legislatures." *Est. of Bride*, 112 F.4th at 1176-77. Based on the foregoing, the Court finds that NetChoice is likely to succeed in showing that California Civil Code §§ 1749.8.9(a), (b)(1)(A), and (b)(1)(D) are expressly preempted by Section 230 and thus are invalid in all their applications as required under *Salerno*. Accordingly, the Court concludes that NetChoice is likely to prevail on its preemption claim grounded in Section 230 (Count 2) to the extent SB 1144 Section 6 adds California Civil Code §§ 1749.8.9(a), (b)(1)(A), and (b)(1)(D).

### 4. Violation of the First Amendment (Count 3)

NetChoice argues that SB 1144 violates the First Amendment. However, the only provisions of SB 1144 challenged on First Amendment grounds in NetChoice's motion are the same provisions as to which the Court has found NetChoice likely to succeed on preemption grounds. Accordingly, the Court need not address whether NetChoice is likely to succeed on the

15

merits of its First Amendment challenges to those provisions as well.

### B. Remaining *Winter* Factors

Having found that NetChoice has shown a likelihood of success on the merits of its claims of preemption under the INFORM Act (Count 1) and Section 230 (Count 2), the Court takes up the remaining *Winter* factors, the likelihood of irreparable harm, the balance of equities, and the public interest.

NetChoice presents evidence that its members will suffer unrecoverable costs in complying with SB 1144 if a preliminary injunction does not issue. *See* Pl.'s Ex. B (Cleland Decl.) ¶ 8; Ex. C (O'Connell Decl.) ¶ 40; Ex. D (Garnett Decl.) ¶ 25. While economic harm ordinarily is not considered irreparable, "where parties cannot typically recover monetary damages flowing from their injury . . . economic harm can be considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

The State presents the declaration of its expert, Dr. Serge Egelman, who states that at least one NetChoice member already collects information regarding transactions completed outside of the online marketplace. *See* Egelman Decl. ¶ 16, ECF 30-1. Dr. Egelman also opines that NetChoice's members are incentivized to collect information made "utilizing" their platforms even where the transactions are not completed on the platforms, because such information can provide insights about the platforms that can later be monetized. *See id.* ¶¶ 22-25. The State's evidence that some NetChoice members voluntarily incur costs to collect information about sales transactions that are not processed through an online marketplace does not negate NetChoice's showing that at least some of its members will be forced to incur unrecoverable costs to comply with SB 1144 absent an injunction. That the amount of such economic injury is not established with precision does not undercut NetChoice's position, because "[t]he analysis focuses on irreparability, irrespective of the magnitude of the injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (internal quotation marks and citation omitted).

Nor is the Court persuaded by the State's argument that NetChoice's irreparable harm argument is negated by its delay in seeking injunctive relief. In *Garcia*, cited by the State, the plaintiff waited months *after* the offending film was uploaded to YouTube before seeking an

16

1  injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015). Here, NetChoice filed its complaint and motion for preliminary injunction more than two months before SB 1144's operative date of July 1, 2044.

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020); *see also Baird v. Bonta*, 81 F.4th 1036, 1039-40 (9th Cir. 2023). Those merged factors favor NetChoice. The State cannot reasonably assert that it has a protectible interest in enforcing federally preempted state law, or that the public interest will be impaired if the State is enjoined from enforcing federally preempted state law.

### C. Conclusion re Entitlement to Preliminary Injunction

"Likelihood of success on the merits is the most important factor" in deciding whether to issue a preliminary injunction. *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir. 2021) (internal quotation marks and citation omitted). As discussed above, the Court concludes that NetChoice has shown a likelihood of success on its claims of preemption under the Inform Act (Claim 1) and Section 230 (Claim 2). Specifically, NetChoice has shown that Section 3 of SB 1144 likely is preempted by the INFORM Act to the extent Section 3 of SB 1144 amends California Civil Code § 1749.8(b), and that Section 6 of SB 1144 likely is preempted by Section 230 to the extent Section 6 of SB 1144 adds California Civil Code § 1749.8.9(a), (b)(1)(A), and (b)(1)(D).

NetChoice also has demonstrated a likelihood that it will suffer irreparable harm absent preliminary injunctive relief, and that the merged factors – the balance of hardships and the public interest – weigh in its favor.

When a plaintiff makes a sufficient showing on all four *Winter* factors, issuance of a preliminary injunction is warranted, even if issuance of the injunction will involve intrusion into an agency's administration of state law. *See Baird*, 81 F.4th at 1041.

Accordingly, NetChoice's motion for preliminary injunction will be GRANTED.

### D. Security

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary

17

1  injunction or a temporary restraining order only if the movant gives security in an amount that the
2  court considers proper to pay the costs and damages sustained by any party found to have been
3  wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The Ninth Circuit has "recognized that
4  Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*."
5  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation
6  omitted) (italics in original).  Thus, the district court has discretion to dispense with the filing of a
7  bond altogether, or to require only a nominal bond.  *See id*.

The parties have not addressed the issue of bond.  The Court finds it appropriate to issue a preliminary injunction without the requirement of a security bond.

**IV. ORDER**

(1) Rob Bonta, Attorney General of the State of California, and all officers, agents, and employees subject to his supervision, direction, or control, are ENJOINED from enforcing the following provisions of SB 1144:

    (a) Section 3 of SB 1144 to the extent it amends California Civil Code § 1749.8(b); and

    (b) Section 6 of SB 1144 to the extent it adds California Civil Code §§ 1749.8.9(a), (b)(1)(A), and (b)(1)(D).

(2) This preliminary injunction shall issue without the requirement of a security bond; and

(3) This preliminary injunction shall take effect immediately and shall remain in effect until otherwise ordered by the Court.

Dated: July 11, 2025

BETH LABSON FREEMAN
United States District Judge